**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN JOSE DIVISION**

| | |
|---|---|
| JOHN DOE I et al. on behalf of themselves and all others similarly situated,<br><br>        Plaintiffs,<br><br>    v.<br><br>GOOGLE LLC,<br><br>        Defendant. | Case No. 3:23-cv-02431-VC |

**DECLARATION OF GEORGIOS ZERVAS, PH.D.**
**AUGUST 3, 2023**

**TABLE OF CONTENTS**

I.  INTRODUCTION AND QUALIFICATIONS ...................................................................1

    A.  Qualifications ..................................................................................................1

    B.  Assignment ....................................................................................................2

    C.  Facts and Data Considered.............................................................................4

    D.  Summary of Plaintiffs' Allegations ...............................................................4

II.  SUMMARY OF OPINIONS ........................................................................................8

III.  GOOGLE PRODUCTS AND SERVICES..................................................................12

    A.  Technology Behind Modern Websites and Apps .........................................12
        1.  Third-Party Web Services .................................................................. 12
        2.  Data Transmissions Between Modern Web Properties and
            Web Servers ....................................................................................... 14
        3.  Cookies .............................................................................................. 19

    B.  Google's Third-Party Services......................................................................24

    C.  Google Analytics Services............................................................................26
        1.  Analytics Products Offered by Google .............................................. 26
        2.  How Google Analytics Works ........................................................... 28

    D.  Google Advertising Services.........................................................................34
        1.  Google Advertising Products for Advertisers..................................... 34
        2.  Google Advertising Products for Publishers....................................... 36
        3.  Types of Online Advertising Offered by Google ................................ 37
        4.  Integration of Google Analytics and Advertising Services ..................... 45
        5.  How Google Advertising Services Work ................................................ 47

IV.  GOOGLE EMPLOYS A VARIETY OF MEASURES TO PREVENT
    TRANSMISSION OF PROTECTED HEALTH INFORMATION AND
    USE OF DATA FROM HEALTHCARE PROVIDER WEB PROPERTIES
    FOR REMARKETING AND PERSONALIZED ADVERTISING ...................................49

    A.  Google Implemented Measures to Prevent the Transmission and Use
        of PHI in Remarketing and Personalized Advertising................................51
        1.  Google Prohibits Transmission of PHI and Helps
            Developers Abide by the Terms of Service to Which They
            Consent .............................................................................................. 52
        2.  Google Proactively Classifies Web Properties to Prevent
            the Use of Potentially Sensitive Information ............................................. 61
        3.  Google Internal Data Policies and Practices Anonymize
            Data and Prevent Identifying Individuals ................................................. 65

    B.  Developers Are Responsible for Data They Transmit to Google and
        Have Information and Tools Needed to Prevent Transmission of PHI .....................70

        1.  Google Does Not Intercept User Data, Rather Developers Choose to Include or Remove Code from Their Web Properties ........................................................................ 70

        2.  Developers Make Explicit Choices Relating to What Data to Transmit to Google ................................................. 72

        3.  Developers Are Required to Inform Visitors of Their Web Property about the Use of Cookies and Data Transmission ................... 75

  C.  Users Can and Do Prevent Data Transmissions to Google ........................................... 81

        1.  Cookie Settings .................................................................. 82

        2.  Browsers Add-ons .............................................................. 84

        3.  Browser-Related Measures ................................................ 85

        4.  Users Can Limit Cookie Transmissions for Websites that Implement Consent Prompt ............................................. 89

        5.  Users Can Limit Transmissions of Advertising Identifiers to Google ........................................................................... 92

        6.  VPN ................................................................................... 94

V.  PLAINTIFFS' EXPERTS MAKE MISLEADING STATEMENTS THAT ARE BASED ON INCORRECT UNDERSTANDING OF RELEVANT TECHNOLOGIES AND IGNORE THE MEASURES GOOGLE HAS IN PLACE TO PREVENT INAPPROPRIATE USE OF DATA ............................................. 96

  A.  The Libert Declaration ......................................................... 97

        1.  Dr. Libert's Analysis Is Based on an Unscientific Sample ...................... 98

        2.  Dr. Libert's Assumptions Regarding Network Transmissions Are Unsupported ........................................ 102

  B.  The Smith Declaration ......................................................... 105

        1.  Mr. Smith Acknowledges That Developers Choose to Include or Remove Code from Websites and Apps ............................... 107

        2.  Mr. Smith Speculates That Google Receives Users' PHI and Uses It in Personalized Advertising but Provides no Evidence to Support such Claim ...................................... 108

        3.  Only Individualized Inquiries Could Determine What, If Any, Health-Related Information Was Ever Transmitted to Google's Servers ............................................................. 108

  C.  The Shafiq Declaration ......................................................... 109

        1.  Dr. Shafiq's Analysis of Google's Abilities to Identify Users Is Unreliable and Unsupported .................................... 110

        2.  Dr. Shafiq Fails to Acknowledge That Google Already Uses Classification Systems to Prevent the Use of Sensitive Information in Personalized Ads ........................................... 116

## I.      INTRODUCTION AND QUALIFICATIONS

### A.      Qualifications

1. I am an Associate Professor of Marketing at Boston University Questrom School of Business, a founding member of the Faculty of Computing & Data Sciences, and Affiliated Faculty of the Department of Computer Science. I am also a visiting researcher at Microsoft Research New England. Prior to joining the Boston University faculty, I held various academic roles, including visiting scholar at the MIT Sloan School of Management, Simons Postdoctoral Fellow at Yale University, and affiliate at the Center for Research on Computation and Society at Harvard University's John A. Paulson School of Engineering and Applied Sciences. I am an associate editor of ACM Transactions on Economics and Computation, and I sit on the editorial review boards of Marketing Science, the Journal of Marketing Research, and the Journal of Marketing.

2. My research combines methods from computer science and economics to study online marketplaces to understand their impact on consumer and firm behavior. I have conducted studies of online marketplaces such as Airbnb, Yelp, TripAdvisor, and Expedia. My work is empirical in nature and includes assembling and analyzing novel sources of data that I collect from these marketplaces to study their operation. I hold a Bachelor of Engineering and a Master of Science in Computer Science from Imperial College London, a Master of Arts in Interactive Media from London College of Communication, and a Ph.D. in Computer Science from Boston University. Before pursuing my Ph.D. in Computer Science, I ran a small information technology company. My C.V. is attached as **Appendix A**.

3. I am being compensated at the rate of $800 per hour for my time working on this case. Research and analysis for this report was also performed by Analysis Group, Inc. personnel under my direction and guidance. In addition, I receive a portion of the fees paid to Analysis Group, Inc. for its work. This compensation is not contingent on the nature of my findings or the outcome of this litigation.

**B.    Assignment**

4. I have been retained by counsel for Google to explain relevant technologies at issue and assess whether Plaintiffs' and Plaintiffs' experts' descriptions of these technologies are factually and technically accurate.

5. In particular, I have been engaged by counsel for Google to:

a. Describe the technology behind Google products and services, including Google Analytics and Advertising services,[1] Google APIs, YouTube, Google Tag and Tag Manager and other products and services that may facilitate transmissions of information from web properties to Google's domains.[2,3] I was also asked to explain how these services operate in terms of transmissions of user data and

---

[1]   In my declaration, I collectively refer to Google Analytics 4, Universal Analytics, Google Analytics 360, and Google Analytics for Firebase as Google Analytics services and to Google Ads and Display Ads as Google Advertising services. I also refer to them together as Google Analytics and Advertising services.

[2]   For the list of Google products alleged to be at issue, *see* Consolidated Class Action Complaint, *John Doe I, et al. v. Google LLC*, 3:23-cv-02431-VC, July 13, 2023 ("Complaint"), fn. 3 and ¶ 45.

[3]   I use the term "web properties" to refer to websites or apps accessible via the Internet.

whether the data these services transmit can be used for remarketing and personalized advertising.

b. Analyze policies, measures, and practices Google has put in place to prevent transmission and use of personal health-related data for remarketing and personalized advertising.[4]

c. Assess tools that Google provides developers[5] and discuss responsibilities that developers have in preventing transmission of personal health-related information to Google and any inadvertent use for remarketing and personalized advertising.

d. Explain measures that users have to prevent transmissions of their private health-related information to Google and other third parties, if any of such transmissions remain after steps taken by Google and developers.

e. Assess and respond to certain opinions expressed by Dr. Libert,[6] Mr. Smith,[7] and Dr. Shafiq.[8] Any specific sentence or opinion in the Plaintiffs' experts' declarations

---

[4]   Plaintiffs' Notice of Motion and Motion for Preliminary Injunction and Provisional Class Certification, *John Doe I, et al. v. Google LLC*, 3:23-cv-02431-VC, July 13, 2023 ("Motion for Preliminary Injunction").

[5]   Throughout this report, I refer to developers as those who own or develop apps and websites, or have controls over decisions relevant to my opinions, such as whether to insert certain code or which third-party services to use.

[6]   Declaration of Dr. Timothy Libert in Support of Plaintiffs' Motion for Preliminary Injunction and Provisional Class Certification, *John Doe I, et al. v. Google LLC*, 5:23-cv-02431-BLF, July 28, 2023 ("Libert Declaration").

[7]   Declaration of Richard M. Smith in Support of Plaintiffs' Motion for Preliminary Injunction and Provisional Class Certification, *John Doe I, et al. v. Google LLC*, 3:23-cv-02431-BLF, July 13, 2023 ("Smith Declaration").

[8]   Declaration of Dr. Zubair Shafiq in Support of Plaintiffs' Motion for Preliminary Injunction and Provisional Class Certification, *John Doe I, et al. v. Google LLC*, 5:23-cv-02431-BLF, July 13, 2023 ("Shafiq Declaration").

or in the Complaint that I do not address should not be construed as an implied agreement with those sentences or opinions.

### C.     Facts and Data Considered

6. In forming my opinions, I reviewed documents and other materials provided to me by counsel for Google and obtained from public sources. These materials include, among others, declarations of Plaintiffs' experts and the documents they produced (referred to herein as "backup" files), declarations of Google employees, public documents describing the functionality of Google's products and services, and applicable terms of service and policies. The sources I considered in preparation of this report are listed in the attached **Appendix B**.

7. My work on this matter is ongoing, and I reserve the right to update, refine, or revise my opinions, as well as form further opinions, if I review additional materials or conduct further analysis in this matter.

### D.     Summary of Plaintiffs' Allegations

8. I understand that Plaintiffs allege that Google LLC ("Google"):[9]

---

[9]   Throughout this report, I refer to Defendant Google LLC as "Google" even for a period starting October 2015 when the company became a part of "Alphabet." *See* Anthony Ha, "Google Officially Becomes Alphabet," TechCrunch, October 2, 2015, https://techcrunch.com/2015/10/02/google-becomes-alphabet/.

a.  unlawfully and secretly tracked, collected, intercepted, and monetized users' private health information by means of providing website and app developers with Google's code to access Google services;[10]

b.  connected and aggregated data received by means of developers inserting Google's code in the code of their web properties and Google using those data to compile "detailed and precise profiles" on users and to generate for advertising revenue;[11] and

c.  violated Google's own terms of service and privacy policies.[12]

9.  I understand that Plaintiffs' allegations concern the following types of data:

a.  ***Identifiers***: names, geolocation, demographic information, IP address, User-Agent, advertising identifiers (i.e., IDFA and AdID), app instance ID, "device qualities

---

[10]  Complaint, ¶¶ 1, 4, 37, 40. I understand that while Plaintiffs' allegations relate to Google's code that may be embedded into either websites or mobile applications, Plaintiffs' experts only discuss websites.

[11]  Complaint, ¶ 6 ("Upon receipt of this unlawfully obtained Health Information, Google uses the information for marketing in its advertising systems and products[.] Google connects and aggregates the Health Information, along with other information that Google has acquired about individuals. In doing so, Google is able to amplify the knowledge and insight it has about patients, compile detailed and precise profiles on patients, and monetize that information into advertising revenue.").

[12]  Complaint, ¶ 9 ("Even if one puts aside the federal and state law requirements, Google's own terms of service and privacy policy assure users of all Google products that it will not collect Health Information without users' consent. And, as detailed below, Google assures users that it will comply with applicable laws, that it will not collect Health Information without consent, and that it will not use that information for purposes of personalized advertising. Through the Google Source Code, Google routinely and systematically violates its promises.").

sufficient to uniquely identify the device," publisher provided identifier, cookies, and URL parameters.[13]

b. ***User actions and associated information***: (1) website browsing history; (2) URL, which purportedly reveals the meaning of communications between patients and healthcare providers and actions taken by users on a website; (3) information that users enter into online forms; (4) timing and frequency of user visits to healthcare providers' websites; (5) information collected from healthcare providers through customer lists.[14]

10.     Plaintiffs claim that Google is unlawfully obtaining "health information" (defined as an individual's status as a patient), "unique patient identifiers," actions taken by patients, and "content of communications" with their healthcare providers from 87% of the websites analyzed by one of their experts.[15,16] They claim that each of Google's at-issue

---

[13]   Complaint, ¶ 34.

[14]   Complaint, ¶ 36.

[15]   Complaint, ¶ 2 ("[T]he private health information at issue includes an individual's status as a patient of a Health Care Provider, unique patient identifiers, the specific actions taken by patients on their Health Care Provider web properties (e.g. specific time and frequency of each patient interaction, such as when a patient logs in and logs out of an online patient portal, requests an appointment, or seeks information about a specific doctor, condition, treatment, or prescription drug), and content of communications that patients exchange with their Health Care Providers ("Health Information"). Content information, in turn, includes information pertaining to patient registrations, access to, and communications with their Health Care Provider within authenticated webpages (i.e. webpages that require log-in or other authentication, such as a patient portal), as well as content information pertaining to patient access to and communications with their Health Care Provider on unauthenticated web pages (e.g. communications relating to specific doctors, appointment requests, symptoms, conditions, treatments, insurance, and prescription drugs).").

[16]   Complaint, ¶ 143 ("Upon information and belief, based on investigation by counsel, an analysis of 6,046 Health Care Providers' web properties reveals that Google Source Code is present on, and thus Google is unlawfully tracking and acquiring patient Health Information

products and services allegedly transmits "persistent unique identifiers" or event data to Google, which Google allegedly uses for its marketing and advertising purposes.[17] Plaintiffs and their expert presumably arrive at this conclusion by analyzing transmissions triggered by code on some web pages within each of the websites and flagging any transmissions made to one of a selected list of Google domains.[18]

11. I understand that Plaintiffs are seeking a preliminary injunction that would:

a. Stop Google from "intercepting" health-related information received from healthcare providers' web properties through Google's technologies, including Google Analytics, Google Ads, Google Display Ads, Google Tag and Tag Manager, Firebase SDK, Google APIs, and YouTube;[19] and

---

from 87% of the Health Care Provider web properties examined."). Plaintiffs' breakdown by Google product includes, for example, Google Analytics: "67% (4,666 Health Care Provider web properties) for Google Analytics[.]" These numbers cannot all be true at the same time, since 67% of 6,046 is approximately 4,051. Plaintiffs therefore either misrepresent the number of web properties analyzed and found to contain no transmissions to Google, or the number of web properties found to contain transmissions. I believe 6,046 represents the number of web properties that Dr. Libert identified as generating network transmissions to selected Google domains, not the total number of web properties analyzed. *See also* Libert Declaration, ¶ 23.

[17]   Complaint, ¶ 101.

[18]   For the list of domains at issue, *see* Libert Declaration, ¶ 22.

[19]   Motion for Preliminary Injunction, ¶ 1 ("Prohibit Google from continuing to acquire Health Information from Health Care Providers through Tracking Technologies associated with Google's advertising systems and products[.]") and fn. 2 ("This Code is associated with Google's advertising systems and products including, but not limited to, Google Analytics, Google Ads, Google Display Ads, Google Tag and Tag Manager, Firebase SDK, Google APIs, and YouTube.").

b.  Prevent Google from "using" users' health-related information, by removing it from Google's advertising systems.[20]

12.     I understand that Plaintiffs bring this class action on behalf of the following putative class and subclass:

a.  "All persons in the United States whose Health Information was obtained by Google from their Health Care Provider";[21] ("U.S. Class")

b.  "All Google Account Holders in the United States whose Health Information was obtained by Google from their Health Care Provider."[22] ("Google Account Holder Subclass")

## II.     SUMMARY OF OPINIONS

13.     I have reached the following opinions on the basis of my review of the information identified herein.

14.     **Section III.A:** Plaintiffs and their experts describe the operation of Google's tags, which developers incorporate in their web properties to enable functionalities of their choice, using such terms as "interception" or "commanding," none of which are correct. Third-party codes and tags, such as those offered by Google in relation to its analytics and advertising services, are ubiquitous for the development of modern apps and websites and require transmissions of data between browsers or apps and third-party servers to operate as

---

[20]  Motion for Preliminary Injunction, ¶ 2 ("Prohibit Google from using patients' Health Information that it has collected from Health Care Providers through its use of Google Source Code.").

[21]  Complaint, ¶ 301.

[22]  Complaint, ¶ 301.

intended. These transmissions occur because developers voluntarily decide to insert relevant code to their web properties (and can similarly decide to remove them), not because Google "commands" any web property or because Google "intercepts" any data transmissions.[23]

15.     **Section III.B:** Plaintiffs allege that Google's codes are present on healthcare provider web properties and that they trigger data transmissions to Google that contain health information of individuals who Google can identify using the information it receives and other information it may have previously received. However, the mere presence of transmissions, including the ones to Google's domains, does not imply that data in these transmissions were personally identifiable, let alone considered protected health information (PHI)[24] as defined under HIPAA.[25] Plaintiffs did nothing more than document that an arbitrary set of websites "contacted" Google without examining what information was actually transmitted. In many instances, depending on which Google service those

---

[23]  I use "codes" or "tags" (only applicable to websites) interchangeably to refer to snippets of third-party code that developers insert into the source code of their web properties.

[24]  Office for Civil Rights, "Summary of the HIPAA Privacy Rule," May 2003, https://www.hhs.gov/sites/default/files/privacysummary.pdf, pp. 3-4 ("The Privacy Rule protects all 'individually identifiable health information' […] 'Individually identifiable health information' is information, including demographic data, that relates to: the individual's past, present or future physical or mental health or condition[;] the provision of health care to the individual, or the past, present, or future payment for the provision of health care to the individual[;] and that identifies the individual or for which there is a reasonable basis to believe it can be used to identify the individual. Individually identifiable health information includes many common identifiers (e.g., name, address, birth date, Social Security Number).").

[25]  The Health Insurance Portability and Accountability Act of 1996 (HIPAA) is a federal law that established national standards in the management of individual identifiable health information. This law protects sensitive personal health information from being disclosed without patient's prior consent or acknowledgement. *See* Office of the Assistant Secretary for Planning and Evaluation, "Health Insurance Portability and Accountability Act of 1996," U.S. Department of Health and Human Services, Aug 20, 1996, https://aspe.hhs.gov/reports/health-insurance-portability-accountability-act-1996.

transmissions were facilitating, they may not have contained the third-party cookies Plaintiffs allege were used *to personalize ads*.

16.         **Sections III.C-III.D**: Plaintiffs incorrectly allege that Google associates the data it collects from health-related web properties to other information it has collected about users. Similar to other providers of advertising services, Google relies on a standard way to match a user's browsing activities across different websites: third-party cookies. But all other types of data received by Google Analytics, including first-party cookie values, *cannot by themselves* be used to match a user's browsing activities across websites and apps of different businesses, given how Google operates internally. Further, websites classified as "sensitive" by Google's internal classification tools, such as healthcare provider websites, cannot use Google's personalized advertising services and are restricted only to Google's advertising services that do not rely on personalization (such as targeting based on pre-defined Google audiences). That way, even if a website classified as "sensitive" inadvertently sends Google personally identifiable information (PII) or PHI, that information will not be used to personalize ads. In fact, beyond observing that transmissions to Google occurred and that healthcare providers' websites may serve ads, Plaintiffs showed no evidence of Google actually using any purported PHI contained in the information received in such transmissions *to personalize* ads.

17.         **Section IV**: Google has implemented a number of measures—e.g., classification systems and internal policies—to detect and limit the use of potentially sensitive data received from healthcare websites. Google cannot determine with certainty the instances in which a website or an app contains protected health-related data because Google lacks the necessary context to make that determination. Instead, Google has terms of service and

policies that prohibit developers from transmitting PHI to Google, and internal policies that prevent the use of that information for advertising. In addition, developers have controls that allow them to prevent transmissions of *any* potentially sensitive information to Google. Google cannot know in advance whether a website or app will violate these policies by, e.g., sending Google PHI even though Google instructed them not to. But this array of measures aimed at preventing transmissions that contain PII or PHI, and at barring the use of sensitive health information for personalized advertising, represents Google's efforts at ensuring its policies are followed. Further, when policies are not followed, Google may take action against offending web properties. Finally, users also have a number of different tools that allow them to limit or prevent transmission of information to third parties.

18.     **Section V:** In the absence of any actual evidence that Google routinely and intentionally uses protected health information for personalized advertising, Plaintiffs and their experts present speculations, and unsupported and misleading analyses:

a.   Dr. Libert considers an arbitrary set of websites to conclude that some of them make network transmissions to Google domains. His analysis is unpersuasive due to analytical and methodological issues, and without consideration of the actual information transmitted and any subsequent use of that information.

b.   Mr. Smith considers a handful of websites and analyzes transmissions generated by these websites. He speculates about what Google does with the information it receives, and in particular, he claims without any support that Google uses such information in personalized advertising. He also acknowledges that developers can decide to insert (and therefore also remove) code to their web properties.

c.  In the absence of any factual basis, Dr. Shafiq speculates that the types of data Google allegedly receives—e.g., IP address—are enough for Google to identify users. Dr. Shafiq's proposed analysis of entropy is a flawed and irrelevant theoretical exercise that neglects real-world factors.

## III.   GOOGLE PRODUCTS AND SERVICES

### A.   Technology Behind Modern Websites and Apps

#### 1.   Third-Party Web Services

19.   Modern web properties contain complex features and include interactive and dynamic components. Developing and maintaining all pieces of such complex software would be infeasible even for many large entities, let alone small ones.[26] Therefore, developers often rely on readily available third-party code components and tools to streamline the website and app development process—e.g., Stripe and PayPal facilitate payments, Adobe Analytics and Google Analytics provide analytics services, and Bootstrap helps with website styling.[27]

---

[26]  For example, Uber relied on the Google Maps API to create its app. Without Google's third-party API, Uber would have had to develop its own mapping software, which would have required a huge hiring increase, or make drivers responsible for their own route. *See* Axos Bank, "APIs: The Proven Tool for Efficient Business Growth," July 1, 2020, https://www.axosbank.com/blog/APIs-The-Proven-Tool-for-Efficient-Business-Growth. *See e.g.*, Visa and Apigee, "Growing Your Business With APIs," https://usa.visa.com/content/dam/VCOM/download/partner-with-us/growing-business-api-whitepaper.pdf, accessed July 24, 2023; Small Business Trends, "Three Ways APIs Are Keeping Small Businesses Digitally Competitive," February 10, 2022, https://smallbiztrends.com/2022/02/api-and-digital-transformation.html ("Yet, many small businesses aren't set up to collect the data and insights they need to truly understand their customers. And to be fair, terms like "database" and "SQL" don't exactly signal an easy learning curve. With APIs, however, small businesses can easily and affordably capture the customer insights they need to drive better customer experiences.").

[27]  Adobe, "Adobe Analytics: Web Analytics for Better Business Intelligence," https://business.adobe.com/products/analytics/adobe-analytics.html, accessed July 24, 2023;

Third-party services, including those created by Google, are therefore ubiquitous in modern website and app development and unsurprisingly present in many web properties—this is how the modern Internet works.[28]

20.    Third-party services typically facilitate website and app development by providing code that developers can incorporate into their website's or app's code to enable functionalities of interest. Developers have full control over whether and how to integrate these third-party codes, including those provided by Google,[29] typically after agreeing to third-party providers' terms.[30] Developers—not third-party service providers—willingly choose to insert third-party code into their website or app to serve their needs.

---

W3 Schools, "What Is Bootstrap?,"
https://www.w3schools.com/whatis/whatis_bootstrap.asp, accessed July 24, 2023; Oleg Kopachovets, "3rd Party API Integration [Benefits, Our Experience, How-To]," ProCoders, March 5, 2023, https://procoders.tech/blog/how-to-integrate-third-party-api/; Ted Vrountas, "What Is the Meta Pixel & What Does It Do?," Instapage, https://instapage.com/blog/meta-pixel, accessed July 31, 2023. Similar third-party tools are also available for apps.

[28]   Virtualspirit, "A Complete Guide on Securing Third-Party APIs in Mobile Apps," March 7, 2023, https://virtualspirit.me/insights/169/a-complete-guide-on-securing-third-party-apis-in-mobile-apps ("In modern times, mobile and web development teams, as well as enterprises, are increasingly relying on various outsourced resources like open source code, outsourced development for their projects, etc. Third-party APIs, extensions, and applications are also becoming popular among them.").

[29]   For example, developers who use Google Analytics can incorporate "tags," which are short snippets of JavaScript code, into the HTML source code for their website. This is highly customizable to satisfy the customer's analytics and privacy needs, and Google offers a tag management system called Google Tag Manager that allows Google Analytics customers to configure and deploy tags on their website via a web-based user interface. Google, "Tag Manager Overview – Tag Manager Help,"
https://support.google.com/tagmanager/answer/6102821, accessed July 18, 2023; Google, "Set Up and Install Tag Manager – Tag Manager Help,"
https://support.google.com/tagmanager/answer/6103696, accessed July 18, 2023.

[30]   Google, "Developer Program Policy – Play Console Help,"
https://support.google.com/googleplay/android-developer/answer/13438822, accessed July 18, 2023 ("If you include third party code (for example, an SDK) in your app, you must

21.     Even though websites and apps may appear to the user as unified pages, they draw on many different files from various sources and are an amalgam of first- and third-party code that developers insert or write themselves. Any third-party code (from Google or other providers) that developers decide to include in the code of their website or app becomes a part of the website or app, along with other code written by the developers themselves.[31] Developers have the option to include or remove third-party code at any point, and therefore they have the ultimate decision over the design of their websites and apps.

2.     *Data Transmissions Between Modern Web Properties and Web Servers*

22.     The nature and content of Internet transmissions vary depending on the purpose and technical needs of those communications and may contain different types of data. Plaintiffs' allegation that Google's products "transmit persistent unique identifiers" in the context of using them to collect users' health information is wrong at multiple levels.[32] First, I have not seen any evidence presented by Plaintiffs or their experts that would show that names, geolocation (other than what is imperfectly implied by IP address), or demographic

---

ensure that the third party code used in your app, and that third party's practices with respect to user data from your app, are compliant with Google Play Developer Program policies, which include use and disclosure requirements. For example, you must ensure that your SDK providers do not sell personal and sensitive user data from your app. This requirement applies regardless of whether user data is transferred after being sent to a server, or by embedding third-party code in your app.").

[31]   For example, developers who wish to use Google Analytics in their websites should add the analytics.js library ("the Google Analytics tag") "near the top of the <head> tag and before any other script or CSS tags, and add the property ID of the Google Analytics property [they] wish to work with." Google, "Add analytics.js to Your Site – Analytics for Web (analytics.js) – Google Developers," https://developers.google.com/analytics/devguides/collection/analyticsjs, accessed July 18, 2023.

[32]   Complaint, ¶ 101.

information was present in web transmissions between users and web properties; these are not standard types of data contained in Internet communications. Second, IP address and User-Agent are fundamental building blocks present in the vast majority of web transmissions and are not something a developer decides to include in transmissions. So even though many of the transmissions that Plaintiffs take issue with may contain some data types Plaintiffs misleadingly portray as "unique patient identifiers,"[33] many of them do not contain cookie values, let alone cookie values that are used for advertising purposes.

23.      Even though I agree that IP addresses must be present in any web transmission as an essential component without which transmissions cannot occur, they cannot necessarily be used to identify specific individuals. For example, if multiple people in the same apartment are trying to access the same website, it is common that all of their web communications are routed through a router that has only one public IP address.[34] IP addresses are also not constant and often vary over time.[35] As I discuss in **Section V.C**, IP addresses

---

[33]   Complaint, ¶ 34. Their list of "unique patient identifiers" at issue includes IP addresses, User-Agent information, and various cookies.

[34]   Alex Chen and Nate Sales, "Multi-User IP Address Detection," Cloudflare, October 15, 2021, https://blog.cloudflare.com/multi-user-ip-address-detection/ ("In practice, IP addresses are more like postal addresses because they can be shared by more than one person at a time.").

Specifically, this type of network setup refers to the widely deployed Network Address Translation ("NAT") address allocation approach. *See* James F. Kurose and Keith W. Ross, *Computer Networking: A Top-Down Approach*, Pearson, 2020, pp. 344-347 ("The NAT-enabled router does not look like a router to the outside world. Instead, the NAT router behaves to the outside world as a single device with a single IP address […] In essence, the NAT-enabled router is hiding the details of the home network from the outside world.").

[35]   Most individual users' devices have dynamic IP addresses, which are assigned by the internet service provider ("ISP") and change periodically depending on the ISP, since it is more cost effective for the ISP to reuse IP addresses. Joshua Prime, "What Is a Dynamic IP Address?," OpenDNS, 2022, https://support.opendns.com/hc/en-us/articles/227987827-What-is-a-Dynamic-IP-Address-.20 ("A dynamic IP address is an IP address that changes from time to

alone cannot be used to identify individuals in many instances and I have seen no evidence from Plaintiffs that Google Analytics uses user IP addresses to associate data from multiple browsing sessions to one another.

24.     User-Agent is a string of characters that inform a server-recipient of web communications about an application (e.g., Chrome or Firefox browser) or an operating system (e.g., iOS or Android) that initiated the transmission to correctly handle the received information.[36] But knowledge of a user's browser version and operating system alone is not something typically used to identify any individuals or collect information about a user for ads personalization.[37,38] As I discuss in **Section V.C**, User-Agent typically contains standard

---

time unlike a static IP address. Most home networks are likely to have a dynamic IP address and the reason for this is because it is cost effective for Internet Service Providers (ISP's) to allocate dynamic IP addresses to their customers.").

[36]   Mozilla Developer, "User-Agent," https://developer.mozilla.org/en-US/docs/Web/HTTP/Headers/User-Agent, accessed July 24, 2023 ("The User-Agent request header is a characteristic string that lets servers and network peers identify the application, operating system, vendor, and/or version of the requesting user agent.").

[37]   Throughout the report, I refer to installations of browser applications (e.g., Chrome or Firefox) that have access to the same memory (i.e., cookies) as a "browser." In some instances, for example if the Chrome browser is updated, the updated browser version can reuse data of the previous version, which I would still refer to as the same "browser." However, two different browser brands (e.g., Chrome and Firefox) do not share data—i.e., cookie values available for the Chrome browser are not available for Firefox and vice versa. When a browser is opened and user browsing activities are not interrupted by closing a browser window, I refer to it as a "browsing session." *See* Dusan Vasic, "What Are Cookies? The Good and the Bad of Browser Cookies," May 5, 2023, https://dataprot.net/articles/what-are-cookies/ ("The influence of cookies is limited to a single browser on a single device. You can't store the same cookie data on multiple devices. Cookies can't be read by multiple browsers.").

[38]   In the current version of Google Analytics, developers have the option to disable the collection of User-Agent. Google, "[GA4] Collect Granular Location and Device Data - Analytics Help," https://support.google.com/analytics/answer/12002752, accessed August 3, 2023 ("If you disable this feature, then Analytics does not collect the following data: […] Browser User-Agent string [.]"). Declaration of Steve Ganem in Support of Defendant

information about user devices and operating systems that alone is not sufficiently unique to identify individuals in many instances and I have seen no evidence from Plaintiffs that Google Analytics uses User-Agent strings to associate data from multiple browsing sessions with one another.[39]

25.     The only other types of information included in Plaintiffs' list of "identifiers" that are at issue are cookies and advertising IDs—industry standard identifiers used to associate browsing activities relating to the same user. But many transmissions to Google do not contain such identifiers. I reviewed the backup files provided by Mr. Smith and saw that, as an example, Mr. Smith's visit to the MedStar Health website triggered a transmission to the Google Tag Manager domain but contained no cookie values.[40] Upon review of Mr. Smith's backup, I also noticed that the transmission to the Google Maps API domain triggered by the same visit to the MedStar Health website also contained no cookie values.[41]

---

Google LLC's Opposition to Plaintiffs' Motion for Preliminary Injunction, *John Doe I, et al. v. Google LLC*, Case No. 4:23-cv-02341-VC, August 2, 2023 ("Ganem Declaration"), ¶ 23 ("Google Analytics allows developers to enable or disable the collection of granular location and device data on a per-region basis. If the feature is disabled, GA4 does not collect data such as browser User-Agent string, device brand, and device model.").

[39]  In most instances, users who have the same browser version, operating system version, and mobile device version (if any) would get the same browser User-Agent string. KeyCDN, "KeyCDN Support: User Agent String," October 4, 2018, https://www.keycdn.com/support/user-agent-string.

[40]  Smith Declaration, backup file "medstarhealth.org-2023-05-24 - HIGHLYCONFIDENTIAL AEO.saz."

[41]  Smith Declaration, backup file "medstarhealth.org-2023-05-24 - HIGHLYCONFIDENTIAL AEO.saz."

26.     Even where cookie values are present in certain transmissions, the at-issue first-party cookie values (e.g., _ga)[42] are pseudonymous from Google's (or anyone else's) perspective.[43,44] As I explain in the next section, first-party cookie values are only accessible to the website that created the cookie. The at-issue first-party cookies containing randomly generated Client ID values therefore cannot by themselves be matched to any other identifying (or pseudo-identifying) information within Google's control.[45]

27.     Finally, for any transmission that may have involved a *third-party* cookie value, one would need to determine (1) the purpose of the cookie value;[46] (2) if a third-party cookie value designed for advertising purposes was actually used in personalized advertising; and (3) if so, whether any personal health information subject to HIPAA was involved. Internal measures implemented by Google (see **Section IV.A**) along with developers' controls

---

[42]   Complaint, ¶ 34 ("As used in this Complaint, unique patient identifiers include but are not limited to: [...] The _ga, _gid, and other Google cookies associated with Google Analytics[.]").

[43]   Pseudonymization is the process of removing personal identifying data and replacing that data with placeholder (often randomized) values. This is often done to protect users' privacy and is commonly accepted as one of the industry standard methods to enhance privacy and data security. *See* Cloudflare, "What Is Pseudonymization?," https://www.cloudflare.com/learning/privacy/what-is-pseudonymization/, accessed July 28, 2023.

[44]   Ganem Declaration, ¶ 34 ("Client ID (stored by the first-party "_ga" cookie) is a pseudonymous, randomly generated string that gets stored in a browser's cookies but does not include personally identifying information.").

[45]   Ganem Declaration, ¶ 34 ("Client ID (stored by the first-party _ga cookie) is a pseudonymous, randomly generated string that gets stored in a browser's cookies but does not include personally identifying information."). One exception is when a developer chooses to use Google Signals and users are signed in and consent to Google receiving their Google Account IDs together with website-specific Google Analytics cookie values. I discuss this circumstance in more detail in **Section IV.A.3**.

[46]   Third-party cookies may be used for advertising purposes but also to store browsing preferences such as the number of search results to display, for example.

(see **Section IV.B**) and choices made by users (see **Section IV.C**) together prevent the transmission, storage, and usage of personal health information to target advertising.

### 3.    Cookies

28.    Cookies are small files that contain a sequence of characters (i.e., cookie values) and a cookie name stored in memory. Among other uses, cookie values allow associating browsing activity by the same user across multiple browsing sessions (as long as the user uses the same browser, on the same device, and does not clear cookies). For example, cookies may be used to store information about user preferences, such as language or login status;[47] help websites in fraud prevention and spam blocking;[48] or enable other functionalities, such as website analytics and personalized advertising.

29.    Cookies can be categorized as first- or third-party (see **Appendix C** for a more detailed explanation of how cookies operate). First-party cookies are set by the website a user is currently visiting.[49] In contrast, third-party cookies are those set by a website from a domain other than the one the user is visiting.[50] Third-party cookies allow third-party service

---

[47]   Cloudflare, "What Are Cookies?," https://www.cloudflare.com/learning/privacy/what-are-cookies/, accessed July 24, 2023.

[48]   Google, "How Google Uses Cookies – Privacy & Terms," https://policies.google.com/technologies/cookies, accessed July 25, 2023 ("Some cookies and other technologies are used to prevent spam, fraud, and abuse. For example, the 'pm_sess', 'YSC', and 'AEC' cookies ensure that requests within a browsing session are made by the user, and not by other sites. These cookies prevent malicious sites from acting on behalf of a user without that user's knowledge.").

[49]   CookiePro, "What Is a First-Party Cookie?," September 17, 2021, https://www.cookiepro.com/knowledge/what-is-a-first-party-cookie/.

[50]   Kinza Yasar, "What is a Third-Party Cookie?," TechTarget, May 2023, https://www.techtarget.com/whatis/definition/third-party-cookie ("A third-party cookie is a cookie that's placed on a user's device -- computer, cellphone or tablet -- by a website from a domain other than the one the user is visiting.").

providers to recognize the same user across different websites in the same browser. As such, third-party cookies may be used to remember user browsing preferences and behavior across websites within the same browser, or can be used by providers of advertising services to track which ads were already displayed to a user or determine if the user proceeded to purchase a product after seeing an ad.[51,52]

30.     Plaintiffs allege that Google disguises cookies used in relation to provision of its services as first-party cookies when in reality they are third-party cookies.[53] That allegation conveys a fundamental misunderstanding of how cookies operate and are used by

---

[51]   CookieYes, "Third-Party Cookies: What Are They and How Do They Work?," June 30, 2023, https://www.cookieyes.com/blog/third-party-cookies/.

[52]   Google, "How Google Uses Cookies – Privacy & Terms," https://policies.google.com/technologies/cookies, accessed July 25, 2023 ("For example, YouTube uses the 'PREF' cookie to store information such as your preferred page configuration and playback preferences like explicit autoplay choices, shuffle content, and player size."). Other cookies associated with YouTube and used to remember user preferences as well as to detect and resolve issues with the service are VISITOR_INFO1_LIVE (also used for advertising purposes) and YEC. *See* Google, "How Google Uses Cookies – Privacy & Terms," https://policies.google.com/technologies/cookies, accessed July 25, 2023 ("Cookies called 'VISITOR_INFO1_LIVE' and 'YEC' serve a similar purpose for YouTube and are also used to detect and resolve problems with the service. These cookies last for 6 months and for 13 months, respectively."; "Google services also use […] 'VISITOR_INFO1_LIVE' and 'YEC' cookies on YouTube, for analytics."; "Depending on your ad settings, other Google services, such as YouTube, may also use these and other cookies and technologies, such as the 'VISITOR_INFO1_LIVE' cookie, for advertising.").

[53]   Complaint, ¶ 4 ("Google designs some of their cookies to be disguised as 'first-party cookies,' i.e., they appear to belong to the Health Care Provider with which the patient is directly communicating. In truth, these cookies belong to Google, an unknown third-party to the patient's communications with their Health Care Provider, allowing Google to track the patient surreptitiously as she navigates her Health Care Providers' web property and to intercept and redirect to Google the patient's Health Information (i.e., identifiers, actions and content of communications with their Health Care Provider).").

Google and developers. The use of cookies is governed by the "Same-Origin Policy."[54] This policy ensures that a domain *only* has access to those cookie values it created and is prevented from accessing any other cookie values created by other domains. Google's reliance on first-party cookies set and transmitted by web properties is not Google's attempt to circumvent user privacy, as alleged.[55]

31.     The Same-Origin Policy does not prevent the domain that created the cookie from using it as it wishes. While only the first-party domain has access to the first-party cookie values it creates, the website can still send the cookie value to a third party, such as Google Analytics. To illustrate this point, I captured transmissions and analyzed homepages of the 11 healthcare providers' domains studied in the Smith Declaration.[56] I examined transmissions

---

[54]   Mozilla Developers, "Security on the Web: Same-Origin Policy," July 4, 2023, https://developer.mozilla.org/en-US/docs/Web/Security/Same-origin_policy ("The same-origin policy is a critical security mechanism that restricts how a document or script loaded by one origin can interact with a resource from another origin."); Dayeol Lee and Eldon Schoop, "Web Security 1: Same-Origin and Cookie Policy," University of California, Berkeley, https://inst.eecs.berkeley.edu/~cs261/fa17/scribe/web-security-1.pdf, accessed August 2, 2023 ("Cookie policy should cooperate with same-origin policy such that the browser does not leak any data to the other origins […].").

[55]   Complaint, ¶¶ 55, 435, 453 ("By disguising the Google Analytics cookies as belonging to MedStar (a first party to the communication) instead of Google (a third party to the communication), the Google Source Code is able to circumvent security measures that would prevent third-party tracking via third-party cookies. That is, a patient's attempt to block third-party cookies would fail with respect to the Google Analytics cookies, because the Google Source Code has disguised these cookies as belonging to first-party Medstar."; "Google circumvented technical and code-based barriers to access and use Plaintiffs' and Class Members' data, computers, computer services, and computer networks. The Google Source Code places Google cookies on Plaintiffs' and Class Members' computing devices, which are designed to disguise itself as a cookie from first-party Health Care Providers so that Google can circumvent cookie blockers and other technical barriers."; "Google designed the Google Source Code to: […] circumvent Plaintiffs' and Class Members third-party cookie blockers").

[56]   I understand that Mr. Smith analyzed unspecified pages within each web property. However, modern websites are not developed as a collection of independent pages but rather are built

---

21

to Google domains associated with at-issue Google products. I find that even if transmissions on these pages occur, many do not involve cookies (see **Figure 1**). This is true for all of the transmissions to Google APIs and Google Tag Manager,[57] and several transmissions to Google Ads. Few of the transmissions that involve cookies include third-party cookies, which is the standard way of associating user activities across websites. Third-party cookies were only transmitted to Google Display Ads domains and, in one instance, to a YouTube domain. As I explain in the remainder of this declaration, Google uses third-party cookies to facilitate its advertising products (but also to provide other services) and has a variety of measures that prevent the use of PHI in personalized advertising or remarketing.

---

by reusing and leveraging templates and components, often including the same code in all, or most of the individual webpages, such as webpage styling, navigation bars, or code required to enable certain third-party functionalities. I therefore focus on the analysis of the home page, recognizing that analysis of transmissions from a particular internal page (i.e., a specific URL other than the home page) would require targeted analysis of that specific URL and any data contained within that URL. For example, Django and FastAPI are two popular backend frameworks that allow generating websites code and backend functionalities (e.g., database data storage) without a need to create each individual page. *See* Django, "The Web Framework for Perfectionists With Deadlines," https://www.djangoproject.com, accessed July 26, 2023; FastAPI, "FastAPI Framework, High Performance, Easy to Learn, Fast to Code, Ready for Production," https://fastapi.tiangolo.com, accessed July 26, 2023.

*See* **Appendix C** for a detailed explanation of how I performed my tests to capture network transmissions.

[57] This is corroborated by Google, *see* Ganem Declaration, ¶ 7 ("GTM does not collect any user data and does not send any data to Google Analytics beyond what the Google Analytics tag itself collects.").

**Figure 1**
**Selected Domains Analyzed by Plaintiffs' Experts**
**Few Transmissions Involve Third-Party Cookies**[58]

| Site Domain | Google APIs | Google Tag Manager | Google Analytics | YouTube | Google Ads | Google Display Ads |
|---|---|---|---|---|---|---|
| healthy.kaiserpermanente.org | No Cookies | No Cookies | 1P | No Transmissions | No Cookies | 1P |
| www.altonmemorialhospital.org | No Cookies | No Cookies | No Transmissions | No Transmissions | No Cookies | No Transmissions |
| www.gundersenhealth.org | No Cookies | No Cookies | 1P | No Transmissions | No Cookies | 1P |
| www.keckmedicine.org | No Cookies | No Cookies | 1P | No Transmissions | 1P | 3P |
| www.mdmercy.com | No Cookies | No Cookies | No Transmissions | No Transmissions | No Cookies | No Transmissions |
| www.medstarhealth.org | No Cookies | No Cookies | 1P | No Transmissions | 1P | 3P |
| www.memorialcare.org | No Cookies | No Cookies | 1P | No Transmissions | 1P | 3P |
| www.mercy.net | No Cookies | No Cookies | 1P | No Transmissions | No Cookies | 3P |
| www.osfhealthcare.org | No Cookies | No Cookies | 1P | No Transmissions | No Cookies | 3P |
| www.plannedparenthood.org | No Cookies | No Cookies | No Cookies | 3P | 1P | 3P |
| www.uhc.com | No Cookies | No Cookies | 1P | No Transmissions | No Cookies | 3P |

32.     Unlike websites, mobile apps are not designed to rely on cookies. For apps, third-party services are often provided as Software Development Kits ("SDKs"), readily available third-party code that developers can integrate into their app to provide additional functionality and streamline the app development process.[59] SDKs, including the Google Analytics for Firebase SDK, collect advertising identifiers of devices and app instance IDs.[60]

---

[58]   I followed Dr. Libert's grouping of Google domains to Google products (*see* Libert Declaration, ¶ 22) and visited the home pages of the 11 domains analyzed by Mr. Smith (*see* Smith Declaration, ¶¶ 61-161). Note that '3P' indicates there was a transmission of third-party cookies to a given service. '1P' indicates there was transmission of first-party cookies only to a given service. 'No cookies' indicates the network requests to that service contained no cookies. 'No transmission' indicates there were no transmissions to that service. Domains flagged as '3P' may have also contained '1P' or 'No Cookies' transmissions. Similarly, domains flagged as '1P' may have also generated 'No Cookies' transmissions.

[59]   IBM Cloud Education, "SDK vs. API: What's the Difference?," July 13, 2021, https://www.ibm.com/cloud/blog/sdk-vs-api ("SDK is a set of software-building tools for a specific platform, including the building blocks, debuggers and, often, a framework or group of code libraries such as a set of routines specific to an operating system (OS).").

[60]   There are two main types of device advertising identifiers. Google Advertising ID is the pseudonymous identifier for Android devices. Identifier for Advertisers is the pseudonymous identifier for iOS devices. Android, "Android Developers: Get a User-Resettable Advertising ID," September 21, 2022, https://developer.android.com/training/articles/ad-id; Apple, "Apple Developer Documentation: advertisingIdentifier," https://developer.apple.com/documentation/adsupport/asidentifiermanager/1614151-advertisingidentifier, accessed July 25, 2023.

23

Similar to cookies, these identifiers help developers remember user preferences, understand how users interact with their app, and enhance user experience.

**B.      Google's Third-Party Services**

33.      Plaintiffs make numerous misleading claims to collectively describe and label the variety of services, products, and codes provided by Google as:

a.  "designed to track and collect individuals' information when they are browsing the Internet";[61]

b.  "transmit[ting] persistent unique identifiers for the users of web properties […], which Google uses for its marketing and advertising purposes including, on information and belief, for segmenting and categorizing individuals within the 'health vertical' classification system."[62]

34.      While I agree that Google's and other third parties' codes are typically designed to be copied and inserted into a website or an app code for developers' convenience, Google's code in this area is not one-size-fits-all. Importantly, I disagree that source code provided by Google to access its services is "designed to track and collect individuals' information."[63] The mere fact that the tag triggers transmissions, without thorough analysis

---

App instance ID is a pseudonymous identifier that is specific to each installation of a given app on a given device that uses Google Analytics for Firebase SDK. Google, "Firebase Help - Data Collection," https://support.google.com/firebase/answer/6318039, accessed July 24, 2023 ("The Google Analytics for Firebase SDK library uses an app-instance identifier to identify a unique installation of the App.").

[61]  Complaint, ¶ 39.

[62]  Complaint, ¶ 101.

[63]  Complaint, ¶ 39.

of what data those transmissions contain, cannot be used to conclude that Google gained access to PHI and used it for remarketing and personalized advertising. These allegations rely on the incorrect assumption that all at-issue Google services transmit pseudonymous identifiers (third-party cookies, in the case of websites, and app instance ID and advertising identifiers, in the case of apps), the transmissions contain PHI, and that transmitted information was in fact used for remarketing or personalized advertising.

35.     Plaintiffs allege that "Google's unlawful tracking, collection and monetization (i.e. its internal use and profiting) of Health Information occurs through the Google Source Code secretly embedded in Health Care Provider web properties"[64] and relates to a diverse set of Google products and services such as Google Analytics, Google Ads,[65] Google Display Ads, Google Tag and Tag Manager, Firebase SDK, Google APIs, and YouTube.[66] However, many of these services either do not transmit any identifiers or the identifiers included in the transmissions cannot be used for remarketing and personalized advertising.

36.     Analysis of Plaintiffs' allegations and Plaintiffs' experts' opinions that describe the variety of Google's services as uniform with respect to data transmission and in relation to their use in remarketing and personalized advertising neglect important aspects of how those services—and Google Analytics and Advertising services in particular—operate.

---

[64]   Complaint, ¶ 4 (footnotes omitted).

[65]   Plaintiffs seem to conflate Google Ads, which is the collection of all Google advertising products, with Search Ads, a particular ad product, as I further discuss in **Section III.D.1**. *See* Complaint, ¶ 72 ("Google Ads is Google's advertising system for Google's eponymous search engine at www.Google.com.").

[66]   Complaint, fn. 3.

Plaintiffs allege that "[a]fter tracking, intercepting and acquiring patients' Health Information, Google uses the information for personalized advertising in its advertising systems […]."[67] This includes "information Google collects through Google Analytics," which is allegedly redirected and shared with Google's advertising products.[68] This fundamentally misrepresents how Google's analytics and advertising products are designed to interact with each other and the many layers of controls that Google has in place internally and externally to ensure users' information, particularly sensitive information such as health-related data, remains protected. I explain how Google Analytics and Advertising services operate in the remainder of this section.

## C.   Google Analytics Services

### 1.   Analytics Products Offered by Google

37.     Google Analytics is a web analytics service offered by Google that allows developers to monitor user activity on their website or app. Developers can use information compiled by Google Analytics to understand their users' needs, improve website or app design, or address technical issues as they arise.[69] Google Analytics 4 ("GA4") is the latest version of Google Analytics, [70] superseding an earlier implementation called Universal

---

[67]   Complaint, ¶ 111.

[68]   Complaint, ¶ 145.

[69]   *See* Kerry Rodden, Hilary Hutchinson, and Xin Fu, "Measuring the User Experience on a Large Scale: User-Centered Metrics for Web Applications," *ACM Press*, April 10, 2010.

[70]   Google Analytics 4 was launched in July 2019 and has been the default version since October 2020. *See* Russell Ketchum, "A New Way to Unify App and Website Measurement in Google Analytics," Google Ads and Commerce Blog, July 31, 2019, https://blog.google/products/ads-commerce/new-way-unify-app-and-website-measurement-google-analytics/; Russell Ketchum, "Prepare for the Future With Google Analytics 4,"

Analytics.[71] Google also offers a paid enterprise version called Google Analytics 360[72] and an app-centric version called Google Analytics for Firebase SDK.[73] For example, **Figure 2** illustrates a Google Analytics report showing the number of recent website visitors, including a breakdown by country and over time, which could help a developer ensure that their website is reaching the intended audience, or help monitor how the website traffic and user engagement evolve over time.[74] A developer who notices that a large share of visits come from a country whose native language is not yet offered on the website may create an

---

Google Ads and Commerce Blog, March 16, 2022, https://blog.google/products/ads-commerce/prepare-for-future-with-google-analytics-4/; Google, "What's New - Analytics Help," https://support.google.com/analytics/answer/9164320, accessed July 24, 2023.

[71] Universal Analytics was released to the public in April 2014 and was retired on July 1, 2023. *See* Google, "Google Analytics Solutions: Universal Analytics: Out of Beta, Into Primetime," https://analytics.googleblog.com/2014/04/universal-analytics-out-of-beta-into.html, accessed July 24, 2023; Google, "Analytics Help - [GA4] Introducing the Next Generation of Analytics, Google Analytics 4," https://support.google.com/analytics/answer/10089681, accessed July 24, 2023.

[72] Google Analytics 360 ("GA360") is a more powerful version of the free version of Google Analytics with more customization options and higher data limits specifically for large enterprises. For example, GA360 allows developers to create a larger number of custom audiences than GA, and it also allows customers to receive enterprise-level support by entering into "service level agreements." *See* Google, "Business Analytics Tools & Solutions - Google Analytics 360," https://marketingplatform.google.com/about/analytics-360/, accessed July 24, 2023; Google, "[GA4] Google Analytics 360 (Google Analytics 4 Properties) - Analytics Help," https://support.google.com/analytics/answer/11202874, accessed July 24, 2023.

[73] Google acquired Firebase in 2014, which is an app development platform that provides integrated tools to streamline the app development process. Frederic Lardinois, "Google Acquires Firebase To Help Developers Build Better Real-Time Apps," TechCrunch, October 21, 2014, https://techcrunch.com/2014/10/21/google-acquires-firebase-to-help-developers-build-better-realtime-apps/; Google, "Firebase SDK - Google Open Source Projects," https://opensource.google/projects/firebasesdk, accessed July 24, 2023. In particular, Google Analytics for Firebase "is an app measurement solution, available at no charge, that provides insight on app usage and user engagement." Google, "Google Analytics for Firebase," https://firebase.google.com/docs/analytics, accessed July 24, 2023.

[74] Google, "Analytics Help - [GA4] Analytics Insights," https://support.google.com/analytics/answer/9443595, accessed July 24, 2023.

additional version of the website in that language, helping to improve user engagement and retention.[75,76]

**Figure 2**
**Example Google Analytics Report**[77]



### 2.    *How Google Analytics Works*

38.    Developers can integrate Google Analytics services by following instructions from public documentation, which include registering for a Google Analytics account, selecting settings relating to what data to share with Google, and accepting Google's terms and policies.[78] Among other restrictions, these terms and policies prohibit the

---

[75]  *See* Renee Garett, Jason Chiu, Ly Zhang, and Sean D. Young, "A Literature Review: Website Design and User Engagement," *Online Journal of Communication and Media Technologies*, Vol. 6, No. 3, July 2016: 1–14.

[76]  As another example, Google Analytics can help app developers to monitor the stability of their website or app by providing statistics about the percentage of users who visited the app without encountering any crashes. *See* Google, "Analytics Help - [GA4] App Stability Overview," https://support.google.com/analytics/answer/12995879, accessed July 24, 2023.

[77]  Google, "Analytics Help - [GA4] Analytics Insights," https://support.google.com/analytics/answer/9443595, accessed July 24, 2023.

[78]  I discuss developers' options regarding such settings further in **Section IV**.

transmission of any form of PII and require developers to disclose their use of Google Analytics to visitors (see **Section IV.A.1**).[79] After registering for an Analytics account, developers are prompted to add their property—i.e., a website or an app.[80]

39.    Similar to many other Google and non-Google third-party services, website developers have to insert third-party code into the source code of their web properties to start transmitting data to their Google Analytics account.[81] Developers implement Google Analytics on their websites using the Google tag (gtag.js). Developers may also use Google Tag Manager, a tag management mechanism, to manage multiple Google tags, including the Google tag.[82] Google Tag Manager allows developers to insert Google tags in their websites'

---

[79]    Google, "[GA4] Set Up Analytics for a Website and/or App - Analytics Help," https://support.google.com/analytics/answer/9304153, accessed July 24, 2023; Google, "Google Analytics Terms of Service," May 15, 2023, https://marketingplatform.google.com/about/analytics/terms/us/; Google, "Data Processing Amendment to the Google Analytics Terms of Service," September 6, 2013, https://www.google.com/analytics/terms/dpa/dataprocessingamendment_20130906.html; Google, "Data Processing Terms - Analytics Help," https://support.google.com/analytics/answer/3379636, accessed July 24, 2023.

[80]    Website developers have to enter the URL of their website and name a "stream" of data to transmit from their website to Google (e.g., "Stream of data from my website"). Similarly, app developers have to create a stream of data from their app to Google. *See* Google, "[GA4] Set Up Analytics for a Website and/or App - Analytics Help," https://support.google.com/analytics/answer/9304153, accessed July 24, 2023; Google, "[GA4] Firebase Integration - Analytics Help," https://support.google.com/analytics/answer/9289234, accessed July 24, 2023.

[81]    Google, "[GA4] Set Up Analytics for a Website and/or App - Analytics Help," https://support.google.com/analytics/answer/9304153, accessed July 24, 2023.

[82]    Google, "[GA4] Set Up Analytics for a Website and/or App - Analytics Help," https://support.google.com/analytics/answer/9304153, accessed July 24, 2023 ("To begin seeing data in your new Google Analytics 4 property, you'll need to do one of the following: Add the tag to a website builder or CMS-hosted website (e.g., HubSpot, Shopify, etc.)[,] [a]dd the Google tag directly to your web pages[,] [a]dd your tag using Google Tag Manager[.]").

code and simplify the integration of different Google products and services.[83] Google Tag Manager itself does not provide any additional analytics or advertising services and does not collect IP addresses, cookies, or any measurement identifiers.[84] For apps, developers rely on Google Analytics for Firebase SDK, which also requires developers to integrate the Google Firebase SDK code in their app and enable Google Analytics functionalities.[85]

40.     Contrary to Plaintiffs' allegations of Google's code "commanding," "intercepting" or "tracking" information on websites,[86] Google Analytics code operates by performing two tasks. First, the code assists a website in creating a first-party cookie named _ga and the associated cookie value when a user first visits the website.[87] The value of the

---

[83]   Google Tag Manager allows developers to conveniently collaborate, deploy, and modify Google tags from a web interface, while gtag.js allows developers to install and work with tags directly in JavaScript. Google, "Tag Manager and the Google Tag (gtag.js) - Tag Manager Help," https://support.google.com/tagmanager/answer/7582054, accessed July 24, 2023.

JavaScript is a programming language often used in web development. W3 Schools, "JavaScript Tutorial," https://www.w3schools.com/js/, accessed July 24, 2023.

[84]   Google, "Data Privacy and Security - Tag Manager Help," https://support.google.com/tagmanager/answer/9323295, accessed July 26, 2023 ("In order to monitor and provide diagnostics about system stability, performance, and installation quality, Google Tag Manager may collect some aggregated data about tag firing. This data does not include user IP addresses or any measurement identifiers associated with a particular individual. Other than data in standard HTTP request logs, all of which is deleted within 14 days of being received, and diagnostics data noted above, Google Tag Manager does not collect, retain, or share any information about visitors to our customers' properties, including page URLs visited.").

[85]   Google, "Get Started With Google Analytics - Google Analytics for Firebase," https://firebase.google.com/docs/analytics/get-started?platform=android, accessed July 24, 2023 ("If you haven't already, add Firebase to your JavaScript project and make sure that Google Analytics is enabled in your Firebase project[.]").

[86]   Complaint, ¶ 111.

[87]    In GA4, first-party cookies for Google Analytics include "_ga" and a variation of the _ga cookie name that includes the Google Tag Manager ID. Google, "Cookie Usage on Websites

30

_ga cookie is the Client ID—a randomly generated pseudonymous identifier that allows Google Analytics to record browsing activities that take place *only* on this *first-party website* within the same browser.[88] In other words, the Client ID is unique to each website, and cannot be used to track users across the web. As explained in **Section III.A.3**, websites can share first-party cookie values with third-party services. Second, Google Analytics code assists the first-party website with transmitting the first-party _ga cookie value, Client ID, to Google servers for subsequent processing via URL parameters.[89] Google Analytics' servers then

---

- Analytics Help," https://support.google.com/analytics/answer/11397207, accessed July 24, 2023.

In Universal Analytics, other first-party cookies for Google Analytics include cookie names "_gid," "_gat," "AMP_TOKEN," etc. Google, "Google Analytics Cookie Usage on Websites - Google for Developers," https://developers.google.com/analytics/devguides/collection/gtagjs/cookie-usage, accessed July 24, 2023.

In this report, for simplicity, I will broadly refer to first-party cookie names associated with Google Analytics as the _ga cookie.

[88] Ganem Declaration, ¶ 34 ("Client ID (stored by the first-party "_ga" cookie) is a pseudonymous, randomly generated string that gets stored in a browser's cookies but does not include personally identifying information. Client ID allows Google Analytics to determine whether two distinct visits to the same website were made by the same user."); Google, "Data Collection - Analytics Help," https://support.google.com/analytics/answer/11593727, accessed July 24, 2023 ("Google Analytics stores a [C]lient ID in a first-party cookie named _ga to distinguish unique users and their sessions on your website."); Google, "Cookies and User Identification - Google for Developers," https://developers.google.com/analytics/devguides/collection/analyticsjs/cookies-user-id, accessed July 26, 2023 ("The analytics.js library accomplishes this via the Client ID field, a unique, randomly generated string that gets stored in the browsers cookies, so subsequent visits to the same site can be associated with the same user.").

[89] URL parameter is a way for websites to pass information to servers through a URL. Google, "Google Ads Help - About URL Parameters," https://support.google.com/google-ads/answer/6277564, accessed July 24, 2023 ("[Developers] can insert URL parameters into your URLs so that [their] URLs track information about a click. URL parameters are made of a key and a value separated by an equals sign (=) and joined by an ampersand (&). The first parameter always comes after a question mark in a URL."). First-party cookie values may be

aggregate and summarize this information and generate aggregate reports that help developers understand user needs and website usage. Neither Google nor any other third parties have access to first-party cookie values unless the developer (who controls the website) decides to provide this information to Google through the use of Google Analytics.

41.     If a website uses Google Analytics, the website transmits the Client ID value associated with the first-party _ga cookie to Google. If another website also uses Google Analytics services that similarly trigger creation of a first-party _ga cookie, the Client ID associated with this _ga cookie will differ between the two websites. Furthermore, if a user uses a different browser or resets cookies, their _ga cookie value is reset, and a user will appear as a new "visitor" for any website that previously associated _ga cookie values with the user. As such, first-party cookies that Google Analytics functionality relies on cannot by themselves be used to associate user activities across websites using the same browser, which does not comport with Plaintiffs' overbroad references to such code as "tracking."[90]

42.     Unlike websites, Google Analytics for apps is integrated through the Google Analytics for Firebase SDK. Instead of cookies, the Firebase SDK uses pseudonymous advertising identifiers and app instance IDs to distinguish, respectively, user

---

included as a URL parameter. For example, the _ga cookie value, or Client ID, is sent to Google often through a URL parameter named cid.

Mr. Smith appears to agree with this description. Smith Declaration, ¶ 59 ("A cookie named _ga is stored in a browser as a Kaiser Permanente first party cookie. A _ga cookie value is sent to Google servers as the cid query string value.").

[90]   As described in **Section IV.C.3**, all cookie values, including the Client ID associated with the _ga cookie, are reset if a user elects to clear their cookies, browsing history, or use a different browser.

devices and installations of apps on a specific device.[91] When developers elect to use Google Analytics for Firebase SDK, the app with the help of the SDK records user in-app interactions (e.g., opening the app) that developers want to analyze.[92] These data records provide insights that allow developers to fine-tune their apps to user preferences and increase user engagement.

43.     Unless web property developers elect to do otherwise—e.g., by enabling Signals (see **Section III.D.4**), data are only processed by Google's servers to provide analytics services to the specific web property and are not associated with user activities on other web properties, similar to a bank's security boxes that are only identified by a number on the box without revealing the identity of the owner or the contents of box. It is impossible for developers to use the first-party cookie generated by Google's code to associate user activity across websites they do not control.[93] Therefore, in the context of Google Analytics services

---

[91] Google, "Firebase Help - Data Collection," https://support.google.com/firebase/answer/6318039, accessed July 24, 2023 ("The Google Analytics for Firebase SDK library uses an app-instance identifier to identify a unique installation of the App. When using the SDK, an app-instance identifier gets generated at the app level. By default, the Firebase SDK collects identifiers for mobile devices (for example, Android Advertising ID and Advertising Identifier for iOS) and utilizes technologies similar to cookies.").

[92] Google, "Get Started With Google Analytics - Google Analytics for Firebase," https://firebase.google.com/docs/analytics/get-started?platform=android, accessed July 24, 2023 ("Google Analytics collects usage and behavior data for your app. The SDK logs two primary types of information: Events: What is happening in your app, such as user actions, system events, or errors. User properties: Attributes you define to describe segments of your user base, such as language preference or geographic location.").

[93] Ganem Declaration, ¶ 35 ("Google Analytics uses a set of cookies to collect data and report site usage statistics without personally identifying individuals. For example, the cookie "_ga," enables websites and apps to distinguish visitors, but does not allow Google or the website or app to identify any given visitor. Each "_ga" cookie is unique to the specific website or app of a business and cannot, by themselves, be used to track an individual's activity across the websites and apps of different businesses."); Google, "Data Collection - Analytics Help," https://support.google.com/analytics/answer/11593727, accessed July 24, 2023 ("Google Analytics stores a [C]lient ID in a first-party cookie named _ga to distinguish

(provided to all websites, whether or not they are health-related), users' pseudo-identities on different websites are kept separate, making any information and activity on these websites deidentified—i.e., the same user will appear as different and unrelated digital pseudo-identities on different websites served by Google Analytics, and only the website using the Google Analytics service will have access to that pseudo-identity.

### D.   Google Advertising Services

#### 1.   *Google Advertising Products for Advertisers*

44.     Google Ads is Google's collection of advertising products, which allow businesses and developers to create and manage online ad campaigns to increase their own website traffic or to advertise their products and services.[94] Google Ads offers a variety of ad campaign types, such as Display ads, YouTube ads, and Search ads,[95] which can serve ads in different formats.[96] Display Ads use visually engaging graphics, animations, and interactive

---

unique users and their sessions on your website."); Google, "Cookies and User Identification - Google for Developers,"
https://developers.google.com/analytics/devguides/collection/analyticsjs/cookies-user-id, accessed July 26, 2023 ("The analytics.js library accomplishes this via the Client ID field, a unique, randomly generated string that gets stored in the browsers cookies, so subsequent visits to the same site can be associated with the same user.").

[94]  Google, "Google Ads Help - Google Ads: Definition," https://support.google.com/google-ads/answer/6319, accessed July 24, 2023.

[95]  *See* Google, "Google Ads Help - About the Google Search Network,"
https://support.google.com/google-ads/answer/1722047, accessed July 24, 2023. Plaintiffs seem to conflate Google Ads, which is the collection of all Google advertising products, with Search Ads, a particular ad product, and seem to allege that Google Ads serves advertising based on information "about user searches directly at www.Google.com" and information from user activity on third-party websites. *See* Complaint, ¶ 72 ("Google Ads is Google's advertising system for Google's eponymous search engine at www.Google.com.").

[96]  Google, "Google Ads Help - Choose the Right Campaign Type,"
https://support.google.com/google-ads/answer/2567043, accessed July 24, 2023; Google,

ads that are shown to users while browsing on non-Google web properties, often with the goal of increasing brand awareness and reaching users who may not yet be familiar with the product offered by the advertiser.[97] YouTube ads are video ads shown on YouTube or web properties that embed YouTube videos,[98] and Search Ads are text ads that are shown to users who conduct online searches on the Google Search website (*www.google.com*) as well as some websites that embed Google search functionality.[99]

45.     To ensure that Google serves ads to a relevant audience and in appropriate context, advertisers have many options to narrow down the desired audience, include or exclude particular categories of users, or target their ads according to various criteria.[100] I discuss the different types of targeting and audience options later in this section.

---

"Google Ads Help - About Ad Formats Available in Different Campaign Types," https://support.google.com/google-ads/answer/1722124, accessed July 24, 2023.

[97]   Google, "Google Ads Help - About Display Ads and the Google Display Network," https://support.google.com/google-ads/answer/2404190, accessed July 24, 2023. Google, "Google Ads Help - Uploaded Display Ads Specifications," https://support.google.com/google-ads/answer/1722096, accessed August 2, 2023. Animated display ads can have a maximum length of 30 seconds, while longer video ads can be shown on YouTube.

[98]   *See* Google, "Google Ads Help - About Video Campaigns," https://support.google.com/google-ads/answer/6340491, accessed July 24, 2023. Shorter video ads can also be shown on Google video partners' web properties through Display ads.

[99]   *See* Google, "Google Ads Help - About the Google Search Network," https://support.google.com/google-ads/answer/1722047, accessed July 24, 2023.

[100]  Google, "Google Ads Help - About Targeting for Display Campaigns," https://support.google.com/google-ads/answer/2404191, accessed July 24, 2023 ("You can use ad group targeting to help get your ads seen by certain types of people or in certain contexts or content. When you focus your targeting on certain types of people, you can aim to get your ads seen by a particular audience (for example, people who've visited your site, or people that are likely to be in the market for a given product) or demographics (for example, young men). […] 'Targeting': When you use this setting, you're telling Google Ads who you'd like to reach with your ads or where you'd like your ads to show on the internet. Use the 'Targeting' setting in your ad groups or campaigns, when you want to narrow your

2.     *Google Advertising Products for Publishers*

46.     In addition to Google Ads products that are used by advertisers aiming to reach existing or potential customers, Google also offers products for website publishers who wish to monetize traffic on their web properties—e.g., to fund web properties that provide free content funded by ads or use collected funds for donations.[101],[102] In the context of a hospital website, for example, the hospital could be both an advertiser (seeking to attract new customers by advertising on other websites) and publisher (seeking to sell advertising space on its own web property). For example, AdSense is Google's ad network that allows publishers to sell advertising space on their websites, while AdMob is Google's product for monetizing mobile apps.[103] Google Ad Manager is an ad management platform for large publishers with significant advertising sales, and it allows them to sell ad space on both websites and apps.[104]

---

ad group to only show to specific audiences or on specific content you've selected."). *See also* Declaration of Oscar Takabvirwa in Support of Defendant Google LLC's Opposition to Plaintiffs' Motion for Preliminary Injunction, *John Doe I, et al. v. Google LLC*, Case No. 4:23-cv-02431-VC, August 3, 2023 ("Takabvirwa Declaration"), ¶¶ 11-17.

[101] Google, "Google Ad Manager Help - Compare Ad Manager, AdSense, and AdMob," https://support.google.com/admanager/answer/9234653, accessed July 24, 2023.

[102] For example, the Mayo Clinic, whose website is used as an example in the Complaint states, is a non-profit medical center, and states on its website that "[a]dvertising and sponsorship revenue is used to support MayoClinic.org and Mayo Clinic's research and education programs." Mayo Clinic, "Advertising and Sponsorship - About This Site," January 12, 2019, https://www.mayoclinic.org/about-this-site/advertising-sponsorship.

[103] Google, "Google Ad Manager Help - Compare Ad Manager, AdSense, and AdMob," https://support.google.com/admanager/answer/9234653, accessed July 24, 2023.

[104] Google, "Google Ad Manager Help - Compare Ad Manager, AdSense, and AdMob," https://support.google.com/admanager/answer/9234653, accessed July 24, 2023.

3.      *Types of Online Advertising Offered by Google*

47.      Online advertising platforms, such as Google, offer three broad categories of advertising to ensure that users see ads they find useful and relevant: contextual advertising, personalized advertising, and remarketing.[105]

48.      Contextual advertising enables advertisers to target their ads based on the fact that a user visits a particular website.[106] This is similar to a drug manufacturer of a cancer treatment taking out an ad in a magazine about golf, relying on assumptions regarding the demographics of the readers of the magazine. Advertisers can choose the specific websites on which their ads will be displayed or keywords and topics that describe the type of websites on which they would like their ads to be displayed.[107]

49.      For example, a pharmaceutical company selling bladder cancer treatments may target websites with the keywords "bladder cancer" to try to display its ads to users who may be visiting websites relating to bladder cancer, as illustrated in **Figure 3**.[108] Contextual advertising may explain why users could see ads related to a website's content, even if no

---

[105] Google, "Google Ads Help - Targeting Your Ads," https://support.google.com/google-ads/answer/1704368, accessed July 24, 2023; Google, "Google Ads Help - About Your Data Segments," https://support.google.com/google-ads/answer/2453998, accessed July 24, 2023.

[106] Google, "Google Ads Help - About Contextual Targeting," https://support.google.com/google-ads/answer/2404186, accessed July 24, 2023; Ted Vrountas, "Contextual Advertising 101: How it Works, Benefits & Why It's Necessary for Relevant Ads," Instapage, https://instapage.com/blog/contextual-advertising. *See also* Google, "Google Ads Help - Targeting Your Ads," https://support.google.com/google-ads/answer/1704368, accessed July 24, 2023.

[107] Google, "Google Ads Help - About Contextual Targeting," https://support.google.com/google-ads/answer/2404186, accessed July 24, 2023. *See also* Google, "Google Ads Help - About Placement Targeting," https://support.google.com/google-ads/answer/2470108, accessed July 24, 2023.

[108] Complaint, ¶ 139.

user-specific information is used for targeting them.[109] As a result, visitors of healthcare provider websites could be served ads that may appear relevant to them, as shown in the Complaint, if they happen to be visiting a healthcare provider website. However, the user who saw an ad related to a sensitive health condition would not have received that ad based on their activities on other health-related web properties, if these properties are classified as sensitive. Given the restrictions Google places on advertisers using "sensitive interest categories," including health conditions, in personalized advertising, a healthcare provider website would be unable to target its ads to users based on their activities on web properties classified as "Sensitive" in the Google Ads system, as I explain further in **Section IV.A.1**.[110]

---

[109] As I discuss in **Section IV.A** below, pharmaceutical companies are generally not allowed to use personalized advertising based on personal health-related data. Google also requires every pharmaceutical manufacturer to be certified by Google in order to serve any ads. *See* Google, "Advertising Policies Help - Healthcare and Medicines," https://support.google.com/adspolicy/answer/176031, accessed July 24, 2023.

[110] Takabvirwa Declaration, ¶ ¶ 29-31 ("If an app or website is classified as Sensitive in V*********, the Google Analytics and Google Ads data from that app is excluded from use for personalized advertising, including user profile building, on the Google Search Ads (www.google.com) platform. […] The YouTube advertising platform relies on the A********* system to personalize the ads it shows users. User activity on apps and web URLs that are deemed "Sensitive" or "Not Found," are filtered out from user profile building in A********* and that data is not used for the personalization of any ads. […] If the app or website is classified as Sensitive in V*********, Display Ads do not use data from ads on those websites and apps to target ads to users on sites and apps in the Google Display Network.").

**Figure 3**
**Example of Contextual Ad**[111]



50.      Plaintiffs incorrectly frame contextual advertising as personalized advertising targeted using health information.[112] Rather, contextual advertising allows advertisers to target their ads based on the content of a particular website they visit.[113] To illustrate, I first visited the Adidas website (see **Figure 4A**) and added a pair of shoes to a shopping cart. Then, I visited the webpage relating to Metastatic Breast Cancer on Mayo Clinic in regular browsing mode, and similar to what Plaintiffs show, I also observed an ad

---

[111] Complaint, ¶ 139.

[112] Complaint, ¶ 142 ("Thus, in each of these three scenarios, Google admits that it uses Health Information for purposes of targeted advertising on Non-Google Websites.").

[113] Google, "Google Ads Help - About Contextual Targeting," https://support.google.com/google-ads/answer/2404186, accessed July 24, 2023 ("This method of targeting uses the keywords or topics you've chosen to match your ads to relevant sites.").

about Metastatic Breast Cancer (see **Figure 4B**), not Adidas or shoes—the interests that could have been inferred from my previous browsing activities. When I visited the same website in Incognito mode without any cookies available for Google or any other party, I also observed the same ad about Metastatic Breast Cancer (see **Figure 4C**). This illustrates that contextual ads can be displayed on websites, just as a billboard on the side of the road, and do not need to be personalized to a specific user. And, in the case of an ad related to a sensitive health condition, Google's policies require that that ad only be contextual and not be personalized to a specific user, including because advertisers are restricted from targeting ads based on health conditions, as I explain further in **Section IV.A.1**.

**Figure 4A**
**Adding Adidas Shoes to Shopping Cart**[114]



---

[114] After adding an item to my Adidas shopping cart, I navigated to my cart to view the item at https://www.adidas.com/us/cart, accessed August 3, 2023.

**Figure 4B**
**Mayo Clinic Ad in Regular Browsing Mode**[115]



**Figure 4C**
**Mayo Clinic Ad in Incognito Mode**[116]



51.     Rather than trying to reach an audience based on context, advertisers can use additional information about users visiting the website to try to find a responsive audience. In personalized advertising, advertisers can try to gain new customers by targeting their ads based on certain characteristics such as user interests, as inferred from their activity on other web properties.[117] For example, New Balance may decide to show its ads specifically to users whose online activities may suggest an interest in running and who are located in the United States.

52.     The third type of advertising called remarketing (also known as retargeting), allows advertisers to serve their ads to users who have previously interacted with the advertiser's web property in an effort to re-engage them.[118] As an example, Adidas could use Google Ads to serve ads to users who have previously added Adidas shoes to their shopping cart, and thus have indicated an interest in Adidas products, even as they are visiting unrelated websites (see **Figures 4A** and **4D**). Again, health-related advertisers are prohibited from this

---

[115]  I navigated to https://www.mayoclinic.org/diseases-conditions/breast-cancer/symptoms-causes/syc-20352470 in Chrome regular browsing mode, accessed August 3, 2023.

[116]  I navigated to https://www.mayoclinic.org/diseases-conditions/breast-cancer/symptoms-causes/syc-20352470 in Chrome Incognito mode, accessed August 3, 2023.

[117]  Google, "Google Ads Help - About Audience Targeting," https://support.google.com/google-ads/answer/2497941, accessed July 24, 2023. The degree of targeting can vary widely but is often broad, since narrow targeting decreases the number of potential customers an ad can reach and may also violate Google's policies. *See* Google, "Google Ads Help - About Ad Reach," https://support.google.com/google-ads/answer/1722045, accessed July 24, 2023.

[118]  Google, "Google Ads Help - About Audience Targeting," https://support.google.com/google-ads/answer/2497941, accessed July 24, 2023. Google also calls remarketing "data segments." *See* Google, "Google Ads Help - About Your Data Segments," https://support.google.com/google-ads/answer/2453998, accessed July 24, 2023.

type of advertising and Google does not allow them to use their own data collected from their websites via Google Analytics in remarketing.[119]

**Figure 4D**
**Adidas Ads Featuring on Washington Post**[120]



53.     Google also offers a tool for remarketing called "Customer Match," which allows advertisers to create remarketing lists based on user data they collected in "first-party context." That may include information collected from the advertiser's web property, but also

---

[119]  Google, "Advertising Policies Help - Personalized Advertising," https://support.google.com/adspolicy/answer/143465, accessed July 24, 2023. I discuss this further in **Section IV.A.1**. *See also* Takabvirwa Declaration ¶ 21 ("Any advertising by web domains and apps must comply with the terms of Google's Advertising Policies, which prohibit advertisers from targeting ads based on personal hardships, such as physical or mental health conditions, treatments, or procedures.").

[120]  After confirming that I had added an item to my cart at https://www.adidas.com/us/cart, I then received advertisements for Adidas products once I visited https://www.washingtonpost.com, accessed August 3, 2023.

information collected offline, for example in a physical store.[121] Plaintiffs claim that in addition to the information "acquired" via transmissions from web properties,[122] Google obtains health information from offline sources via Customer Match by allowing "its advertisers, like Health Care Providers" to provide "offline Health Information" to Google.[123] However, this is clearly not the case, because health-related advertisers are prohibited from using Customer Match, due to Google's restrictions on personalized advertising and remarketing based on sensitive categories, which also apply to Customer Match.[124]

---

[121] Google, "Advertising Policies Help - Customer Match Policy," https://support.google.com/adspolicy/answer/6299717, accessed July 26, 2023.

[122] Complaint, ¶ 102.

[123] Complaint, ¶¶ 106, 107.

[124] Google, "Google Ads Help - How Google Uses Customer Match Data," https://support.google.com/google-ads/answer/6334160, accessed July 26, 2023. Google only uses user data to create Customer Match audiences for the advertiser and does not make Customer Match data available to any third party, including other advertisers. As Plaintiffs acknowledge in their Complaint, Google also has a number of policies that apply specifically to Customer Match, and it requires additional privacy policy disclosures from advertisers using Customer Match. Advertisers without "a good history of policy compliance" are ineligible to use Customer Match. *See* Takabvirwa Declaration, ¶ 24 ("Advertisers using Customer Match must also comply with Google's Customer Match Policy, which prohibits advertisers from running ads that collect personally identifiable information, creating ad content that implies knowledge of personally identifiable information or sensitive information about the advertiser's customers, or advertising for products related to sensitive information, such as pharmaceutical products. Advertisers are additionally prohibited from using sensitive interest categories, such as physical or mental health conditions, to target ads to users or to promote the advertisers' products and services. Further, advertisers are not allowed to use data from their Customer Match campaigns to identify sensitive interest categories related to their customers.").

44

4. *Integration of Google Analytics and Advertising Services*

54.     For developers and advertisers who are using both Google Analytics and Google Advertising Services, it can be beneficial to integrate these services.[125] This allows advertisers to observe users through the full customer cycle, from the moment when they initially interact with an ad to any subsequent actions they later take on the web property (such as making a purchase) and see this information in one place.[126] For example, after linking its Google Analytics and Advertising accounts, New Balance may notice that new users who arrived at their website via YouTube ads spend more time engaging with the website, and are more likely to make a purchase, than users who arrived via a search ad; as a result, New Balance could use this information to reallocate its advertising budget.[127]

55.     Google Analytics users can also enable Google Signals—a feature that, among other things, allows associating and analyzing visits by the same signed-in, consented Google user to the web property from the same business from different devices. This gives developers more accurate analytics reports, which account for the fact that a user may click on an ad using a mobile device, but later make a purchase on a desktop computer.[128] Cross-device Google Signals data are only applicable to those users who are signed in to a Google

---

[125] This can be accomplished by linking a Google Advertising account to one or more Google Analytics accounts. *See* Google, "Analytics Help - [GA4] Link Google Ads and Analytics," https://support.google.com/analytics/answer/9379420, accessed July 24, 2023.

[126] Google, "Analytics Help - [GA4] Link Google Ads and Analytics," https://support.google.com/analytics/answer/9379420, accessed July 24, 2023.

[127] Google, "Google Ads Help - About Google Analytics Data in Google Ads Reports," https://support.google.com/google-ads/answer/6332958, accessed July 24, 2023.

[128] Google Signals data can be used by developers and advertisers who have "a monthly average of 500 users per day per property." Google, "Analytics Help - [GA4] Activate Google Signals for Google Analytics 4 Properties," https://support.google.com/analytics/answer/9445345, accessed July 31, 2023.

account and enabled "Web & App Activity" ("WAA"), "Supplemental Web & App Activity" ("sWAA"), Google Ads Personalization ("GAP"), and "New Ad Control" ("NAC") (see **Section IV.A.3**).[129]

56.    Integrating Google Analytics with Google Advertising and using Google Signals also allows some advertisers to run remarketing campaigns based on data obtained through their Google Analytics account.[130] By default, Google Analytics creates two audience lists that can be used for remarketing: "purchasers," which are users who have made a website or in-app purchase or paid for an app, and "all users," which are all users who have installed an app or visited a website.[131] Continuing with the example of New Balance, after having seen in their Google Advertising reports that YouTube ads seem to be more effective than display ads in driving purchases, their marketing team may decide to run a remarketing campaign to show YouTube ads to users who have previously visited the New Balance website without

---

[129]   Google, "Analytics Help - [GA4] Activate Google Signals for Google Analytics 4 Properties," https://support.google.com/analytics/answer/9445345, accessed July 31, 2023 ("Google signals are session data from sites and apps that Google associates with users who have signed in to their Google accounts, and who have turned on Ads Personalization. This association of data with these signed-in users is used to enable cross-device reporting, cross-device remarketing, and cross-device conversion export to Google Ads."); Google, "Customize Your Ads Experience - My Ad Center Help," https://support.google.com/My-Ad-Center-Help/answer/12155451, accessed July 24, 2023 ("Turn on or off personalized ads on Google – to tell Google whether or not to use your preferences, info, and activity to show you relevant ads."); Ganem Declaration, ¶ 41 ("Google Signals is an optional feature that allows developers to access session data associated with users who have turned on WAA, sWAA, GAP, and NAC, and are signed into their Google Account..").

[130]   Google, "Analytics Help - [GA4] Link Google Ads and Analytics," https://support.google.com/analytics/answer/9379420, accessed July 24, 2023; Google, "Analytics Help - [GA4] Enable Remarketing With Google Analytics Data," https://support.google.com/analytics/answer/9313634, accessed July 24, 2023.

[131]   Google, "Analytics Help - [GA4] Enable Remarketing With Google Analytics Data," https://support.google.com/analytics/answer/9313634, accessed July 24, 2023.

making a purchase. Again, such remarketing functionality is disabled for healthcare provider web properties. [132]

57.     Developers who decide to combine functionalities of Google Analytics and Advertising services are subject to additional requirements and limitations imposed by Google's policies, as I discuss in **Section IV.A.1**.

5.     *How Google Advertising Services Work*

58.     Personalized advertising relies on understanding what ads users might be interested in seeing and on determining digital pseudo-identities that match advertisers' target audiences. This requires the ad platform that matches users with advertisers to know relevant *pseudonymized* information, such as user characteristics or interests, which can be inferred to some degree from users' browsing activities (e.g., what kind of websites they frequently visit). Only considering browsing activity on the current website may not provide the full picture. For example, one could assume that a user browsing *golf.com* is an older male interested in playing golf, and use this assumption to serve this user ads for other activities and products that may appeal to a member of such audience, such as ads for golfing clubs, a cruise, slippers, cigars, or gardening tools. However, if the user is actually the daughter of an aspiring golf player only visiting *golf.com* to purchase a gift magazine subscription for her father, she may

---

[132] Takabvirwa Declaration, ¶¶ 9-10 ("In general, healthcare provider web domains and apps are classified "Sensitive" in I**. […] Google policy prohibits web domains and apps that are classified "Sensitive" from using advertiser-curated audience lists. This policy helps ensure that sensitive interest categories aren't inadvertently used for targeting audiences. Advertiser-curated audiences include Your Data Segments, Customer Match, Similar Segments, and Custom Segments. Your Data Segments (formerly known as remarketing) allow advertisers to re-engage users that have interacted with their business by showing them ads when they visit sites and apps on platforms like the Display Network, Google Search, and YouTube.").

not be very receptive to those ads. If providers of advertising services (e.g., Google) are able to use information about websites that users visited in the past to form more comprehensive marketing profiles, they may be able to reach more responsive audiences and serve tailored ads that users are more likely to act on (e.g., by viewing the ads, clicking on the ads, or making subsequent purchases of the advertised products).

59.     Google's advertising services rely on third-party cookies, a standard approach to connect user browsing activities on different websites.[133] Even if a web property is not serving *personalized* ads (and regardless of whether the web property also uses Google Analytics), Google may still use third-party cookies for tracking conversions on this web property, and thus receive third-party cookie values to measure users' click-through behavior.[134]

60.     Conversion tracking allows an advertiser to see whether clicks on their ad led a user to take a certain action, such as a purchase or download of an app.[135] When users

---

[133]  Google, "Campaign Manager 360 Help: How Google Marketing Platform Advertising Products and Google Ad Manager Use Cookies," https://support.google.com/campaignmanager/answer/2839090, accessed August 2, 2023 ("Cookies are tiny text files that are stored on a user's browser. [...Cookies] allow websites and servers to distinguish the browser from other browsers that store different cookies, and to recognize each browser by its unique cookie ID."). *See also* Google, "Analytics Help: About Remarketing Audiences in Analytics," https://support.google.com/analytics/answer/2611268, accessed August 2, 2023.

[134]  Google, "Comply with EU User Consent Policy - Google Ad Manager Help," https://support.google.com/admanager/answer/7673898, accessed August 3, 2023 ("Although non-personalized ads don't use cookies or mobile ad identifiers for ad targeting, they do still use cookies or mobile ad identifiers for frequency capping, aggregated ad reporting, and to combat fraud and abuse. Therefore, you must obtain consent to use cookies or mobile ad identifiers for those purposes where legally required, per the ePrivacy Directive in certain EEA countries.").

[135]  Google, "[GA4] About Conversions - Analytics Help," https://support.google.com/analytics/answer/9267568, accessed July 31, 2023 ("A conversion

interact with an ad, such as by clicking on a text ad or viewing a video ad, Google Ads sets a third-party cookie that contains information about the interaction, and a pseudonymous identifier for a user or the ad click that brought the user to the advertiser's website.[136] When the user later takes the conversion action on the website, the Google Tag reads the cookie and sends it back to Google Ads with the conversion information.[137] These cookies are stored in the browser subject to the user settings and controls I discuss in **Section IV.C**.

## IV.    GOOGLE EMPLOYS A VARIETY OF MEASURES TO PREVENT TRANSMISSION OF PROTECTED HEALTH INFORMATION AND USE OF DATA FROM HEALTHCARE PROVIDER WEB PROPERTIES FOR REMARKETING AND PERSONALIZED ADVERTISING

61.    As I explained, the tool that providers of third-party services typically use for remarketing and personalized advertising is third-party cookies. First-party cookie values generated by Google Analytics and passed as parameters cannot alone be used to identify individuals. In this section, I discuss measures that Google, developers, and users themselves can—and do—take to minimize the risk of transmission of PHI to Google and its use for remarketing and personalized advertising.

---

is any user action that's valuable to your business; for example, a user purchasing from your store or subscribing to your newsletter are examples of common conversions.").

[136]   Google, "How Google Ads Tracks Website Conversions - Google Ads Help," https://support.google.com/google-ads/answer/7521212, accessed July 31, 2023 ("When people interact with your ads by clicking a text ad or viewing a video ad, Google Ads stores cookies that contain information about the interaction, and a unique identifier for a user or the ad click that brought the user to your site.").

[137]   Google, "How Google Ads Tracks Website Conversions - Google Ads Help," https://support.google.com/google-ads/answer/7521212, accessed July 31, 2023 ("When someone converts on your website, the conversion tracking tag you installed reads this cookie and sends it back to Google Ads with the conversion information.").

62.     Google cannot *a priori* determine whether a web property may potentially attempt to transmit PHI and, given that many web properties may include both health- and non-health-related content, if a particular transmission is health-related. Even on web properties that belong to HIPAA-regulated entities (such as healthcare providers), webpages that only provide "general information about the regulated entity like their location, services they provide, or their policies and procedures […] generally do not have access to individuals' PHI" and are therefore not subject to HIPAA regulations.[138] Google's terms of service inform (and require consent from) all developers considering the use of Google's analytics and advertising products that they have the responsibility *not* to transmit personal health related information.[139] HIPAA-regulated developers have the responsibility to know whether the information they control is considered PHI. They also have the technical capability—and Google provides them with settings and education to help them—to prevent transmitting such data and violating Google's terms of service and policies.

63.     Regardless of the settings and choices made by developers and Google, users are also equipped with a variety of privacy controls and tools that can prevent transmission of personal health-related information to any third party, including Google.

64.     As **Figure 5** summarizes, even before data arrive at Google's servers, users' own actions and developers' settings determine what information gets transmitted. If

---

[138] Office for Civil Rights, "Use of Online Tracking Technologies by HIPAA Covered Entities and Business Associates," U.S. Department of Health and Human Services, https://www.hhs.gov/hipaa/for-professionals/privacy/guidance/hipaa-online-tracking/index.html, accessed July 24, 2023.

[139] Google, "HIPAA and Google Analytics - Analytics Help," https://support.google.com/analytics/answer/13297105, accessed July 24, 2023. Plaintiffs and Plaintiffs' experts also cite to these policies. *See* Complaint, ¶ 8; Smith Declaration, ¶ 212.

developers transmit PHI in violation of Google's terms of service and policies, Google has measures in place to prevent use of such data in remarketing and personalized advertising.

**Figure 5**
**Flow of User Data and Measures in Place**



**A.    Google Implemented Measures to Prevent the Transmission and Use of PHI in Remarketing and Personalized Advertising**

65.    While I agree with Plaintiffs that Google has terms of service and policies aimed at, among others, preventing transmissions of PHI and its use for remarketing and personalized advertising, I disagree with their conclusion that "Google breaks this promise because it does not require Health Care Providers to comply with applicable law, to respect privacy rights, or to refrain from engaging in misleading or fraudulent conduct in the unlawful tracking, collection and disclosure to Google of patients' Health Information" and "fails to use its systems to detect, deter, or prevent its collection of Health Information from Health Care Providers."[140] As I discuss below, because of how websites, apps, and third-party

---

[140]  Complaint, ¶ 239.

services operate, it is the responsibility of developers to refrain from sending Google users'
PHI.

66.     Google has implemented policies that developers and advertisers must
consent to use Google's products. Given that Google lacks sufficient information to determine
whether certain content is sensitive and given that developers are better informed about what
information their web properties contain, Google imposes responsibilities on developers to
protect the data of their own users, and expects them to comply with their obligations. Google
also proactively takes measures against developers who violate Google's policies.

67.     In addition to measures that Google takes to prevent transmissions of
sensitive data, Google's internal policies are in place to ensure that data cannot be
deanonymized and are accessed only for appropriate business and legal purposes.

### 1.     Google Prohibits Transmission of PHI and Helps Developers Abide by the Terms of Service to Which They Consent

68.     Developers and advertisers who decide to use Google Analytics or
Advertising services must accept and abide by privacy and data use policies, including those
that govern transmissions of health-related data. In fact, Plaintiffs and their experts recognize
that Google created policies and terms of service, and indeed cite to the numerous documents
that Google provides to inform developers and advertisers.[141] The Smith Declaration

---

[141] *See, e.g.,* Complaint, ¶ 263 ("Google publicly states that Google Analytics is not appropriate for web properties that implicate Health Information."), ¶ 329 (""HIPAA and Google Analytics", which expressly states: "[c]ustomer[s] must refrain from using Google Analytics in any way that may create obligations under HIPAA for Google""). *See also* Smith Declaration, ¶ 210 ("On a Google support page, Google warns health care providers that they 'must refrain from exposing to Google any data that may be considered Protected Health Information (PHI)' when using Google Analytics[.]").

references Google documents and policies designed to inform developers about what data Google collects and help HIPAA-regulated entities understand the potential implications of using Google products and services.[142] As Mr. Smith pointed out, these materials provide HIPAA-regulated entities with resources on how to avoid transmitting health-related information to Google and explicitly instruct them to avoid sending such data to Google.[143]

69.     Google also advises against the use of Google Analytics on pages that are HIPAA-covered or "are related to the provision of health care services."[144] Specifically relating to all developers who decide to use Google Analytics services, Google Analytics Terms of Service do not allow them to transmit any form of PII.[145] And even though data

---

[142] Smith Declaration, ¶ 193 (referencing Google, "Google Privacy Policy," https://policies.google.com/privacy, accessed July 26, 2023), ¶ 210 (referencing Google, "HIPAA and Google Analytics - Analytics Help," https://support.google.com/analytics/answer/13297105, accessed July 24, 2023).

[143] Google, "HIPAA and Google Analytics - Analytics Help," https://support.google.com/analytics/answer/13297105, accessed July 24, 2023 ("Customers must refrain from using Google Analytics in any way that may create obligations under HIPAA for Google. HIPAA-regulated entities using Google Analytics must refrain from exposing to Google any data that may be considered [PHI], even if not expressly described as PII in Google's contracts and policies.").

[144] Google, "HIPAA and Google Analytics - Analytics Help," https://support.google.com/analytics/answer/13297105, accessed July 24, 2023 ("Customers who are subject to HIPAA must not use Google Analytics in any way that implicates Google's access to, or collection of, PHI, and may only use Google Analytics on pages that are not HIPAA-covered. Authenticated pages are likely to be HIPAA-covered and customers should not set Google Analytics tags on those pages. Unauthenticated pages that are related to the provision of health care services, including as described in the HHS bulletin, are more likely to be HIPAA-covered, and customers should not set Google Analytics tags on HIPAA-covered pages.").

[145] Google, "Google Analytics Terms of Service," May 15, 2023, https://marketingplatform.google.com/about/analytics/terms/us/ ("You will not and will not assist or permit any third party to pass information, hashed or otherwise, to Google that Google could use or recognize as personally identifiable information, except where permitted by, and subject to, the policies or terms of Google Analytics features made available to You,

---

53

transmitted from web properties that only use Google Analytics services do not reveal personal identities (see **Section III.C.2**), Google also advises against the use of Google Analytics on pages that are HIPAA-covered or "are related to the provision of health care services."[146] Unlike developers, Google does not know whether a specific web property is HIPAA-regulated or whether a particular data point is considered PHI. Therefore, developers have the responsibility to comply with the terms they consent to and Google assists them in doing so by, for example, explaining what PII means,[147] outlining best practices to prevent

---

and only if, any information passed to Google for such Google Analytics feature is hashed using industry standards").

[146] Google, "HIPAA and Google Analytics - Analytics Help," https://support.google.com/analytics/answer/13297105, accessed July 24, 2023 ("Customers who are subject to HIPAA must not use Google Analytics in any way that implicates Google's access to, or collection of, PHI, and may only use Google Analytics on pages that are not HIPAA-covered. Authenticated pages are likely to be HIPAA-covered and customers should not set Google Analytics tags on those pages. Unauthenticated pages that are related to the provision of health care services, including as described in the HHS bulletin, are more likely to be HIPAA-covered, and customers should not set Google Analytics tags on HIPAA-covered pages."; "Analytics customers are responsible for determining whether they are HIPAA-regulated entities and what their obligations are under HIPAA. Customers must refrain from using Google Analytics in any way that may create obligations under HIPAA for Google. HIPAA-regulated entities using Google Analytics must refrain from exposing to Google any data that may be considered Protected Health Information (PHI), even if not expressly described as PII in Google's contracts and policies. Google makes no representations that Google Analytics satisfies HIPAA requirements and does not offer Business Associate Agreements in connection with this service."; "If you need to delete data from the Analytics servers for any reason, you can schedule a data-deletion request or use the User Deletion API.").

[147] Google, "Understanding PII in Google's Contracts and Policies - Analytics Help," https://support.google.com/analytics/answer/7686480, accessed July 24, 2023 ("Google interprets PII as information that could be used on its own to directly identify, contact, or precisely locate an individual. This includes: email addresses, mailing addresses, phone numbers, precise locations (such as GPS coordinates – but see the note below), full names or usernames. For example, if you're a publisher whose contract prohibits you from passing PII to Google, the URLs of pages on your website that display ads by Google must not include email addresses, because those URLs would be passed to Google in any ad request. Google has long interpreted its PII prohibition in this way.").

the transmissions of PII, [148] and providing materials on HIPAA and guidance to prevent release of PHI to third-party services.[149] In the event developers inadvertently collect PHI or PII and transmit such data to Google, Google further provides a data-deletion functionality that developers can use to ensure their compliance with Google Analytics terms.[150]

70.     Google does not allow personalizing ads based on "sensitive interest categories" like health, race, religion, or sexual orientation to personalize ads or target users based on those characteristics, which limits the use cases of such data, even if

---

[148] Google, "Analytics Help - Best Practices to Avoid Sending Personally Identifiable Information (PII)," https://support.google.com/analytics/answer/6366371, accessed July 24, 2023 ("When implementing Analytics on a property, follow the best practices in this article to reduce the risk of passing PII to Google. In this article: User IDs, Page URLs and titles, PII entered by users, Data Import, Analytics features and privacy risk, Geolocation, AdSense").

[149] Google, "Analytics Help - Best Practices to Avoid Sending Personally Identifiable Information (PII)," https://support.google.com/analytics/answer/6366371, accessed July 24, 2023 ("When implementing Analytics on a property, follow the best practices in this article to reduce the risk of passing PII to Google. In this article: User IDs, Page URLs and titles, PII entered by users, Data Import, Analytics features and privacy risk, Geolocation, AdSense").

[150] Google, "Data-Deletion Requests - Analytics Help," https://support.google.com/analytics/answer/9940393, accessed July 24, 2023 ("If you need to delete data from the Analytics servers for any reason, then you can use a data-deletion request to issue a request for its removal. A data-deletion request is used to delete text collected by event parameters. The specific text data will be erased and replaced with '(data deleted)', but the event will still be counted in the overall metrics in your reports."); Ganem Declaration, ¶ 14 ("Google provides tools to delete data in cases where developers accidentally send Google PII or other prohibited information.").

transmitted.[151,152] Similar restrictions apply to remarketing and Customer Match.[153] Google accompanies these policy obligations with educational materials that assist advertisers in complying with those policies, including clarifying how Google interprets sensitive information.[154] In instances when these measures do not stop violations of these policies,

---

[151]  Google, "Google Ads Help - Helping Advertisers Comply With the U.S. States Privacy Laws in Google Ads," https://support.google.com/google-ads/answer/9614122, accessed July 25, 2023.

I understand that this policy existed since at least March 18, 2019. Google, "Personalized Advertising - Advertising Policies Help," https://web.archive.org/web/20190318212521/https://support.google.com/adspolicy/answer/143465, accessed July 25, 2023.

[152]  Google, "Advertising Policies Help - Personalized Advertising," https://support.google.com/adspolicy/answer/143465, accessed July 24, 2023. One such category is "personal health content," which includes "[p]hysical or mental health conditions, including diseases, sexual health, and chronic health conditions."

[153]  Google requires advertisers who use remarketing to include specific information about their use of remarketing in their privacy policy, which needs to include a message about the use of cookies and an explanation of opt-out options. *See* Google, "Advertising Policies Help - Personalized Advertising," https://support.google.com/adspolicy/answer/143465, accessed July 24, 2023; Google, "Google Ads Help - What to Include in Your Privacy Policy for Your Data Segments," https://support.google.com/google-ads/answer/2549063, accessed July 25, 2023. According to Google's advertising policies, advertisers who promote products and services related to "personal health content" such as "[p]hysical or mental health conditions, including diseases, sexual health, and chronic health conditions" are not allowed to use remarketing, to "ensure that sensitive interest categories aren't inadvertently used for targeting audiences." Additionally, in order to protect user privacy, Google does not allow advertisers to use "a remarketing list that targets an overly narrow or specific audience." *See* Google, "Advertising Policies Help - Personalized Advertising," https://support.google.com/adspolicy/answer/143465, accessed July 24, 2023. This also applies to a possible combination of remarketing and personalized targeting criteria. Google has minimum size requirements for target audience, which range from at least 100 to at least 1000 users in a remarketing list, or data segment, based on the type of ads served. *See* Google, "Google Ads Help - About Your Data Segment Compatibility," https://support.google.com/google-ads/answer/7476585, accessed July 25, 2023.

[154]  Google, "Advertising Policies Help - Personalized Advertising," https://support.google.com/adspolicy/answer/143465, accessed July 24, 2023 ("We define sensitive interest categories in terms of the following content policy principles: Legal restrictions: Ads must comply with the law. Personal hardships: Ads shouldn't target users in ways that exploit their difficulties or struggles. Identity and belief: Ads shouldn't target users

Google takes affirmative actions against developers who violate the terms they consent to. For example, measures that Google may take include but are not limited to blocking or limiting ads or suspension of accounts.[155]

71.     Developers may also want to act as advertisers and wish to integrate Google Advertising features to their Google Analytics account by linking their Google Ads account to their Google Analytics account.[156] Google Analytics accounts are not linked by default to Google Ads accounts; the developer must affirmatively link the two in order to integrate their capabilities.[157] In these instances, Google prohibits any attempt to identify users or merge any

---

based on categories prone to systemic discrimination or unfair stigmas. Sexual interests: Ads shouldn't target users based on inherently private sexual interests or experiences. Access to opportunities: Ads shouldn't limit access to opportunities by leveraging unfair societal biases when targeting users with specific content categories.").

[155] Google, "Advertising Policies Help - What Happens If You Violate Our Policies," https://support.google.com/adspolicy/answer/7187501, accessed July 25, 2023 ("Ads and assets that don't follow Google Ads policies will be disapproved. A disapproved ad won't be able to run until the policy violation is fixed and the ad is reviewed. […] Accounts may be suspended if we find violations of our policies or the Terms & Conditions. If we detect an egregious violation, your account will be suspended immediately without prior warning. An egregious violation of the Google Ads policies is a violation so serious that it is unlawful or poses significant harm to our users or our digital advertising ecosystem. Egregious violations often reflect that the advertiser's overall business does not adhere to Google Ads policies or that one violation is so severe that we cannot risk future exposure to our users.[…] If we suspend your account, all ads in the suspended account will stop running, and we will no longer accept advertising from you, unless successfully appealed. Any related accounts (for example, accounts using the same payment method) will also be suspended, and any new accounts you create will be automatically suspended. […] Remarketing lists that don't follow the Personalized advertising policy may be disabled. These lists can no longer be used with ad campaigns, and new users won't be added to the lists."). *See also* Google, "Advertising Policies Help - Personalized Advertising," https://support.google.com/adspolicy/answer/143465, accessed July 24, 2023.

[156] *See* **Section III.D.4** for more details.

[157] Ganem Declaration, ¶¶ 17-18 ("Google Ads is a separate, paid service provided by Google that enables businesses to promote their products and services. [...] If a developer also has both a Google Ads account and a Google Analytics account, they may also choose to link their Google Analytics property to their Google Ads account.").

information collected through Google features in order to create personally identifiable information, without prior and affirmative consent of users to do so.[158] Regardless of user consent, advertisers are not allowed to disaggregate data to identify individual users.[159] Google also provides developers with detailed instructions on how to disable personalized advertising, including how to exclude specific events and dimensions from use in personalized advertising.[160]

72.     In addition to prohibiting developers from transmitting information that would violate Google policies, Google also requires developers to inform their users about the use of cookies, app instance IDs, or advertising identifiers and explain how data are

---

[158] Google, "Advertising Policies Help - What Happens If You Violate Our Policies," https://support.google.com/adspolicy/answer/7187501, accessed July 25, 2023. Google, "Analytics Help - [GA4] Policy Requirements for Google Analytics Advertising Features," https://support.google.com/analytics/answer/2700409, accessed July 25, 2023 ("[developers] will not identify users or facilitate the merging of personally identifiable information with additional information collected through any Google advertising product or feature unless you have robust notice of, and the user's prior affirmative (i.e., opt-in) consent to, that identification or merger, and are using a Google Analytics feature that expressly supports such identification or merger. Irrespective of users' consent, you must not attempt to disaggregate data that Google reports in aggregate.").

[159] Google, "Analytics Help - [GA4] Policy Requirements for Google Analytics Advertising Features," https://support.google.com/analytics/answer/2700409, accessed July 25, 2023 ("This means you will not identify users or facilitate the merging of personally identifiable information with additional information collected through any Google advertising product or feature unless you have robust notice of, and the user's prior affirmative (i.e., opt-in) consent to, that identification or merger, and are using a Google Analytics feature that expressly supports such identification or merger. Irrespective of users' consent, you must not attempt to disaggregate data that Google reports in aggregate."). Once Google aggregates data, it cannot be used to identify organization, account, or users. *See* Google, "Data Sharing Settings - Analytics Help," https://support.google.com/analytics/answer/1011397, accessed July 25, 2023.

[160] Google, "[GA4] Exclude Specific Events and User-Scoped Custom Dimensions From Ads Personalization - Analytics Help," https://support.google.com/analytics/answer/9494752, accessed July 25, 2023.

collected and processed by the developer's web property and Google.[161,162] To assist developers in informing users and obtaining their consent, Google introduced a consent mode that allows users to communicate their privacy preferences with regards to cookie, app instance IDs, and advertising identifiers to Google.[163] Google then tailors behavior of

---

[161]  Google, "Google Analytics Terms of Service," May 15, 2023, https://marketingplatform.google.com/about/analytics/terms/us/ ("You must post a Privacy Policy and that Privacy Policy must provide notice of Your use of cookies, identifiers for mobile devices (e.g., Android Advertising Identifier or Advertising Identifier for iOS) or similar technology used to collect data. You must disclose the use of Google Analytics, and how it collects and processes data. This can be done by displaying a prominent link to the site "How Google uses information from sites or apps that use our services," (located at www.google.com/policies/privacy/partners/, or any other URL that Google may provide from time to time). You will use commercially reasonable efforts to ensure that a User is provided with clear and comprehensive information about, and consents to, the storing and accessing of cookies or other information on the User's device where such activity occurs in connection with the Service and where providing such information and obtaining such consent is required by law.").

[162]  Google also explains what information Google Analytics collects through its default implementation as number of users, session statistics, approximate geolocation, and browser and device information. Google also states how it stores unique client IDs and how to disable them. *See* Google, "Data Collection - Analytics Help," https://support.google.com/analytics/answer/11593727, accessed July 24, 2023 ("Google Analytics collects the following information through the default implementation: number of users, session statistics, approximate geolocation, browser and device information. See a full list of the default events and user properties collected by Google Analytics. Analytics also collects enhanced measurement events (when enabled) from web data streams and in-app purchases from app data streams. Identifiers for websites: Google Analytics stores a client ID in a first-party cookie named _ga to distinguish unique users and their sessions on your website. Analytics doesn't store the client ID when analytics storage is disabled through Consent Mode.").

[163]  Napkin, "Everything You Need to Know (So Far) About Google's Consent Mode," October 31, 2022, https://www.napkyn.com/blog-new/everything-you-need-to-know-so-far-about-googles-consent-mode ("Google released its "Consent Mode" in September 2020."). Google, "Analytics Help - Consent Mode on Websites and Mobile Apps," https://support.google.com/analytics/answer/9976101, accessed July 24, 2023 ("Consent mode lets you communicate your users' cookie or app identifier consent status to Google. Tags adjust their behavior and respect users' choices. Consent mode interacts with your Consent Management Platform (CMP) or custom implementation for obtaining visitor consent, such as a cookie consent banner. Consent mode receives your users' consent choices from your cookie banner or widget and dynamically adapts the behavior of Analytics, Ads,

analytics services to respect user's preferences. When a user does not consent, transmissions

to Google Analytics will not contain cookie values, app instance IDs, or advertising identifiers

(if enabled by a developer). Such transmissions can only be used for aggregate measurements

of website activities without attributing these activities to any user identifiers (i.e., cookie

values).[164]

73.     Google also mandates developers to notify users of Google advertising

features on their websites and inform users about ways to opt out of Google Analytics

Advertising features.[165]

---

and third-party tags that create or read cookies. When visitors deny consent, instead of storing cookies, tags send pings to Google. If you are using Google Analytics 4, Google fills the data collection gaps with conversion modeling and behavioral modeling.").

[164] Google, "Analytics Help - Consent Mode on Websites and Mobile Apps," https://support.google.com/analytics/answer/9976101, accessed July 24, 2023 ("Consent mode lets you communicate your users' cookie or app identifier consent status to Google. Tags adjust their behavior and respect users' choices. Consent mode interacts with your Consent Management Platform (CMP) or custom implementation for obtaining visitor consent, such as a cookie consent banner. Consent mode receives your users' consent choices from your cookie banner or widget and dynamically adapts the behavior of Analytics, Ads, and third-party tags that create or read cookies. When visitors deny consent, instead of storing cookies, tags send pings to Google. If you are using Google Analytics 4, Google fills the data collection gaps with conversion modeling and behavioral modeling.").

[165] When linking Google Analytics with Advertising features, developers are required to notify users in their privacy policy about: (1) the Google Analytics features they implemented; (2) how any first-party and third-party cookie will be used by the developer and any third-party vendor; and (3) how users can opt out of Google Analytics features by adjusting their ad settings or using other opt-out methods available to them, such as the Google Analytics opt-out browser add-on (*see* **Section IV.C**). *See* Google, "Google Analytics Opt-out Browser Add-on Download Page," https://tools.google.com/dlpage/gaoptout, accessed July 26, 2023; Google, "Analytics Help - [GA4] Policy Requirements for Google Analytics Advertising Features," https://support.google.com/analytics/answer/2700409, accessed July 25, 2023 ("[developers] are required to notify your visitors by disclosing the following information in your privacy policy: the Google Analytics Advertising Features you've implemented; how you and third-party vendors use first-party cookies (such as the Google Analytics cookie) or other first-party identifiers, and third-party cookies (such as Google advertising cookies) or other third-party identifiers together; how visitors can opt-out of the Google Analytics

74.     Users of Google's Advertising services (i.e., advertisers) are subject to the general data privacy requirements applicable to all Google products, as well as additional advertising policies that govern, for example, the use of personalized advertising, and advertising for products from specific categories, such as healthcare and medicine.[166]

### 2.     Google Proactively Classifies Web Properties to Prevent the Use of Potentially Sensitive Information

75.     I understand that Google uses two classification lists to proactively prevent the use of sensitive data, including health-related data, for remarketing and personalized advertising:[167] one of these lists (I**) restricts advertisers' use of data from web properties classified as "Sensitive" or "Mixed Content" to create audience lists for remarketing;[168,169] the other list (V*********) restricts the use of data from user visits to web properties

---

Advertising Features you use, including through Ads Settings, Ad Settings for mobile apps, or any other available means (for example, the NAI's consumer opt-out).").

[166]  Google, "Advertising Policies Help - Personalized Advertising," https://support.google.com/adspolicy/answer/143465, accessed July 24, 2023 ("Google's privacy policy applies to all Google features and dictates how Google collects, uses and protects user data."); Google, "Advertising Policies Help - Healthcare and Medicines," https://support.google.com/adspolicy/answer/176031, accessed July 24, 2023.

[167]  Takabvirwa Declaration, ¶ 5 ("There are two main sensitivity classification lists in the Google Ads system: (i) Personalized Ads Sensitivity, also known as I**; and (ii) V*********."). The names of the proprietary classification systems have been abbreviated.

[168]  Takabvirwa Declaration, ¶ 5 ("I** classification happens any time an advertiser is trying to create their own, first-party audience to re-target ads. The classification happens to the place where the audience is being gathered from, and the sensitivity carries on to the audiences. For example, if an advertiser wants to track users who visit their YouTube channel, the I** classification will review the first-party audience and will close the list if the YouTube channel is classified as sensitive.").

[169]  Takabvirwa Declaration, ¶ 19. Advertisers with domains classified as "Mixed Content" can create audience lists, but "ads targeted at those audiences are manually reviewed to prevent sensitive ads from being served to those audiences."

classified as "Sensitive" for subsequent ad personalization.[170] Other systems may build on these classifications and process them further.[171]

76.    Plaintiffs and Plaintiffs' experts identify several domains and subdomains as allegedly transmitting health-related information, as I discuss in **Section III.A**.[172] Out of the 11 domains tested by Mr. Smith, all but one were classified as "Sensitive" or "Mixed Content" in the I\*\* classification list.[173] Note, however, that regardless of any sensitivity classification, advertisers are not allowed to target ads based on health conditions, treatments, or procedures.[174] Similarly, all but one of these 11 domains were also classified as "Sensitive"

---

[170] Takabvirwa Declaration, ¶ 5 ("V\*\*\*\*\*\*\*\* classification occurs when Google wishes to understand a particular user's interests for purposes of personalized advertising. If a website or app falls within a sensitive V\*\*\*\*\*\*\*\* category, Google will not track information from content browsed on the sensitive app or websites. For example, for personalized advertising purposes, Google may remember that a user is interested in soccer, but will not remember that the user searched for a hospital.").

[171] Takabvirwa Declaration, ¶ 28 ("The A\*\*\*\*\*\*\*\* system is a personalization system that creates user profiles for ads personalization. The A\*\*\*\*\*\*\*\* system uses different forms of data, such as URLs, when building user profiles. The A\*\*\*\*\*\*\* system reads the V\*\*\*\*\*\*\* classifications when processing these various forms of data. Based on the classification in the V\*\*\*\*\*\*\*\* system, the data from that URL may be filtered out from the A\*\*\*\*\*\*\*\* system (such as in the case of "Sensitive" URLs listed below), and would not be used to build user profiles, and would therefore not be used for ads personalization. Based on the way the A\*\*\*\*\*\*\* system processes data, certain URLs may also be "Not Found" in the A\*\*\*\*\*\*\* system, and therefore data from those URLs also will not be used to build user profiles or for ads personalization.").

[172] Smith Declaration, ¶¶ 61-161.

[173] Takabvirwa Declaration, ¶ 7. The domain *uhc.com* belonging to a health insurance provider was classified as "Non Sensitive," while three other domains were classified as "Mixed Content."

[174] Takabvirwa Declaration, ¶ 21 ("Any advertising by web domains and apps must comply with the terms of Google's Advertising Policies, which prohibit advertisers from targeting ads based on personal hardships, such as physical or mental health conditions, treatments, or procedures.").

in the V********* classification list.[175] However, specific web URLs can be processed further to determine their eligibility for advertising purposes.[176]

77.    These classification systems categorize websites based on text they contain, and apps based on the description that developers create themselves when posting their apps on Apple's and Google's app stores.[177] Therefore, Google cannot determine with certainty whether certain app or website contains and may transmit health-related information and inherently involves a risk of misclassification. Contrary to developers, Google lacks full information to know whether a website is health-related or not. [178] For example, *https://standuptocancer.org/* is a website associated with an organization that raises funds for cancer research. Visitors to the website may consist of those who merely wish to donate to the organization regardless of whether the visitor has any sort of health condition. As another example, a visit to a university cancer research center *https://www.bumc.bu.edu/cancercenter/* that "provides […] patient care in combination with innovative research programs"[179] does not necessarily convey health status and is therefore difficult for any system to classify. A

---

[175] Takabvirwa Declaration, ¶ 26. The domain *uhc.com* belonging to a health insurance provider was classified as "Non Sensitive."

[176] For example, even though V********* classifies the domain *uhc.com* as "Non Sensitive," the A********* system determines the web URL *www.uhc.com* to be "Sensitive." *See* Takabvirwa Declaration, ¶ 28.

[177] Takabvirwa Declaration, ¶ 4 ("Web domains are classified based on the text on the website. Apps are classified based on the app's Play Store or iOS store description, which is created by the app developer.").

[178] Even app descriptions provided by developers may be misleading, a known issue that app stores try to address. *See, e.g.*, Brandon Russell, "Google Play is Cracking Down on Misleading App Names and Icons," XDA Developers, July 28, 2021, https://www.xda-developers.com/google-play-is-cracking-down-on-misleading-app-names-and-icons/.

[179] Boston University Medical Campus, "BU-BMC Cancer Center," https://www.bumc.bu.edu/cancercenter/, accessed August 1, 2023.

classification system that, for example, screens websites for the presence of certain medical terms would misclassify such a website as sensitive despite the fact that visitors to the website do not convey any sensitive health information through their interactions with the website.

78.     Google's classification system may also not be able to perfectly classify websites that contain mixed content. For example, the *kaiserpermanente.org* domain contains webpages ranging from health advice[180] to climate environmental concerns[181] and is classified as "Mixed Content" according to the I** classification.[182] Google manually reviews ads targeted to advertiser-curated audience lists for web properties classified as "Mixed Content."[183]

79.     Google takes further steps to give additional controls to websites by allowing them to exclude specific data from being used for ads personalization.[184] Therefore, developers not only have the responsibility to use Google's services in accord with the terms

---

[180] *See, e.g.*, Kaiser Permanente, "Higher Survival Rates for Our Patients With Colon Cancer," June 22, 2023, https://about.kaiserpermanente.org/health-and-wellness/health-research/news/higher-survival-rates-for-our-patients-with-colon-cancer.

[181] *See, e.g.,* Kaiser Permanente, "Engaging Businesses for Action on Climate and Health Equity," June 7, 2023, https://about.kaiserpermanente.org/commitments-and-impact/healthy-communities/news/engaging-businesses-for-action-on-climate-and-health-equity.

[182] Takabvirwa Declaration, ¶ 7.

[183] Takabvirwa Declaration, ¶ 19 ("Web domains and apps classified as 'Mixed Content' may build advertiser-curated audience lists, but ads targeted at those audiences are manually reviewed to prevent sensitive ads from being served to those audiences.").

[184] Google, "[GA4] Exclude Specific Events and User-Scoped Custom Dimensions From Ads Personalization - Analytics Help," https://support.google.com/analytics/answer/9494752, accessed July 25, 2023 ("You can exclude specific events or user-scoped custom dimensions from being used to personalize ads, and thus reserve that data for measurement purposes only.").

they consent to but also have all necessary tools to prevent the use of particular pieces of health-related information for personalized advertising.

### 3. Google Internal Data Policies and Practices Anonymize Data and Prevent Identifying Individuals

#### a) Google Pseudonymizes Data and Forbids Unauthorized Joining of Pseudonymous and Non-Pseudonymous Data

80.        Cookies, app instance IDs, and advertising IDs are not linked to any personal information, and Google also takes additional steps to ensure that information Google receives cannot be used to identify individuals.[185] For example, Google's policies indicate that the first-party cookie _ga (as with other cookies) is pseudonymous and "cannot be used to track a given user or browser across unrelated websites," meaning that Google or any other party cannot connect _ga cookie values for the same user across the different web properties this user visits.[186] As described in **Section III.C.2**, _ga cookie values are Client

---

[185] Ganem Declaration, ¶ 47 ("After the consent check is complete, Google removes data from both of the duplicated logs to prevent "joining," or combining of the disparate data parts to identify pseudonymized users. All pseudonymized identifiers are removed from the signed-in GAIA copy of the data. Conversely, all signed-in identifiers are removed from the pseudonymous log.").

[186] Google, "How Google Uses Cookies – Privacy & Terms," https://policies.google.com/technologies/cookies, accessed July 25, 2023 ("For example, Google Analytics uses a set of cookies to collect information and report site usage statistics without personally identifying individual visitors to Google. '_ga', the main cookie used by Google Analytics, enables a service to distinguish one visitor from another and lasts for 2 years. Any site that implements Google Analytics, including Google services, uses the '_ga' cookie. Each '_ga' cookie is unique to the specific property, so it cannot be used to track a given user or browser across unrelated websites."); Ganem Declaration, ¶ 35 ("Google Analytics uses a set of cookies to collect data and report site usage statistics without personally identifying individuals. For example, the cookie "_ga," enables websites and apps to distinguish visitors, but does not allow Google or the website or app to identify any given visitor. Each "_ga" cookie is unique to the specific website or app of a business and cannot, by themselves, be used to track an individual's activity across the websites and apps of different businesses.").

IDs, which are pseudonymous identifiers that cannot be used to identify individuals and can be reset (as with other cookie values) when users clear browsers' cookies or enter private browsing mode.

81.      Further, in GA4, users' IP addresses are not recorded.[187] In Universal Analytics, an older version of GA4, Google allowed developers to request IP address masking for users accessing their web properties, which truncated users' IP addresses.[188]

82.      Unless users are signed into their Google Account *and* enable various settings that consent to their data being linked with their Google Account (described in detail below), all user data is treated completely pseudonymously. For these users who have not given Google's permission, Google implements measures to prevent connecting pseudonymous data with non-pseudonymous identifiers, such as users' Google Accounts.

---

[187]  Google, "EU-Focused Data and Privacy - Analytics Help," https://support.google.com/analytics/answer/12017362, accessed July 25, 2023 ("Google Analytics 4 does not log or store individual IP addresses. Analytics does provide coarse geo-location data by deriving the following metadata from IP addresses: City (and the derived latitude, and longitude of the city), Continent, Country, Region, Subcontinent (and ID-based counterparts). For EU-based traffic, IP-address data is used solely for geo-location data derivation before being immediately discarded. It is not logged, accessible, or used for any additional use cases.").

[188]  Google, "IP Masking in Universal Analytics - Analytics Help," https://support.google.com/analytics/answer/2763052, accessed July 25, 2023 ("When a customer of Universal Analytics requests IP-address masking, Analytics truncates the address as soon as technically feasible. The IP-masking feature in Universal Analytics sets the last octet of Ipv4 user IP addresses and the last 80 bits of Ipv6 addresses to zeros in memory shortly after being sent to Google Analytics. The full IP address is never written to disk in this case. Geographic dimensions are later derived from truncated IP addresses.").

Universal Analytics was released to the public in April 2014 and was retired on July 1, 2023. *See* Google, "Google Analytics Solutions: Universal Analytics: Out of Beta, Into Primetime," https://analytics.googleblog.com/2014/04/universal-analytics-out-of-beta-into.html, accessed July 24, 2023; Google, "Analytics Help - [GA4] Introducing the Next Generation of Analytics, Google Analytics 4," https://support.google.com/analytics/answer/10089681, accessed July 24, 2023.

These measures include data encryption, strict data retention policies, and restricted access for Google employees.[189]

> b) *Google Analytics Pseudonymous Data Is Not Linked to Google Accounts Unless Explicitly Consented by Users*

83.     As illustrated by **Figures 6, 7,** and **8**, a user who signs into their Google Account has access to various privacy preferences, including the option to enable WAA, sWAA, GAP, and NAC.[190] sWAA and NAC are disabled by default and require affirmative opt-in from the user.

---

[189] Ganem Declaration, ¶¶ 48-50 ("Google then employs multiple techniques to further ensure the pseudonymous data and GAIA-tied data cannot be joined. First, Google creates "fuzziness" or slight errors in the data. For example, Google adds random error into timestamps in GAIA-linked logs so they cannot be matched with timestamps elsewhere. Second, Google encrypts certain identifiers using short-term retention keys that are deleted after a fixed period of time. After the keys are deleted, decryption is impossible. Google uses separate encryption keys for pseudonymous logs and GAIA-linked logs. Additionally, Google only stores the data for a fixed period of time. AdID and IDFA, for example, are stored in an encrypted form for 60 days to allow for reprocessing at the user's request or when necessary to correct errors. The encryption keys are stored for 60 days under strict monitoring. Google personnel are barred from using these keys without authorization and Google has monitors in place to ensure unauthorized use does not occur. Finally, Google uses a restricted need-based access process. Data stored in the logs is tiered. None of the tiers include personally identifiable information. The lowest level tier, which is the default access tier, includes only event data. Google employees therefore cannot see any identifiers by default. In order to query a log in a higher tier, Google employees must submit a request ticket which allows Google to audit and track the request. The employee must explain why they need that specific level of access. If granted, the access is restricted temporally. Employees must re-request access after the time period has concluded if access is still necessary.").

[190] WAA, when enabled, "allows Google to save a Google Account owner's searches and other activity on Google-owned web properties such as Chrome or Google Maps to the user's Google Account for the purpose of improving and personalizing the user experience." sWAA is a supplemental setting of WAA and, when enabled, "allows Google to save a user's activity on third-party websites and apps that use Google services to the user's Google Account." Ganem Declaration, ¶ 39.

**Figure 6**
**Web & App Activity Controls of Google Account Holders**[191]



84.        If, and only if, a user signs into their Google Account, enables *all* four settings, *and* visits websites for which developers have enabled Google Signals,[192] their Google Analytics data can be saved to their Google Account ID ("GAIA ID").[193]

---

Google Account holders also have the option to enable GAP, "a feature which allows users to tailor the ads they see based on the web and app activity saved to their accounts." If a user elects to enable GAP, they can choose to also enable NAC, a supplemental GAP setting that "indicates a desire to combine their activity data on third party apps and websites with their activity on Google's first party apps and websites and to allow Google to use that combined data for ads personalization." Ganem Declaration, ¶ 40.

[191]   After signing into a Google account, WAA and sWAA controls can be modified at https://myactivity.google.com/activitycontrols, accessed August 2, 2023.

[192]   Google Signals are discussed in **Section III.D.4.**

[193]   Ganem Declaration, ¶ 41 ("In order for a given website or app to save Google Analytics data to a person's GAIA ID who has turned on WAA, sWAA, GAP and NAC, the website or app developer must turn on Google Signals. Google Signals is an optional feature that allows developers to access session data associated with users who have turned on WAA, sWAA,

**Figure 7**
**Google Ads Personalization for Google Account Holder**[194]



GAP and NAC, and are signed into their Google Account. Therefore, a user's GAIA ID can only be collected along with their Google Analytics data for a given app or website when (1) the user has signed in to their Google account; (2) the user has turned on WAA, sWAA, GAP, and NAC; and (3) the website or app developer has enabled Google Signals."). *See also* Google, "Analytics Help - [GA4] Activate Google Signals for Google Analytics 4 Properties," https://support.google.com/analytics/answer/9445345, accessed July 31, 2023.

[194]   After signing into a Google account, settings for personalized ads can be modified at https://myaccount.google.com/data-and-privacy, accessed August 2, 2023.

**Figure 8**
**Control Over Data Used to Personalize Ads on Sites that Partner with Google**[195]



#### B. Developers Are Responsible for Data They Transmit to Google and Have Information and Tools Needed to Prevent Transmission of PHI

       *1.*     *Google Does Not Intercept User Data, Rather Developers Choose to Include or Remove Code from Their Web Properties*

      85.     Plaintiffs allege that Google's code, which developers willingly integrate into their web properties to obtain additional functionalities, "causes the interception of the patient's identifiers, along with the communication content […] and will transmit that

---

[195] After signing into a Google account, settings for control over data used for Google Ads personalization can be modified at https://myaccount.google.com/data-and-privacy, accessed August 2, 2023.

information to Google properties [.]"[196] For example, Plaintiffs mischaracterizes a diagram published by Google that "explains how Google Analytics collects, filters, and stores data," to claim that Google's code "causes the interception and redirection of HTTPS Requests to Google Analytics."[197]

86.     Developers are the ones who voluntarily decide which, if any, third-party code (including code offered by Google) is embedded into their web property's source code to enable functionalities that developers may not have the resources to develop themselves.[198] Google's code, as intended by developers, may trigger communications to third-party servers to access necessary resources from these servers or to rely on them to perform computationally demanding tasks (e.g., to summarize data in Google Analytics). As such, developers intend

---

[196] Complaint, ¶ 5 ("By way of example, when a patient visits a Health Care Provider's web property and searches for a particular doctor to treat their […] the patient is communicating with their Health Care Provider. But, where the Google Source Code is present, the Google Source Code causes the interception of the patient's identifiers, along with the communications content […] and will transmit that information to Google properties, such as Google Analytics, Google Ads and Google Display Ads. Likewise, when a patient logs in to their patient portal they are making a communication with their Health Care Provider and confirming their status as a patient of the hospital. But, where the Google Source Code is present, the Google Source Code causes the interception and transmission of the patient's identifiers, along with the specific action taken […] to Google (in many instances, this information is also accompanied by the exact date and time of log-ins and log-outs)."). *See also* Libert Declaration, ¶ 9 ("[…] I was able to […] conduct testing to identify the websites where the inclusion of Google source code caused the interception and transmission of patient information to Google.").

[197] Google, "Safeguarding Your Data - Analytics Help," https://support.google.com/analytics/answer/6004245, accessed July 25, 2023 ("Download this diagram that explains how Google Analytics collects, filters, and stores data."); Complaint, ¶ 50 ("As illustrated in the above diagram, the Google Source Code causes the interception and redirection of HTTPS Requests to Google Analytics. According to Google's own diagram, the redirected HTTPS request includes, among other things: 'Cookies & Identifiers,' which include the identifiers at issue in this action; and 'Request URL' and 'Query string parameters,' which include the 'content of communications' at issue in this action.").

[198] *See* **Section III.A.1.**

for Google to receive the data sent by their web properties with a clear purpose of leveraging Google services. Google does not require any developer to use its services, and it provides detailed public documentation, as discussed above in **Section IV.A.1**, that clearly explains what types of data may be transmitted to Google if a developer chooses to use one of its products. Contrary to Plaintiffs' allegations, Google does not—and cannot—intercept the data since the developers *intentionally* send them to Google's servers in the first place.

### 2. Developers Make Explicit Choices Relating to What Data to Transmit to Google

87.     When developers set up Google Analytics for their websites, they may only incorporate Google Analytics code on pages of their websites that are not covered under HIPAA.[199] Google provides clear guidance for developers to determine whether data may or may not qualify as PHI. Google also advises developers to err on the side of caution to not deploy Analytics code on "pages that are related to the provision of health care services."[200]

---

[199]  Google, "HIPAA and Google Analytics - Analytics Help," https://support.google.com/analytics/answer/13297105, accessed July 24, 2023 ("Customers must refrain from using Google Analytics in any way that may create obligations under HIPAA for Google. HIPAA-regulated entities using Google Analytics must refrain from exposing to Google any data that may be considered Protected Health Information (PHI), even if not expressly described as PII in Google's contracts and policies.").

[200]  Google, "HIPAA and Google Analytics - Analytics Help," https://support.google.com/analytics/answer/13297105, accessed July 24, 2023 ("For HIPAA-regulated entities looking to determine how to configure Google Analytics on their properties, the HHS bulletin provides specific guidance on when data may and may not qualify as PHI. Here are some additional steps you should take to ensure your use of Google Analytics is permissible: [...] Unauthenticated pages that are related to the provision of health care services, including as described in the HHS bulletin, are more likely to be HIPAA-covered, and customers should not set Google Analytics tags on HIPAA-covered pages.").

88.     After developers set up their Google Analytics account, they can further choose whether to share data with other Google products and services, for modeling contributions and business insights, technical support, and to help develop and improve Google Analytics services.[201] In all those cases, developers are in control of whether they wish to share Google Analytics data.

89.     To further protect user privacy, developers also have the ability to disable the collection of location and device data, which include information on city name, latitude and longitude (of city), browser version, device brand and model, and device name.[202]

90.     Similarly, app developers who choose to incorporate the Google Analytics for Firebase SDK into their apps have control over the collection and use of Google Analytics data, including the option to disable the collection of advertising identifiers (see **Figures 9A** and **9B**) or add option to their app that allows users to delete the app instance ID and other analytics data stored locally on their devices, and reset app instance ID in the process (see **Figure 9C**).[203]

---

[201]  Google, "Data Sharing Settings - Analytics Help," https://support.google.com/analytics/answer/1011397, accessed July 25, 2023.

[202]  Google, "EU-Focused Data and Privacy - Analytics Help," https://support.google.com/analytics/answer/12017362, accessed July 25, 2023.

[203]  Google, "Google Analytics for Firebase: Configure Analytics Data Collection and Usage - Android," https://firebase.google.com/docs/analytics/configure-data-collection?platform=android, accessed July 25, 2023; Google, "Privacy Controls in Google Analytics - Analytics Help," https://support.google.com/analytics/answer/9019185, accessed July 25, 2023 ("The Google Analytics for Firebase SDK lets you add controls to your app so that users can delete Analytics data stored locally on their mobile devices, and reset the app-instance ID in the process."); Google, "FirebaseAnalytics," https://firebase.google.com/docs/reference/android/com/google/firebase/analytics/FirebaseAnalytics, accessed July 26, 2023 ("[public] void resetAnalyticsData () [-] Clears all analytics data for this app from the device and resets the app instance id.").

**Figure 9A**
**Disabling Advertising Identifier Collection in Android[204]**

> **Disable Advertising ID collection**
>
> If you wish to disable collection of the Advertising ID ↗ in your Android app, you can set the value of `google_analytics_adid_collection_enabled` to `false` in your app's `AndroidManifest.xml` in the `application` tag. For example:

**Figure 9B**
**Disabling Advertising Identifier Collection in iOS[205]**

> **Disable IDFA collection**
>
> If you installed Firebase through CocoaPods by adding `pod 'Firebase/Analytics'` to your app's Podfile and wish to disable collection of the IDFA (a device's advertising identifier) in your Apple app, ensure that the AdSupport framework is not included in your app.

**Figure 9C**
**Resetting App Instance ID in Google Analytics for Firebase SDK[206]**

> **public void resetAnalyticsData ()**
>
> Clears all analytics data for this app from the device and resets the app instance id.

---

[204] Users can find instructions for disabling Advertising Identifier collection in Android at https://firebase.google.com/docs/analytics/configure-data-collection?platform=android, accessed August 2, 2023.

[205] Users can find instructions for disabling Advertising Identifier collection in iOS at https://firebase.google.com/docs/analytics/configure-data-collection?platform=ios, accessed August 2, 2023.

[206] Users can find instructions for resetting app instance ID in Google Analytics for Firebase SDK at https://firebase.google.com/docs/reference/android/com/google/firebase/analytics/FirebaseAnalytics, accessed August 2, 2023.

91.     Furthermore, developers who use Google Advertising services to monetize traffic on their websites have the option to mark their data as "non-personalized ads (NPA)" to prevent Google from using this information in targeted advertising.[207]

### 3.     Developers Are Required to Inform Visitors of Their Web Property about the Use of Cookies and Data Transmission

92.     As I explained in **Section IV.A.1**, Google requires developers who choose to use its services to inform visitors and seek their consent before collecting their information. Several of the web properties analyzed by Mr. Smith contain such disclosures and require consent before transmitting any information to Google.

93.     For example, MemorialCare web property prompts new visitors to "accept" their use of cookies:[208]

**Figure 10**
**Example of Consent Prompt on MemorialCare Website**[209]



We use cookies to give you the best experience. By using our site, you agree to our use of cookies. Please review our **privacy policy** to learn more.          Accept

94.     Their privacy policy, which is hyperlinked in the prompt, informs users about why MemorialCare collects information, how the information will be used or disclosed,

---

[207] Google, "[GA4] Exclude Specific Events and User-Scoped Custom Dimensions From Ads Personalization - Analytics Help," https://support.google.com/analytics/answer/9494752, accessed July 25, 2023.

[208] MemorialCare, "Top Hospitals & Doctors in Orange & LA County," https://www.memorialcare.org/, accessed July 26, 2023.

[209] A consent prompt will appear when visiting web property referenced by Mr. Smith at https://www.memorialcare.org/, accessed July 26, 2023. *See* Smith Declaration, ¶ 143.

and how users may update or delete identifiable information from MemorialCare's records. MemorialCare also urges users "not willing to accept the terms of this Privacy Policy [to] not use our website."[210] MemorialCare also informs its visitors about its use of Google Analytics and Advertising services, which may "gather and store information about [user's] visit" such as the date and time of the visit, the pages visited, and approximate location, among others.[211] The privacy policy also notes that the information is "only used in aggregate" and "cannot be used to identify you as an individual."[212] MemorialCare also provides users information on the consequences of disabling cookies, if they choose to do so.[213]

95.    Several of the healthcare providers referenced in Plaintiff expert reports disclose the use of information for business analytics purposes within privacy policies listed on their websites. The use of Google Analytics is disclosed by the following: MedStar

---

[210] MemorialCare, "Privacy Policy," https://www.memorialcare.org/policies-legal-notices/privacy-policy, accessed July 26, 2023 ("This MemorialCare Privacy Policy ('Privacy Policy') describes how MemorialCare collects information from you or about you online through our website at memorialcare.org ('website'), why we collect this information, how we will use or disclose this information, how you may update or delete identifiable information about you from our records as well as some other general information about our privacy practices. By accessing, browsing and/or using our website, you are deemed to accept the terms of this Privacy Policy. If you are not willing to accept the terms of this Privacy Policy, please do not use our website.").

[211] MemorialCare, "Privacy Policy," https://www.memorialcare.org/policies-legal-notices/privacy-policy, accessed July 26, 2023.

[212] MemorialCare, "Privacy Policy," https://www.memorialcare.org/policies-legal-notices/privacy-policy, accessed July 26, 2023.

[213] MemorialCare, "Privacy Policy," https://www.memorialcare.org/policies-legal-notices/privacy-policy, accessed July 26, 2023 ("Most browsers automatically accept these cookies. You usually can change your browser setting to prevent the acceptance of cookies, but this may prevent you from using some of the features of our website. Information collected through cookies is not linked to any personally identifiable information.").

Health,[214] MemorialCare,[215] Mercy,[216] and Planned Parenthood.[217] Several websites disclose

the use of information gathered from cookies for business analytics purposes, and also

---

[214] MedStar Health, "Online Privacy Policy," November 13, 2021, https://www.medstarhealth.org/online-privacy-policy ("We may use certain third-party web analytics services, such as Google Analytics, to help us understand and analyze how visitors use the Site and to serve ads on our behalf across the Internet. We've implemented Google Analytics Advertising features on the Site (including interest-based advertising, audience targeting, demographics and interests reporting, device reporting, display advertising, and video ads reporting).", "For more information on how Google Analytics uses data collected through the Site, visit: https://policies.google.com/technologies/partner-sites.").

[215] MemorialCare, "Privacy Policy," https://www.memorialcare.org/policies-legal-notices/privacy-policy, accessed July 26, 2023 ("Google's Universal Analytics: MemorialCare uses Google's Universal Analytics (UA) software to gather and store information about your visit.", "The basic information we collect includes: the date and time of your visit to our website; the pages and documents you viewed on our website; the URL of the website you visited prior to ours; the type and version of your Web browser and operating system; your location at the time of your visit, down to the city-level. The Google Analytics Privacy Policy is available at https://www.google.com/intl/en/policies/privacy/", "Google Analytics: MemorialCare may employ tools provided by Google Analytics to support Display Advertising, including Remarketing, Google Display Network Impression Reporting, data collection via advertising cookies and anonymous identifiers, the DoubleClick Campaign Manager integration and/or Google Analytics Demographics and Interest Reporting. In general, this means that third-party vendors, including Google, may show MemorialCare ads on sites across the Internet based upon visits to MemorialCare websites. To implement these tools, MemorialCare and third-party vendors, including Google, use first-party cookies and third- party cookies together to inform, optimize, and serve ads based on past visits to MemorialCare websites.").

[216] Mercy, "Website Terms & Privacy," https://www.mercy.net/about/legal-notices/, accessed July 14, 2023 ("Mercy uses third party service providers, including but not limited to Google Analytics, Adobe Analytics, and cookies in order to improve our service, user experience, and to analyze how the website is used. Aside from your device's Internet Protocol address (IP address), which can disclose your general location, the information collected by Google Analytics and Adobe Analytics is anonymized traffic data including length of stay on the Website, browser information, and device information. The collected information is used to provide an overview of how people are accessing and using the Website. For information about how Google Analytics uses data when you use partners' sites or apps see www.google.com/policies/privacy/partners (https://policies.google.com/technologies/partner-sites).").

[217] Planned Parenthood, "Privacy Policy," June 7, 2021, https://www.plannedparenthood.org/privacy-policy ("We and our affiliates may use the information we collect from or about you through the Online Services for a number of purposes, including, but not limited to: … generating and analyzing statistics about your use

reference Google in another section of the privacy policy: Gundersen Health System,[218]

Kaiser Permanente,[219] and UnitedHealthcare.[220] Additionally, some websites disclose the use

of the Online Services", "We also collect this information by setting a unique anonymous identifier called User ID, set by Universal Google Analytics.").

[218] Gundersen Health System, "Privacy Policy," https://www.gundersenhealth.org/privacy, accessed July 14, 2023 ("We automatically collect and temporarily store the following information about your visit: the name of the domain you use to access the Internet (for example, aol.com, if you are using an America Online account); the date and time of your visit; the pages you visited; and the address of the web site you came from when you came to visit. We use this information for statistical purposes and to help us make our site more useful to visitors.", "If you are interested in opting-out of advertising cookies, please visit https://tools.google.com/dlpage/gaoptout/.").

[219] Kaiser Permanente, "Website and Mobile Application Privacy Statement," October 2021, https://healthy.kaiserpermanente.org/privacy ("Kaiser Permanente routinely gathers data on Site activity, such as how many people visit the Site, the web pages or mobile screens they visit, where they come from, how long they stay, etc. The data is collected on an aggregate basis, which means that no personally identifiable information is associated with the data. This data helps us improve our content and overall usage. The information is not shared with other organizations for their independent use. The Site does not honor a browser's signal or header request not to track the user's activity.", "We may also place a persistent third-party cookie (provided by Google) on your hard drive if you sign on to kp.org. This cookie will prevent kp.org members from seeing advertising that is targeted towards people who are not members of Kaiser Permanente's health plan, when searching on Google.").

[220] UnitedHealthcare, "Online Services Privacy Policy," December 21, 2022, https://www.uhc.com/privacy ("We may use your Information: …To perform analytics and to improve our products, Online Services, and advertising", "We may also use third-party analytics companies to provide these services.", "In addition, you may also have additional means to manage the collection of Activity Information by: …Visiting Google to "Opt-Out" of display advertising or customize Google display network ads").

of information for business analytics purposes, but do not reference Google specifically: Effingham Health System,[221] Invega,[222] Keck Medicine,[223] and OSF HealthCare.[224]

96.     Several of the websites that offer disclosures regarding the use of information for analytics in their privacy policies also provide instructions on how to disable or "opt-out" of third-party analytics tools or adjust cookie settings. The following healthcare providers analyzed in Smith Declaration offer users links to opt-out of third-party analytics and targeted advertising, with some also offering cookie disabling instructions: Gundersen

---

[221] Effingham Health System, "Privacy Disclaimer and Informed Consent," https://www.effinghamhealth.org, accessed July 27, 2023 ("Effingham Hospital may collect IP addresses in order to conduct its internal healthcare operations, system administration, report aggregate information internally, and to conduct site analysis.").

[222] Invega, "Cookie Policy," December 19, 2019, https://www.invega.com/cookie-policy ("This Cookie Policy is designed to tell you about our practices regarding the collection of information through cookies and other tracking technologies (like gifs, web beacons, etc.). The functionalities for which we use these technologies may include the following: …[a]nalyzing the use of our products, services or applications, assisting with our promotional and marketing efforts (including behavioral advertising)").

[223] Keck Medicine, "Privacy Policy," https://www.keckmedicine.org/privacy-policy/, accessed July 14, 2023 ("We use cookies to continuously improve our site. By knowing how often you visit our site and what information is most interesting to you, we are able to create content that better serves our patients needs.").

[224] OSF HealthCare, "Website Privacy Policy," July 7, 2023, https://www.osfhealthcare.org/legal/privacy/ ("We may disclose aggregated information about our users, and information that does not identify any individual, without restriction. We may disclose personal information that we collect or you provide as described in this privacy policy: …To third parties who provide analytics and advertising for our services to you on both our Websites and on unaffiliated websites.").

Health System,[225] Kaiser Permanente,[226] MedStar Health,[227] MemorialCare,[228] Planned

Parenthood,[229] and UnitedHealthcare.[230] Additional healthcare providers offer instructions on

---

[225] Gundersen Health System, "Privacy Policy," https://www.gundersenhealth.org/privacy, accessed July 14, 2023 ("If you are interested in opting-out of advertising cookies, please visit https://tools.google.com/dlpage/gaoptout/.").

[226] Kaiser Permanente, "Website and Mobile Application Privacy Statement," October 2021, https://healthy.kaiserpermanente.org/privacy ("Our ad network service provider uses cookies, Web beacons, and other tracking technologies to collect information about your activities on this and other websites and to then provide you with KP advertising on other websites. We may also place a persistent third-party cookie (provided by Google) on your hard drive if you sign on to kp.org. This cookie will prevent kp.org members from seeing advertising that is targeted towards people who are not members of Kaiser Permanente's health plan, when searching on Google. If you wish to not have this information used for the purpose of serving you targeted ads, you may opt out (https://optout.networkadvertising.org/?c=1).").

[227] MedStar Health, "Online Privacy Policy," November 13, 2021, https://www.medstarhealth.org/online-privacy-policy ("To find out more about how these third-party analytics services manage the privacy of information in conjunction with delivering ads online, and how to opt out of information collection by these networks, please visit: https://youradchoices.com/, https://youradchoices.com/appchoices, or https://thenai.org/.", "To opt out of Google Analytics cookies, visit: https://adssettings.google.com/authenticated and https://tools.google.com/dlpage/gaoptout/.").

[228] MemorialCare, "Privacy Policy," https://www.memorialcare.org/policies-legal-notices/privacy-policy, accessed July 26, 2023 ("You can opt-out of receiving DoubleClick advertising at https://support.google.com/ads/answer/2662922?hl=en.", "You usually can change your browser setting to prevent the acceptance of cookies, but this may prevent you from using some of the features of our website.").

[229] Planned Parenthood, "Privacy Policy," June 7, 2021, https://www.plannedparenthood.org/privacy-policy ("If you do not want the Online Services to collect information through the use of cookies, you can set your web browser to reject cookies from the Online Services. Each browser is different, so you should check your browser's "Help" menu to learn how to change your cookie preferences. If you reject or block cookies from the Online Services, however, the Online Services may not function as intended. In addition to the records left on your computer by cookies, your browser and operating system contain other records of your web browsing and other actions (e.g., browser history). As with cookies, you can find information about how to clear these history trails in your browser's "Help" menu.", "To opt-out of Google Analytics for the web, visit the Google Analytics opt-out page https://tools.google.com/dlpage/gaoptout and install the add-on for your browser.").

how to disable cookies: Effingham Health System,[231] Invega,[232] Keck Medicine,[233] and OSF HealthCare.[234]

## C.    Users Can and Do Prevent Data Transmissions to Google

97.    Users have access to numerous settings and browser add-ons that would prevent data transmissions to Google and other third-party service providers. For websites, users can use browsers that differ in default privacy settings, browser settings, and extensions such as cookie settings, various ad blocking extensions, and other browser add-ons that are designed to affect certain transmissions of data. For apps, users have the option to reset their

---

[230]  UnitedHealthcare, "Online Services Privacy Policy," December 21, 2022, https://www.uhc.com/privacy ("For more information about third-party advertising networks and similar entities that use these technologies, see https://youradchoices.com/control, and to opt-out of such ad networks' and services' advertising practices, go to https://optout.aboutads.info/ and https://optout.networkadvertising.org/.", "You may disable cookies and similar items by adjusting your browser preferences at any time", "In addition, you may also have additional means to manage the collection of Activity Information by: … Visiting https://www.google.com/settings/ads to "Opt-Out" of display advertising or customize Google display network ads").

[231]  Effingham Health System, "Privacy Disclaimer and Informed Consent," https://www.effinghamhealth.org, accessed July 27, 2023 ("The "help" section, located on the toolbar of most browsers, will tell you how to prevent your browser from accepting new cookies, how to have the browser notify you when you receive a new cookie or how to disable cookies altogether.").

[232]  Invega, "Cookie Policy," December 19, 2019, https://www.invega.com/cookie-policy ("Except where allowed by applicable law, we place cookies after having received your consent through the cookie banner or preference center. You can change your cookie settings per cookie category (except for strictly necessary cookies that are required for the proper functioning of the site) at any time by clicking on the "cookie settings" button below:").

[233]  Keck Medicine, "Privacy Policy," https://www.keckmedicine.org/privacy-policy/, accessed July 14, 2023 ("You can reset your browser to refuse all cookies or to indicate when a cookie is being sent.").

[234]  OSF HealthCare, "Website Privacy Policy," July 7, 2023, https://www.osfhealthcare.org/legal/privacy/ ("You may refuse to accept browser cookies by activating the appropriate setting on your browser.", "You can set your browser to refuse all or some browser cookies, or to alert you when cookies are being sent.").

device's identifiers or block apps from accessing these identifiers altogether. These privacy-related measures are widely used and, as shown in my testing, do affect what data flow from user browsers. Users who deploy these tools can limit transmission of personal data, including the at-issue personal health-related data. These types of user choices would impact what, if any, health-related data may be transmitted to Google domains during a visit of a healthcare web property and would therefore require individualized analysis. Plaintiffs and plaintiffs' experts ignore the fact that users have many tools that allow them to customize the flow information during their browsing sessions.

*1.    Cookie Settings*

98.      Most modern browsers, including Chrome, Edge, Firefox, and Safari, allow users to modify cookie settings and thereby provide users options to allow or block transmissions of certain types of cookies.[235] For example, users of Chrome can allow all cookies, block third-party cookies, or block all cookies (see **Figure 11**).[236]

---

[235]  Patti Croft, "How To Enable and Disable Cookies on Every Web Browser," All About Cookies, June 14, 2023, https://allaboutcookies.org/how-to-manage-cookies. In 2020, an ad-serving company called Flashtalking published its annual Cookie Rejection Report, which examines cookies being blocked or deleted by web browsers. The company evaluated data from 36 different advertisers over a 30-day period in 2019, covering over six billion impressions. The report found that on average, 64% of cookies were rejected across devices, with a 41% rejection rate for desktop, 73% rejection rate for tablet, and 79% rejection rate for mobile devices. Cookie rejection occurs because users are in an environment where cookies do not function or because browsers implement cookie blocking settings.

[236]  Google, "Google Chrome Help - Clear, Allow & Manage Cookies in Chrome," https://support.google.com/chrome/answer/95647, accessed July 25, 2023.

**Figure 11**
**Chrome Cookie Settings**[237]



99.        To evaluate the impact of cookie settings on data that Chrome transmits to Google, I visited one of the websites tested by Mr. Smith and compared cookie transmissions under default Chrome settings—which in non-private browsing mode allow all cookies—with cookie transmission under the "Block third-party cookies" settings. I discuss technical details of my testing in **Appendix C**, which also contains an explanation of first- and third-party cookies. **Exhibit 1** summarizes the results of my cookie blocking test. Under default Chrome settings, both first- and third-party cookies were sent to domains associated with Google. However, when I changed the Chrome browser setting to block third-party cookies, I observed that *no* third-party cookies were sent to Google domains. As expected, first-party cookies continued to be transmitted to Google domains. When I changed the setting to block all cookies, I observed that *no* cookies were sent to Google domains.

---

[237]  Google users can modify their cookie settings at chrome://settings/cookies, accessed August 2, 2023.

2.      *Browsers Add-ons*

100.    Most modern browsers allow users to install extensions, including those that prevent or restrict data transmissions. For example, users can install Google Analytics Opt-out Add-on extension. This extension was developed by Google to "provide website visitors the ability to prevent their data from being collected and used by Google Analytics" (see **Figure 12**).[238]

**Figure 12**
**Google Analytics Opt-out Add-on Extension**[239]



101.    Using the same website as above, my testing confirmed that Google Analytics Opt-out Add-on extension operates as expected. **Exhibit 2** shows that the _ga cookie was not transmitted to the Google domain when I enabled the Google Analytics Opt-out Add-on extension.

102.    Users can also install extensions that block advertisements and other third-party content more broadly including, but not limited to, content related to Google Analytics

---

[238] Google, "Google Analytics Opt-out Add-on (by Google) - Chrome Web Store," January 26, 2021, https://chrome.google.com/webstore/detail/google-analytics-0pt-out/fllaojicojecljbmefodhfapmkghcbnh; Google, "Privacy Controls in Google Analytics - Analytics Help," https://support.google.com/analytics/answer/9019185, accessed July 25, 2023.

[239] Google, "Google Analytics Opt-out Add-on (by Google) - Chrome Web Store," January 26, 2021, https://chrome.google.com/webstore/detail/google-analytics-0pt-out/fllaojicojecljbmefodhfapmkghcbnh.

and Advertising services. One example of such extension is uBlock Origin, installed by more than ten million users on Chrome (see **Figure 13**).[240] My tests using the same website as above show no cookie values were transmitted to Google domains (see **Exhibit 3**) when uBlock Origin was enabled.

<div align="center">

**Figure 13**
**uBlock Origin Extension**[241]

</div>



### 3.    *Browser-Related Measures*

103.    While the core functionality of most modern browsers is the same, browsers may differ in their default settings. For example, in default settings, Chrome allows all cookies in regular browsing mode (see **Figure 11**) and only blocks third-party cookies in private browsing mode.[242] However, Firefox and Safari both block third-party cookies by default.[243]

---

[240]  Google, "uBlock Origin - Chrome Web Store," July 20, 2023, https://chrome.google.com/webstore/detail/ublock-origin/cjpalhdlnbpafiamejdnhcphjbkeiagm.

[241]  Google, "uBlock Origin - Chrome Web Store," July 20, 2023, https://chrome.google.com/webstore/detail/ublock-origin/cjpalhdlnbpafiamejdnhcphjbkeiagm.

[242]  Emil Protalinski, "Chrome 83 Arrives With Redesigned Security Settings, Third-Party Cookies Blocked in Incognito," VentureBeat, May 19, 2020, https://venturebeat.com/business/google-chrome-83/ ("Starting with Chrome 83, the browser blocks third-party cookies within each Incognito session by default.").

[243]  Since 2019, Firefox had blocked third-party cookies by default for selected websites. Dave Camp, "Firefox Now Available With Enhanced Tracking Protection by Default Plus Updates to Facebook Container, Firefox Monitor and Lockwise," Mozilla, June 4, 2019,

Therefore, even without modifying browser settings, the user's choice of browser will impact data transmissions to Google domains.

104.     My tests demonstrate that data transmissions under default Chrome settings are different from those under default Firefox settings, even when I visited the same website (see **Exhibit 4**). In Chrome, both first- and third-party cookies are sent to domains associated with Google (see **Figure 11**). However, transmissions of third-party cookie values are blocked in Firefox.[244]

105.     Users can also choose to delete all cookies stored in their browser. For example, as shown in **Figure 14,** in Chrome, users can elect to clear "[c]ookies and other site data," and in doing so, reset all cookie values stored by any domains, including those related to Google products such as the Client ID value associated with the _ga cookie for Google Analytics.[245]

---

https://blog.mozilla.org/en/products/firefox/firefox-now-available-with-enhanced-tracking-protection-by-default/ ("For new users who install and download Firefox for the first time, Enhanced Tracking Protection will automatically be set on by default as part of the 'Standard' setting in the browser and will block known "third-party tracking cookies" according to the Disconnect list."). Similarly, since March 2020, Safari blocks all third-party cookies by default. John Wilander, "Full Third-Party Cookie Blocking and More," WebKit, Mar 24, 2020, https://webkit.org/blog/10218/full-third-party-cookie-blocking-and-more/ ("Cookies for cross-site resources are now blocked by default across the board.").

[244]   Dave Camp, "Firefox Now Available With Enhanced Tracking Protection by Default Plus Updates to Facebook Container, Firefox Monitor and Lockwise," Mozilla, June 4, 2019, https://blog.mozilla.org/en/products/firefox/firefox-now-available-with-enhanced-tracking-protection-by-default/ ("For new users who install and download Firefox for the first time, Enhanced Tracking Protection will automatically be set on by default as part of the 'Standard' setting in the browser and will block known "third-party tracking cookies" according to the Disconnect list.").

[245]   *See* **Section III.C.2** for detailed description of Client ID associated with the _ga cookie.

**Figure 14**
**Chrome Setting to Clear Cookies and Other Site Data**[246]



106.     Users can also browse in the private browsing mode, available in all popular browsers (e.g., *Incognito* in Chrome, *InPrivate* in Edge, *Private Browsing Mode* in Safari, and *Private Window* in Firefox). The private browsing mode is designed to conceal the user's activity from other people who may use the same device.[247] In doing so, private browsing

---

[246]  Google users can clear their browser history by visiting chrome://settings/clearBrowserData, accessed August 2, 2023.

[247]  Google, "How Private Browsing Works in Chrome - Google Chrome Help," https://support.google.com/chrome/answer/7440301, accessed July 25, 2023 ("When you browse privately, other people who use the device won't see your history."); Mozilla, "Incognito Browser: What It Really Means," https://www.mozilla.org/en-US/firefox/browsers/incognito-browser/, accessed July 25, 2023 ("Incognito or private mode keeps your browsing history private. That's it.").

mode discards records of user activities as soon as that user closes the browser, thereby not storing any cookie values in browser.[248]

107.    To illustrate this behavior, I first cleared my browsing history, cookies, and cache, and visited *https://healthy.kaiserpermanente.org/front-door* in Incognito mode in Chrome.[249] **Figure 15** below shows a screenshot of the website placing several cookies in the Chrome browser, including the _ga cookie with a cookie value set to "GA1.1.1022224718.1689799184."

**Figure 15**
**Cookies Placed in Chrome During Incognito**



---

[248]  Mozilla, "Incognito Browser: What It Really Means," https://www.mozilla.org/en-US/firefox/browsers/incognito-browser/, accessed July 25, 2023 ("In Firefox, Private Browsing deletes cookie data when you close the browser window and doesn't track your browsing data. It also blocks tracking cookies by default. Finally, it won't remember any files you download, but those files will still be on your computer. In Chrome, incognito mode does the same thing.").

[249]  This domain was included in the Smith Declaration. Smith Declaration, ¶ 61.

108.     I then closed the Incognito window and re-opened the Chrome browser in regular browsing mode. To see if the Chrome browser discarded cookies after I closed the Incognito window, I navigated to the "See all site data and permissions" option under the "Privacy and Security" section in Chrome settings. As shown in **Figure 16**, my browser did not have any saved cookies after I exited the Incognito mode.

**Figure 16**
**Cookies Discarded After Exiting Incognito**[250]



*4.     Users Can Limit Cookie Transmissions for Websites that Implement Consent Prompt*

109.     Certain websites examined by Plaintiffs' experts contain disclosures and require user consent before proceeding to view website content. For example, the website for Invega, a medication used for the treatment of schizophrenia and related disorders, requested user consent (see **Figure 17**) and informed the visitor that "information may also be used for the purposes of personalized advertisements about products, programs and services which

---

[250] Google users can confirm that all cookies were discarded after exiting Incognito by visiting Chrome://settings/content/all, accessed July 20, 2023.

may be considered sensitive in your state" and disclosed that "sensitive personal information

[…] may include […] health related information."[251]

**Figure 17**
**Example of Consent Prompt on Invega Website**[252]



110.      The hyperlinked "Cookies Settings" popup offered various cookie blocking

options for this website. As shown in **Figure 18**, users have the option to view (by clicking

on the "+" sign) and block cookies classified as "Functional Cookies" and "Targeting

Cookies" (by switching the toggle).

---

[251] Invega, "Invega: For the Treatment of Schizophrenia & Schizoaffective Disorder," https://www.invega.com/, accessed August 1, 2023.

[252] This domain was included in the Libert Declaration. Navigate to https://www.invega.com with a clean browser history and a consent prompt will appear, accessed August 1, 2023. *See* Libert Declaration, ¶ 10.

**Figure 18**
**"Cookie Settings" Popup on Invega Website**[253]



111.     Google Analytics cookies (e.g., _ga and _gid) are included in the category "Performance Cookies" and clearly marked as first-party cookies set by *invega.com* and are always active.

---

[253] This domain was included in the Libert Declaration. Navigate to https://www.invega.com with a clean browser history and a consent prompt will appear. Select "Cookies Settings" to view the Cookie Preference Center, accessed August 1, 2023. *See* Libert Declaration, ¶ 10.

5.       *Users Can Limit Transmissions of Advertising Identifiers to Google*

112.       As described in **Section III.A.3** SDKs, including those offered by Google such as the Firebase SDK, collect pseudonymous identifiers to distinguish user devices. There are two main types of advertising identifiers—Google Advertising ID ("AdID") is the identifier for Android devices, and Identifier for Advertisers ("IDFA") is the iOS counterpart.[254] Similar to cookies, these advertising identifiers help developers remember user preferences, collect information about user behaviors, and understand how users interact with their app.

113.       Both iOS and Android devices offer settings that allow users to limit apps' access to advertising identifiers or completely reset them. For example, iOS offers users the App Tracking Transparency feature (see **Figure 19**).[255] When a user chooses option "Ask App Not to Track", apps or any third parties will not have access to the IDFA.[256]

---

[254]   Android, "Android Developers: Get a User-Resettable Advertising ID," September 21, 2022, https://developer.android.com/training/articles/ad-id; Apple, "Apple Developer Documentation: advertisingIdentifier," https://developer.apple.com/documentation/adsupport/asidentifiermanager/1614151-advertisingidentifier, accessed July 25, 2023.

[255]   Apple, "Apple Support - If an App Asks to Track Your Activity," February 13, 2023, https://support.apple.com/en-us/HT212025 ("App Tracking Transparency allows you to choose whether an app can track your activity across other companies' apps and websites for the purposes of advertising or sharing with data brokers.").

[256]   Apple, "Apple Support - If an App Asks to Track Your Activity," February 13, 2023, https://support.apple.com/en-us/HT212025 ("If you choose Ask App Not to Track, the app developer can't access the system advertising identifier (IDFA), which is often used to track.").

**Figure 19**
**Users Can "Ask App Not to Track" In iOS**[257]



114.     Similarly, Android allows users to both reset and delete AdID, as illustrated

in **Figure 20**.

---

[257] Apple, "Apple Support - If an App Asks to Track Your Activity," February 13, 2023,
https://support.apple.com/en-us/HT212025.

**Figure 20**
**Android Instructions to Reset or Delete AdID**[258]



> You can control your Advertising ID on each device you use.
>
> To control personalized ads on your Android devices, you can:
>
> • **Reset your device's advertising ID,** which replaces the current ID with a new one. Apps can still show you personalized ads, but for a while they may not be as relevant or interesting to you.
>
> • **Delete your device's advertising ID,** which deletes the advertising ID and doesn't assign a new one. Apps can still show you ads, but they may not be as relevant or interesting to you. You won't see ads based on this advertising ID, but you may still see ads based on other factors, like the information you've shared with apps.
>
> Your Advertising ID will be reset or deleted, but apps may have their own settings using other types of identifiers, which can also affect the types of ads you see.

      *6.*    *VPN*

115.    I understand that Plaintiffs' allegations concern the transmissions of, among others, IP addresses.[259] However, users can "mask" their IP address by using one of many free and paid VPN services, thereby blocking the transmission of their actual IP address to Google.[260]

---

[258] Google, "My Ad Center Help - How Personalized Ads Work," https://support.google.com/My-Ad-Center-Help/answer/12155656, accessed August 1, 2023.

[259] Complaint, ¶¶ 58, 59, 78, 79 ("When a patient visits a Health Care Provider web property containing the Google Source Code for Google Analytics, that source code is designed to redirect to Google Analytics the patient's device and other identifiers. For example, when a patient interacts with MedStar's web property, including it patient portal, identifiers that are intercepted by the Google Source Code and transmitted to Google Analytics may include and are not limited to: The patient's IP address", "When the Google Source Code for Google Ads is present on a Health Care Provider's web property, the source code causes the redirection of patient identifiers to Google. For example, when a patient interacts with MedStar's web property, including its patient portal, the Google cookies and identifiers that the Google Source Code causes to be redirected to Google Ads may include and are not limited to: The patient's IP address").

[260] VPNs (or Virtual Private Network) are services that create a private network connection over a public network, using technologies such as encryption tunnels. When an individual uses a VPN to browse the Internet, their device does not directly communicate with website servers. Instead, the user's device communicates with a VPN server, which in turn communicates

116.    To illustrate that VPN services are an effective tool to mask users' IP addresses, I accessed a website that shows IP addresses with and without the use of VPN. First, I observed an IP address of the test machine by navigating to *https://whatismyipaddress.com/* without having enabled a VPN service (see **Figure 21A**). Because IP addresses can be used to approximate a geographic location, **Figure 21A** also shows that my actual unmasked location at the time of conducting this test was in Massachusetts, United States.

**Figure 21A**
**Illustration of Unmasked IP Address**



---

with the website servers. In this manner, the VPN server acts as an intermediary between the user's device and a website or an app a user intends to interact with. Fortinet, "How Does a VPN Work?," https://www.fortinet.com/resources/cyberglossary/how-does-vpn-work, accessed August 1, 2023.

Users can select among a variety of paid (e.g., ExpressVPN, NordVPN) and free (e.g., Proton VPN) VPN services. *See* Mo Harber-Lamond, "The Best Free VPN Services in 2023," Tom's Guide, July 28, 2023, https://www.tomsguide.com/best-picks/best-free-vpn. *See also* Proton VPN, "Fast, Secure & Private Online VPN Service," https://protonvpn.com, accessed August 1, 2023; ExpressVPN, "High-Speed, Secure & Anonymous VPN Service," https://www.expressvpn.com, accessed August 1, 2023; NordVPN, "The Best Online VPN Service for Speed," https://nordvpn.com, accessed August 1, 2023.

41% of US and UK users use VPN services at least once a week. *See* Statista, "Frequency of Virtual Private Network Usage in the U.S. and U.K. 2020," Jul 7, 2023, https://www.statista.com/statistics/1219770/virtual-private-network-use-frequency-us-uk/.

117.    I then used NordVPN, a popular VPN service to change my IP address to be located in Italy. When I visited *https://whatismyipaddress.com/* again, as **Figure 21B** shows, the service detected an IP address located in Italy, which confirms that VPN services allow users to mask their actual IP addresses with an IP address associated with a different device and geographical area.

**Figure 21B**
**Illustration of Masked IP Address Using NordVPN**



## V.    PLAINTIFFS' EXPERTS MAKE MISLEADING STATEMENTS THAT ARE BASED ON INCORRECT UNDERSTANDING OF RELEVANT TECHNOLOGIES AND IGNORE THE MEASURES GOOGLE HAS IN PLACE TO PREVENT INAPPROPRIATE USE OF DATA

118.    As part of my assignment, I was asked to assess and respond to certain opinions expressed by Dr. Libert, Mr. Smith, and Dr. Shafiq in their expert declarations. I find that Plaintiffs' experts make numerous misleading claims about the data that Google receives in the context of providing analytics and advertising services. Their analyses are flawed and their assertions regarding Google's use of these data for targeted advertising are incorrect. In this section, I respond to claims expressed in Plaintiffs' experts' opinions not addressed in the preceding sections of the report.

A.     The Libert Declaration

119.     Dr. Libert set out to "identify health care websites where the inclusion of Google source code is causing the interception and transmission of patient information to Google." [261] He compiled a list of websites across a number of categories (hospitals, pharmacies, prescription drugs, and health insurers) and analyzed network traffic generated by them with the goal of identifying instances of Google code "causing" transmission of user information, identifiers, or browser activity to Google. [262] He concluded that 87% of the websites he analyzed included source code that resulted in such transmissions and called this "comprehensive and indiscriminate data collection." [263]

120.     First and foremost, Google does not "intercept" any information, as developers voluntarily choose to include Google-provided code into the source code of their websites and apps, as I explained in **Section IV.B**.

121.     Even setting this issue aside, the analysis presented in the Libert Declaration (and the result of 87%) [264] suffers from fundamental methodological and analytical shortcomings along multiple dimensions: (1) his calculation contains basic errors, such as double counting certain domains, making arbitrary decisions regarding subdomains, and including entities without a clear justification; (2) Dr. Libert provides no details regarding the choice of entities included in the denominator, likely understating the actual number of

---

[261] Libert Declaration, ¶ 9.

[262] Libert Declaration, ¶¶ 9, 15, 21.

[263] Libert Declaration, ¶¶ 9, 10.

[264] Dr. Libert's main result of 87% was calculated across all at-issue Google products. However, similar reasoning applies to the calculations for specific Google products, *see* Libert Declaration, ¶ 23.

"hospitals, pharmacies, prescription drugs, and health insurers;"[265,266] and (3) Dr. Libert makes the unfounded and incorrect assumption that all transmissions to certain Google domains "exposed user information, identifiers, and browsing activity"[267] and he fails to explain why all transmitted data would necessarily be "patients' health information and communications with their health care providers."[268] These factors combined result in incorrect and unreliable conclusions.

1.    *Dr. Libert's Analysis Is Based on an Unscientific Sample*

122.    Dr. Libert's calculations contain basic errors and indicate a lack of quality checks. Dr. Libert's sample contains duplicate entries: for example, *thrive.kaiserpermanente.org* is listed among hospitals as well as among health insurers;[269]

---

[265] Libert Declaration, ¶ 15.

[266] Apart from the fact that Dr. Libert does not clearly describe the full set of entities he analyzed, and does not include such information in his backup materials, he also provides no justification as to why the web properties of each of these entities would be expected to contain PHI. As the bulletin issued by the HHS explained, "Tracking technologies on regulated entities' unauthenticated webpages generally do not have access to individuals' PHI[.]" For entities not even in control of PHI, the use of Google products should not be a cause for concern. *See* Office for Civil Rights, "Use of Online Tracking Technologies by HIPAA Covered Entities and Business Associates," U.S. Department of Health and Human Services, https://www.hhs.gov/hipaa/for-professionals/privacy/guidance/hipaa-online-tracking/index.html, accessed July 24, 2023.

[267] Libert Declaration, ¶ 21.

[268] Libert Declaration, ¶ 34.

[269] Libert Declaration, backup files "google-202306_verified_hospitals.csv" and "google-202306_health_insurance.csv."

and domains *ummc.care* and *www.ummc.care* are counted as two different hospitals.[270] At the very basic level, this double-counts transmissions from the same domain (see **Figure 22**):[271]

**Figure 22**
**Selected Examples of Double-Counting Website Transmissions**
**in Libert Declaration**[272]

| Site Domain | Publisher ID | Google APIs | Google Tag Manager | Google Analytics | YouTube | Google Ads | Google Display Ads |
|---|---|---|---|---|---|---|---|
| auth.healthpartners.com | - | 1 | 0 | 0 | 0 | 0 | 0 |
| auth.healthpartners.com | - | 1 | 0 | 0 | 0 | 0 | 0 |
| fotivda.com | G-RYSHREHJXM : UA-185144531-3 | 0 | 1 | 1 | 0 | 1 | 1 |
| www.fotivda.com | G-RYSHREHJXM : UA-185144531-3 | 0 | 1 | 1 | 0 | 1 | 1 |
| healthy.kaiserpermanente.org | G-ENXTD8TZ70 | 1 | 1 | 1 | 0 | 1 | 1 |
| healthy.kaiserpermanente.org | G-ENXTD8TZ70 | 1 | 1 | 1 | 0 | 1 | 1 |
| memorialhermann.org | G-KX3C23PC0X : UA-144120915-1 | 0 | 1 | 1 | 0 | 1 | 1 |
| www.memorialhermann.org | G-KX3C23PC0X : UA-144120915-1 | 0 | 1 | 1 | 0 | 1 | 1 |
| thrive.kaiserpermanente.org | UA-39990278-1 | 0 | 1 | 1 | 1 | 1 | 1 |
| thrive.kaiserpermanente.org | UA-39990278-1 | 0 | 1 | 1 | 1 | 1 | 1 |
| www.geisinger.org | UA-7395697-20 : UA-7395697-13 | 1 | 1 | 1 | 0 | 0 | 0 |
| www.geisinger.org | UA-7395697-20 : UA-7395697-13 | 1 | 1 | 1 | 0 | 0 | 0 |
| www.medstarhealth.org | G-2BE1FECSN6 : UA-43394204-1 | 1 | 1 | 1 | 1 | 1 | 1 |
| www.medstarhealth.org | G-2BE1FECSN6 : UA-43394204-1 | 1 | 1 | 1 | 1 | 1 | 1 |
| www.phs.org | G-8W8R58P15N : UA-4158169-1 | 0 | 1 | 1 | 0 | 1 | 1 |
| www.phs.org | G-8W8R58P15N : UA-4158169-1 | 0 | 1 | 1 | 0 | 1 | 1 |
| www.sanfordhealth.org | UA-17672572-1 : G-JSE8FM168H | 1 | 1 | 1 | 0 | 1 | 1 |
| www.sanfordhealth.org | UA-17672572-1 : G-JSE8FM168H | 1 | 1 | 1 | 0 | 1 | 1 |
| www.ssmhealth.com | - | 1 | 0 | 0 | 1 | 0 | 0 |
| www.ssmhealth.com | - | 1 | 0 | 0 | 1 | 0 | 0 |

123.    Furthermore, Dr. Libert makes arbitrary decisions regarding subdomains. For example, he counts the English-language version *thrive.kaiserpermanente.org* and the

---

[270]  Libert Declaration, backup file "google-202306_verified_hospitals.csv."

[271]  The websites double-counted by Dr. Libert also have the same Published ID—a unique identifier of the developer account associated with Google Advertising services. Since all web properties under the same Publisher ID most likely belong to the same developers, they most likely share certain functionalities selected by developers, such as what third-party services to use. *See, e.g.,* Google, "Google AdSense Help - Publisher ID," https://support.google.com/adsense/answer/2923881, accessed July 26, 2023; Google, "Google AdSense Help - Find Your Publisher ID," https://support.google.com/adsense/answer/105516, accessed July 26, 2023. All website pages are associated with the same Publisher ID.

[272]  Libert Declaration, backup file "google-global_report.csv."

99

Spanish-language version *vivabien.kaiserpermanente.org* as two different entities.[273] In another example, Dr. Libert considers *zilretta.com* and *fad.zilretta.com* as two different prescription drug web properties.[274] However, the latter one is a subdomain that shows a Google map and allows users to find a doctor. It is a developer's choice whether to implement a page as a subdomain (such as, e.g., *fad.zilretta.com*) or a subdirectory within the domain (such as, e.g., *zilretta.com/find-a-doctor*). Dr. Libert also includes entities without a clear justification: his list of hospitals contains entries that are arguably not even hospitals such as *https://pay.instamed.com/* (a provider of HIPAA-compliant healthcare payments technology and a subsidiary of J.P. Morgan).[275] Similarly, his list of pharmacies includes web properties of many major grocery and retail stores, such as *www.costco.com*, *www.hannaford.com*, *www.safeway.com*, *www.shaws.com*, *www.walmart.com*, and *www.wegmans.com*. While these types of entities may also provide pharmacy services, their websites include many web pages that do not contain any PHI.[276] Suggesting that transmissions initiated by the homepage or an arbitrary web page within such websites contain PHI is not credible. These issues can artificially lead to higher reported percentages and raise concerns regarding credibility of his sample selection approach.

---

[273] Libert Declaration, backup file "google-202306_health_insurance.csv."

[274] Libert Declaration, backup file "google-202306_drugs.csv."

[275] InstaMed, "InstaMed Powers a Better Healthcare Payments Experience," https://www.instamed.com, accessed July 28, 2023; Libert Declaration, backup file "google-202306_verified_hospitals.csv."

[276] Dr. Libert instructed his program to analyze "the home page and a random set of web pages from within each health care web property." *See* Libert Declaration, ¶ 21. Without providing the exact list of web pages examined, it is not possible to replicate his analysis and evaluate all shortcomings.

124. Dr. Libert stated that "[t]he first step in [his] analysis was to select a set of properties to investigate."[277] However, he does not provide the full set of web properties he analyzed in his backup and does not provide a replicable methodology other than four broad categories (hospitals, pharmacies, prescription drugs, and health insurers). One can infer from his results that he must have analyzed approximately 7,000 web properties.[278] However, this selection of a sample of websites to analyze is flawed. There were over 6,000 hospitals in the U.S. as of 2021.[279] Without explaining a sample selection procedure, which is an important consideration in any data analysis,[280] Dr. Libert states that he "was given a list of 3,394 hospital web-properties from Plaintiffs' counsel" without clarifying how this list was generated or what checks he performed to ensure that the list given to him by counsel was either exhaustive or a statistically representative sample, which are necessary factors to ensure that such a sample is a valid source for the type of analysis Dr. Libert attempts to perform.[281]

---

[277] Libert Declaration, ¶ 15.

[278] This can be calculated by using the number of web properties with any Google transmissions reported in Libert Declaration, ¶¶ 16-19, divided by the corresponding shares reported in Libert Declaration, backup file "google-summaries.csv": 3,394 / 0.84 + 101 / 0.82 + 1,765 / 0.96 + 786 / 0.79 = 6,997.

[279] American Hospital Association, "Fast Facts on U.S. Hospitals, 2023," May 2023, https://www.aha.org/system/files/media/file/2023/05/Fast-Facts-on-US-Hospitals-2023.pdf.

[280] The Office of Research Integrity, "Responsible Conduct in Data Management: Data Selection," U.S. Department of Health and Human Services, https://ori.hhs.gov/education/products/n_illinois_u/datamanagement/dstopic.html, accessed August 1, 2023 ("The goal of sampling is to select a data source that is representative of the entire data **universe** of interest. [D]ata sample representativeness should be tested and/or verified before use of those data. […] A variety of sampling procedures are available to reduce the likelihood of drawing a biased sample …] These methods of sampling try to ensure the representativeness from the entire population [and] contrast sharply with the '**convenience**' sample where little or no attempt is made to ensure representativeness.").

[281] Libert Declaration, ¶ 16 ("With respect to hospitals, I was given a list of 3,394 hospital web-properties from Plaintiffs' counsel."). It appears that 3,394, as reflected in Dr. Libert's produced documents, is the number of hospitals with network traffic to Google domains, and

Even though Dr. Libert admits that "the web-properties that [he] was able to compile is (*sic*) not intended to represent the full list of 'Health Care Providers,'" this does not make it an acceptable or statistically valid approach.[282] There are likely at least 2,000 hospitals that Dr. Libert did not consider. Since it is unknown if the web properties of the hospitals that Dr. Libert left out contain Google's codes, his analysis is methodologically misleading, and his results are not credible. Similar concerns arise with regards to his list of prescription drugs, which I estimate included approximately 1,839 web properties, despite over 20,000 prescription drugs approved for marketing by the FDA as of April 2023.[283] His list of pharmacies consisted of an estimated 123 web properties, despite more than 23,000 independent pharmacies operating in the U.S. as of 2022.[284]

### 2. Dr. Libert's Assumptions Regarding Network Transmissions Are Unsupported

125.     Apart from the concerns regarding sample selection and reliance on a list of websites given by counsel, other flaws make Dr. Libert's conclusions unreliable. Dr. Libert does not consider whether the transmissions he assesses actually contain the types of data

---

*not* the number of hospitals on the list given to him from counsel. Based on the provided information, it appears that the list must have included approximately 4,040 hospitals (= 3,394 / 0.84).

[282] Even Plaintiffs' experts do not appear to agree with each other on a common set of relevant healthcare provider domains. While Mr. Smith includes Planned Parenthood in his list (*see* Smith Declaration, ¶¶ 61-161), this entity does not appear in backup to the Libert Declaration.

[283] U.S. Food and Drug Administration, "FDA at a Glance," April 2023, https://www.fda.gov/media/168049/download ("There are over 20,000 prescription drug products approved for marketing.").

[284] PCMA, "New Data Reveal a Stable Independent Pharmacy Market," August 1, 2022, https://www.pcmanet.org/new-data-reveal-a-stable-independent-pharmacy-market/.

Plaintiffs and their experts take issue with, such as third-party cookies, which in any event, can only be used to associate browsing activity across websites with user pseudo-identities. The Libert Declaration glosses over the technical aspects of these transmissions and does not offer any feasible explanation for how Google (or any other third-party provider) could use data from such transmissions to access health information about a specific individual. As I discuss in **Section III.B**, the transmissions triggered by different Google codes vary in what, if any, data they contain.

126.     It is the responsibility of HIPAA-regulated developers to determine which web pages within their web property may contain PHI, and prevent transmission of such information to third parties.[285] However, even the U.S. Department of Health and Human Services recognizes that even HIPAA-regulated entities may have web pages that do *not* involve PHI:

> "Regulated entities may also have unauthenticated webpages, which are webpages that do not require users to log in before they are able to access the webpage, such as a webpage with general information about the regulated entity like their location, services they provide, or their policies and procedures. Tracking technologies on regulated entities' unauthenticated webpages generally do not have access to individuals' PHI; in this case, a regulated entity's use of such tracking technologies is not regulated by the HIPAA Rules."[286]

---

[285]  I discuss this in **Section IV.A.1**.

[286]  Office for Civil Rights, "Use of Online Tracking Technologies by HIPAA Covered Entities and Business Associates," U.S. Department of Health and Human Services, https://www.hhs.gov/hipaa/for-professionals/privacy/guidance/hipaa-online-tracking/index.html, accessed July 24, 2023.

Arguing that "many web pages within a single web property" contain certain code, even if the web property is subject to HIPAA, is irrelevant without analyzing the specific webpages and the actual information transmitted.

127.    Finally, Dr. Libert fails to recognize the many controls that users have to limit data transmissions during their browsing sessions. As I explain in **Section IV.C** above, users have the ability to restrict information transmitted to third parties through tools such as account settings, device settings, cookie settings, browser add-ons or other browser-related measures, or a VPN. To illustrate this, consider the example presented by Dr. Libert analyzing transmissions that occurred on a website after his "click-through action."[287] He describes this action being "captured" by Google Analytics and Google Tag Manager because of transmissions to *google-analytics.com* and *googletagmanager.com.* But when I enable Google Analytics Opt-out Add-on,[288] no transmissions to *google-analytics.com* occur and the URL parameters in the transmission to *googletagmanager.com* only contain the publisher ID without any user-specific information (see **Figure 23**).[289]

---

[287]  Libert Declaration, ¶¶ 32-33.

[288]  See **Section IV.C.2** for discussion of browser add-ons.

[289]  Google Analytics Opt-out Add-on is one of many tools available to users. Others include cookie settings, privacy-related extensions (e.g., uBlock Origin), and JavaScript-limiting settings and extensions. I discuss and test at least some of these in **Section IV.C**.

**Figure 23**
**Illustration of the Effect of Google Analytics Opt-out Add-on on Limiting Transmissions**
**Using Example Presented by Dr. Libert[290]**



128.    Given the many methodological and analytical flaws of the analysis presented in the Libert Declaration, I find his conclusions unreliable and unfounded.

**B.    The Smith Declaration**

129.    Mr. Smith in his declaration analyzed transmissions of data between a user's browser and a web server when visiting selected websites.[291] He found "at least five [PHI] identifiers" that he claims healthcare provider websites "routinely" sent to Google: URL, IP address, cookie IDs, device IDs, and "other characteristics that could uniquely identify the individual."[292] He asserts that Google receives information from healthcare provider websites that includes personally identifiable information about patients, the date and time of communications, and the fact that communication occurred between a patient and a healthcare

---

[290]   Libert Declaration, ¶ 33.

[291]   Smith Declaration, ¶ 3.

[292]   Smith Declaration, ¶ 207.

provider.[293] Mr. Smith appears to agree that individual identifiability is the crux of PHI.[294] Simply knowing that a hypothetical cid parameter equals "284403989" made an appointment to see a doctor does not imply that Google can identify this user in their own user database.[295] However, Mr. Smith does not provide a single example of an instance in which Google attempted to identify, let alone succeeded in identifying, a specific individual based on their activity on a healthcare provider web property, or served them a personalized ad in connection with such activity.

130.     First, the Smith Declaration acknowledges, and I agree, that developers are the ones who can choose to include (and therefore remove) Google-provided code to the code of their web property, and that HIPAA-regulated entities have obligations under the U.S. federal law to safeguard PHI they control.[296] Second, the Smith Declaration does not present

---

[293]  Smith Declaration, ¶ 217.

[294]  Smith Declaration, ¶ 211 ("According to the HHS web page referenced by the Google support page, Protected Health Information (PHI) means 'individually identifiable health information[.]'"). *See also* eCFR, "45 CFR 160.103 -- Definitions," July 21, 2023, https://www.ecfr.gov/current/title-45/subtitle-A/subchapter-C/part-160/subpart-A/section-160.103 ("Protected health information means individually identifiable health information[.]").

[295]  Mr. Smith does not seem to claim that Google received any data considered PII per Google's interpretation, such as email addresses, mailing addresses, phone numbers, precise location, full names, or usernames. *See* Google, "Understanding PII in Google's Contracts and Policies - Analytics Help," https://support.google.com/analytics/answer/7686480, accessed July 24, 2023.

[296]  Mr. Smith explains how Google source code is downloaded and deployed on a website. He provides a screen shot and URL to a Google Developer website explaining how web owners can configure the source-code once downloaded through Google Tag Manager prior to deployment, which includes implementing security features. *See* Smith Declaration, ¶¶ 63, 64 ("The Google-supplied JavaScript code for Google Analytics is downloaded from a Google server named www.googletagmanager.com", "The Google JavaScript code on the Kaiser Permanente Web property is deployed using the Google Tag Manager tool: Source: https://developers.google.com/tag-platform/tag-manager").

any evidence of Google receiving individually-identifiable health-related information, attempting to identify pseudonymous information it processes, or using such information for personalized advertising. In addition, the Smith Declaration ignores the many tools that developers and users have to limit or prevent transmission of data, which imply that individualized inquiry would be necessary to determine what, if any, health-related individually-identifiable information was transmitted in an interaction between a particular user and a website or an app.

### 1.    *Mr. Smith Acknowledges That Developers Choose to Include or Remove Code from Websites and Apps*

131.    I agree with Mr. Smith that the code embedded by the developer who decides to use a third-party service such as, for example, Google Analytics is "simple to remove from health care provider Web properties."[297] However, this is not a decision that Google has any control over. As I explained in **Section III.A**, Google does not, and cannot, unilaterally insert or remove code from developers' websites or apps, and Mr. Smith fails to offer any technical solution how Google could take over developers' web properties to remove the code they voluntarily insert.

132.    Mr. Smith makes misleading and sensational statements, such as the claim that "Google Analytics JavaScript code will [...] command patients' browsers."[298] None of Google's products and services operate in that manner. Google's code does not *command* any user's browser any more than a map app commands a car in which a driver follows the

---

[297]   Smith Declaration, ¶ 220.

[298]   Smith Declaration, ¶ 59 ("For example, at the Kaiser Permanente Web property, Google Analytics JavaScript code will also command patients' browsers to make redirected HTTP GET and POST requests to multiple Google servers.").

suggested route. Website and app developers *choose* to embed snippets of code written by third parties and can also modify any part of the source code of their web properties.

### 2. *Mr. Smith Speculates That Google Receives Users' PHI and Uses It in Personalized Advertising but Provides no Evidence to Support such Claim*

133.   Mr. Smith speculates that Google receives PHI from healthcare provider web properties and uses this information for personalized advertising without a single example of a user receiving a personalized ad based on their browsing activity on healthcare provider web properties. Mr. Smith ignores the fact that Google has numerous measures in place to prevent transmission or inappropriate use of sensitive data. As explained in **Section IV.A.2**, Google employs tools designed to prevent transmission of personally identifiable information, health-related or otherwise, and educates developers about how they can ensure sensitive information is not transmitted. I have seen no evidence—and Mr. Smith has also not provided any such evidence—that would suggest that Google has received individually identifiable health-related information, attempted to de-anonymize such information, or used it in remarketing or personalized advertising.

### 3. *Only Individualized Inquiries Could Determine What, If Any, Health-Related Information Was Ever Transmitted to Google's Servers*

134.   Last, developers and users have many tools at their disposal to mask or limit information that gets transmitted by a browser. For example, developers can truncate information, as described in the Smith Declaration,[299] or mark it as NPA to prevent its use in

---

[299]  Smith Declaration, ¶ 194 ("Google also offers an option in Google Analytics to mask IP addresses once they are received by a Google server…").

targeted advertising.[300] As I discuss in **Section IV.C**, users themselves can take many steps to limit or prevent transmission of information between their browsers and web servers, including modifying Google account settings and device settings, blocking cookies, installing browser add-ons, or using a VPN. Further, as it appears from videos and transmission records included in the backup,[301] Mr. Smith was logged into a Google Account while performing his testing and did not disclose in his report what browser and account settings he had on during the testing. Not all users are signed into their Google Accounts and Mr. Smith does not explain how his results can be generalized to an inherently diverse population of users in terms of settings and tools they use and how they browse. Determining what, if any, health-related information was transmitted between a particular user and a website or app would require individual analysis of each such session.

### C.    The Shafiq Declaration

135.    Dr. Shafiq offers two main opinions. First, he assessed whether the information that Google receives through Google Analytics, Google Ads, and Google Display Ads services used by healthcare web properties may be considered personally identifiable. Relying on the concept of "entropy"—a measure of how informative data are—Dr. Shafiq concludes that "information collected by Google allows it to identify patients uniquely and

---

[300]   I discuss options that developers have at their disposal to limit data transmitted to Google in **Section IV.B.2**.

[301]   *See e.g.,* Smith Declaration, backup file "Gundersen-2023-05-17 - HIGHLY CONFIDENTIAL AEO.wmv" and "Kaiser-patient-portal-2023-05-25 - HIGHLY CONFIDENTIAL AEO.wmv."

persistently on health care related websites and apps."[302] As discussed below, I disagree with this opinion. Second, Dr. Shafiq was asked to opine on Google's ability to identify healthcare web properties.[303] He concludes that Google can do so "using its own Verticals taxonomy and content classification API, as well as off-the-shelf content classification services."[304] However, Dr. Shafiq fails to acknowledge that Google already uses multiple classification systems to prevent the use of sensitive information, including health-related information, in personalized ads and does not have the necessary context to classify each data point within each webpage or app.

### 1. *Dr. Shafiq's Analysis of Google's Abilities to Identify Users Is Unreliable and Unsupported*

136.    Dr. Shafiq reaches his conclusion that Google has enough information to identify users by relying on inappropriate methodology and speculations about what information Google receives and stores without regards to how Google actually uses (or does not use) the data. Setting aside the fact that I do not consider the analytical approach using the entropy concept to be appropriate in this particular context, even if Google receives any of the types of information that Dr. Shafiq mentions, neither he nor Plaintiffs' other experts have presented any evidence that Google routinely attempts to personally identify users by combining those pieces of information. To the contrary, as I discuss in **Section IV.A.3**,

---

[302]  Shafiq Declaration, ¶ 6. Although Dr. Shafiq presents entropy as a 'privacy metric', it is typically understood as a "measure of uncertainty" in information theory. *See* C. E. Shannon, "A Mathematical Theory of Communication," *The Bell System Technical Journal*, Vol. 27, July, October, 1948, pp. 379–423 and 623–656.

[303]  Shafiq Declaration, ¶ 7 ("I have been asked to analyze whether a data company, like Google, can readily identify health care related websites and apps.").

[304]  Shafiq Declaration, ¶ 7.

Google has internal policies that prevent unauthorized joins of data and has retention policies that would lead to deletion of data after certain periods of time.

137.    Dr. Shafiq reaches two conclusions: (1) some of the types of data Google receives are on their own sufficient to identify individual users;[305] and (2) Google can combine different data to identify individual users.[306] Both conclusions are incorrect.

138.    To illustrate the challenge of Google attempting to match users' pseudonymous identifiers, IP address, User-Agent, or other device attributes to specific individuals, consider the following hypothetical example. Suppose that at the end of the semester, I record students' grades in a spreadsheet, organized by their first name and the initial of their last name (e.g., Wei L.) and their unique usernames in the university registrar system (e.g., wli24). However, one day a technical glitch deletes all of the usernames—the unique identifier in the list—and all I am left with are the first names and grades. Even if names may contain many characters, I may not be able to match the grades to actual students in the system. For example, there may be multiple students with the same name (e.g., Wei L.), making it impossible for me to determine which grade belongs to which one of them. The same student could also be using different variations of their name in different systems: Wei could be Wendy in the registrar's system, or Michael could appear as Mike.

139.    This example relates to Dr. Shafiq's argument that Google can use users' IP addresses (similar to students' names in the example above) to personally identify users

---

[305] Shafiq Declaration, ¶ 17 ("First, the IP address by itself is a sufficiently unique and persistent identifier to be classified as PII.").

[306] Shafiq Declaration, ¶ 20 ("Fourth, the various device attributes collected by Google also contain sufficient entropy that can be combined with IP address and user agent to exceed the 32-bit identifiability threshold.").

(similar to actual students, identified by their usernames in the example above).[307] Dr. Shafiq seems to claim that if IP addresses are allowed to be long enough, one could use them to identify individuals. He reaches the conclusion that an "IP address, especially the newer IPv6 variant, is able to uniquely identify [users]" relying solely on the fact that the length of IPv6 address is 128 bits, which implies approximately 340 trillion-trillion-trillion combinations of possible IP addresses. However, Dr. Shafiq ignores how IP addresses are actually allocated, used (or reused), or shared among users. The logic Dr. Shafiq presents is incorrect.

140.     Dr. Shafiq also overstates how much information each individual data point (e.g., IP address) may even *practically* contain.[308] He neglects to account for the fact that many of the attributes he considers may not be associated with a unique individual, can get reset, or get reused. IP addresses, as Dr. Shafiq acknowledges,[309] can be shared among many individuals through VPN services or private networks or can be dynamic, something Dr.

---

[307] *See* Shafiq Declaration, ¶ 17 ("There are two prevalent IP protocols: IPv4 and IPv6. The length of IPv4 address is 32 bits (i.e., ≈4 billion possible IPv4 addresses). Note that IPv4 addresses are sometimes reused or shared across users (e.g., using a mechanism called Network Address Translation [NAT]). The new IPv6 protocol is now used by approximately one-half of Internet users in the United States. The length of IPv6 address is 128 bits (i.e., ≈340 trillion-trillion-trillion IP addresses possible IPv6 addresses). Thus, IP address, especially the newer IPv6 variant, is able to uniquely identify patients.").

[308] For example, the current version of Google Analytics does not log or store IP addresses, and the previous version of the product, Universal Analytics, offered the option of masking IP addresses.

[309] Shafiq Declaration, ¶ 17 ("Note that IPv4 addresses are sometimes reused or shared across users [.]").

*See also* Alex Chen and Nate Sales, "Multi-User IP Address Detection," Cloudflare, October 15, 2021, https://blog.cloudflare.com/multi-user-ip-address-detection/ ("In practice, IP addresses are more like postal addresses because they can be shared by more than one person at a time.").

Shafiq also acknowledges.[310] At the same time, one individual may be associated with multiple IP addresses (e.g., work and home).[311] Indeed, the peer-reviewed research Dr. Shafiq cites relies on the data of "34,488 unique public IP addresses collected from 2,230 unique users"—which is more than 15 IP addresses per studied user on average, further discrediting Dr. Shafiq conclusions.[312] The evidence Dr. Shafiq cites contradicts his own conclusions that IP addresses can be assumed to be unique, or near-unique. This conclusion is also broadly applicable to many types of data besides an IP address that Dr. Shafiq considers. For example, cookie values can be reset or expire (see **Section IV.C.3**).[313]

---

[310] Shafiq Declaration, ¶ 17 ("[…] IP addresses may not always be static (i.e., they can change) [.]").

*See also* Joshua Prime, "What Is a Dynamic IP Address?," OpenDNS, 2022, https://support.opendns.com/hc/en-us/articles/227987827-What-is-a-Dynamic-IP-Address-.20 ("A dynamic IP address is an IP address that changes from time to time unlike a static IP address. Most home networks are likely to have a dynamic IP address and the reason for this is because it is cost effective for Internet Service Providers (ISP's) to allocate dynamic IP addresses to their customers.").

[311] Such as when using a mobile device along with a home computer and a computer at work.

[312] Vikas Mishra et al., "Don't Count Me Out: On the Relevance of IP Addresses in the Tracking Ecosystem," *Association for Computing Machinery*, April 20, 2020, pp. 808–815https://dl.acm.org/doi/10.1145/3366423.3380161 ("The average retention period of an IP address is 9.3 days, whereas 760 IP addresses (~2 %) were retained for more than 100 days.").

[313] For instance, Chrome allows users to clear all cookies. *See* Google, "Google Chrome Help - Clear, Allow & Manage Cookies in Chrome," https://support.google.com/chrome/answer/95647, accessed July 25, 2023; Google, "Google Chrome Help - Clear, Allow & Manage Cookies in Chrome," https://support.google.com/chrome/answer/95647, accessed July 25, 2023. Cookies also have a variable expiration date which is often capped. In Chrome, for instance, as of August 2022 cookies cannot have an expiration date that is greater than 400 days. *See* Ari Chivukula, "Cookie Expires and Max-Age Attributes Now Have Upper Limit - Chrome Developers," Chrome Developers Blog, January 12, 2023, https://developer.chrome.com/blog/cookie-max-age-expires/.

141.     Dr. Shafiq makes further misleading claims that "the various device attributes collected by Google also contain sufficient entropy that can be combined"[314] while admitting in a footnote that this conclusion is speculative:

> "While the overall entropy of a combination of fields cannot be computed by simply adding them up if they are not independent as I discussed above, there is clear sufficient entropy together in these fields such that the joint entropy easily surpasses the 32-bit identifiability threshold."[315]

142.     When combining different data points in such a manner, one would need to determine any additional information is *independent* or *overlapping* with information already considered. The formula used by Dr. Shafiq assumes that the attributes contained in the transmissions from healthcare web properties to Google (such as IP address, screen size and color depth, screen resolution) are independent. However, in reality, many of these attributes are not independent and the amount of information contained in those attributes is greatly reduced. In fact, this applies to many types of information that Dr. Shafiq argues in his report "contain sufficient entropy that can be combined."[316] For example, device model and platform type information are not independent (e.g., users cannot install the Android operating system on an Apple device or Android users are more likely to use Chrome while iOS users are more likely to use Safari); similarly, information in User-Agent header also contains information about a user's device.[317]

---

[314]  Shafiq Declaration, ¶ 20.

[315]  Shafiq Declaration, fn. 18.

[316]  Shafiq Declaration, ¶ 20.

[317]  For example, a User-Agent header could contain the following information: "Mozilla/5.0 (iPhone14,3; U; CPU iPhone OS 15_0 like Mac OS X) AppleWebKit/602.1.50 (KHTML, like Gecko) Version/10.0 Mobile/19A346 Safari/602.1." This would indicate that the user is navigating on a Safari browser along with other device information.

143.     In fact, the study Dr. Shafiq relies on to argue that different types of data jointly contain enough entropy to "easily surpass[] the 32-bit identifiability threshold" contradicts Dr. Shafiq's assertion—something Dr. Shafiq himself acknowledges but neglects to address in his analysis.[318],[319] For example, Dr. Shafiq lists various types of data and implied number of bits they contain to conclude that those together "exceed the 32 bit identifiability threshold."[320] However, the source Dr. Shafiq relies on illustrates that even though adding up the entropy contained in each individual type of data amounts to over 50 bits,[321] the paper concludes that such data contain only around 18.8 bits of information after accounting for the fact that those types of data have much less unique information not already present in other types of data. This emphasizes that Dr. Shafiq's assertions about the amount of information data that Google receives may jointly contain is speculative, and Dr. Shafiq did not perform

---

[318]  Shafiq Declaration, ¶¶ 20, 21 ("Fourth, the various device attributes collected by Google also contain sufficient entropy that can be combined18 with IP address and user agent to exceed the 32-bit identifiability threshold. For example, IP address (containing up to 32 bits for IPv4 and up to 128 bits for IPv6) and user agent (containing approximately 10 bits) can be combined with various device attributes: screen/viewport size and color depth (7.72 bits), screen resolution (4.89 bits), Accept-Language (5.918 bits), Accept-Encoding (1.53 bits), Device platform (2.31 bits), Accept (2.21 bits), and whether device is mobile (0.68 bits) to exceed the 32 bit identifiability threshold."; "In summary, the various pieces of information collected by Google Analytics, Google Ads, and Google Displays Ads far exceeds the 32-bits entropy identifiability threshold. My conservative analysis shows that the information collected by Google allows it to identify individuals uniquely and persistently on health care related websites and apps.").

[319]  Shafiq Declaration, fn. 18 ("While the overall entropy of a combination of fields cannot be computed by simply adding them up if they are not independent as I discussed above, there is clear sufficient entropy together in these fields such that the joint entropy easily surpasses the 32-bit identifiability threshold.").

[320]  Shafiq Declaration, ¶ 20.

[321]  Peter Eckersley, "How Unique Is Your Web Browser?," Electronic Frontier Foundation, https://coveryourtracks.eff.org/static/browser-uniqueness.pdf, accessed August 3, 2023, Table 2. Summing up entries presented in the table amounts to 55.733 bits of information.

a rigorous analysis to present any trustworthy estimates. Moreover, such analysis is not "conservative" as Dr. Shafiq presents it.[322]

144.    Given that (1) Dr. Shafiq admits he cannot make definitive conclusions relating to how much information Google could jointly extract from different types of data it allegedly receives and (2) his analysis of how much information these data types contain is severely flawed, the conclusions of his entropy analysis are unfounded and unreliable. Furthermore, this analysis is irrelevant, as I have seen no evidence that Google combines multiple types of data it receives to identify individuals in the manner suggested in the Shafiq Declaration. Neither Dr. Shafiq nor any other Plaintiffs' expert provided such evidence. Dr. Shafiq's entropy calculation is flawed, unsubstantiated, and greatly overstates Google's ability to uniquely identify users.

### 2.    Dr. Shafiq Fails to Acknowledge That Google Already Uses Classification Systems to Prevent the Use of Sensitive Information in Personalized Ads

145.    Dr. Shafiq reaches the conclusion that "Google can likely easily identify health care related websites and apps using [its 'Verticals'] content classification technology"[323] and can use this classification tool to "classify content on health care related websites and apps."[324] While I agree that Google uses classification systems to categorize

---

[322]  Shafiq Declaration, ¶ 21 ("In summary, the various pieces of information collected by Google Analytics, Google Ads, and Google Displays Ads far exceeds the 32-bits entropy identifiability threshold. My conservative analysis shows that the information collected by Google allows it to identify individuals uniquely and persistently on health care related websites and apps.").

[323]  Shafiq Declaration, ¶¶ 22, 24.

[324]  Shafiq Declaration, ¶ 23.

websites and apps for advertising purposes (see **Section IV.A.2**), I find Dr. Shafiq's desired application of one of these classification systems to identify healthcare content misguided.

146.     Dr. Shafiq ignores the fact that Google already employs classification systems to prevent the use of sensitive information in ad personalization. Google's policies prohibit use of data from web properties classified as "sensitive" for personalized advertising or remarketing (see **Section IV.A**).

Signed on the 3rd day of August, 2023.

_____

Georgios Zervas