**SIMMONS HANLY CONROY, LLP**
Jason 'Jay' Barnes State Bar No. 362776
An Truong (admitted *pro hac vice*)
112 Madison Avenue, 7th Floor
New York, NY 10016
Telephone: (212) 784-6400
Facsimile: (212) 213-5949
*jaybarnes@simmonsfirm.com*
*atruong@simmonsfirm.com*

**KIESEL LAW LLP**
Jeffrey A. Koncius, State Bar No. 189803
Nicole Ramirez Jones, State Bar No. 279017
8648 Wilshire Boulevard
Beverly Hills, CA 90211-2910
Telephone: (310) 854-4444
Facsimile: (310) 854-0812
*koncius@kiesel.law*
*ramirezjones@kiesel.law*

**SCOTT+SCOTT ATTORNEYS AT LAW LLP**
Joseph P. Guglielmo (admitted *pro hac vice*)
Ethan Binder (admitted *pro hac vice*)
600 W. Broadway, Suite 3300
San Diego, CA 92101
Telephone: (619) 233-4565
Facsimile: (619) 233-0508
*jguglielmo@scott-scott.com*
*ebinder@scott-scott.com*

**LOWEY DANNENBERG, P.C.**
Christian Levis (admitted *pro hac vice*)
Amanda Fiorilla (admitted *pro hac vice*)
44 South Broadway, Suite 1100
White Plains, NY 10601
Telephone: (914) 997-0500
Facsimile: (914) 997-0035
*clevis@lowey.com*
*afiorilla@lowey.com*

**LIEFF CABRASER HEIMANN
 & BERNSTEIN, LLP**
Michael W. Sobol, State Bar No. 194857
Melissa Gardner, State Bar No. 289096
275 Battery Street, 29th Floor
San Francisco, CA 94111-3339
Telephone: (415) 956-1000
Facsimile: (415) 956-1008
*msobol@lchb.com*
*mgardner@lchb.com*

**LIEFF CABRASER HEIMANN
 & BERNSTEIN, LLP**
Douglas Cuthbertson (admitted *pro hac vice*)
250 Hudson Street, 8th Floor
New York, NY 10013
Telephone: 212 355-9500
Facsimile: 212-355-9592
*dcuthbertson@lchb.com*

*Attorneys for Plaintiffs and the Proposed Class*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

| | |
|---|---|
| JOHN DOE, et al., on behalf of themselves and all others similarly situated,<br><br>                    Plaintiffs,<br><br>         v.<br><br>GOOGLE LLC,<br><br>                    Defendant.<br><br>**This document applies to: All Actions** | Case No. 3:23-cv-02431-VC<br>Consolidated with: 3:23-cv-02343-VC<br><br>**CLASS ACTION**<br><br>**JOINT STATUS REPORT RE DKT. 256**<br><br>Honorable Susan Van Keulen |

Plaintiffs and Google LLC ("Google") submit this Joint Status Report pursuant to the Court's Order re Discovery Dispute at Dkt. 244: Protocol for Production of Data Source Information ("Order"). Dkt. 256.

## I.    PLAINTIFFS' POSITION

Pursuant to Step One of the Court's Order, Google identified more than 18,000 data sources reflecting: (1) the tables in Kansas and Oz containing event-level data keyed on user identifiers that Google Ads and Display Ads use; (2) Sawmill logs used in Google's advertising systems; and (3) portions of Spanner, BigTable, and Napa containing data for certain components of the Google Analytics system. Google's prior productions only included descriptions for the Sawmill logs and no information about these other systems. Accordingly, to assist in evaluating the relevance of these data sources, Plaintiffs requested additional information describing the data sources Google in Kansas and Oz, Spanner, BigTable, and Napa. Google produced engineer descriptions reflecting this information on March 13, 2026.

In Step Two, Plaintiffs narrowed this list to approximately 7,200 data sources that appeared relevant based on Google descriptions.

Google agreed to produce Step Three information for each of the 17 data tables in Kansas and Oz that it identified, but objects to producing that information for the Sawmill, Spanner, BigTable, and Napa systems.[1] The disputes regarding each of these systems is outlined below.

***Sawmill*** is Google's "large-scale system that allows for the collection, storage, and management of business-critical event records." DOEVC-3223. Google identified a total of 2,897 Sawmill logs in Step One of the process containing the data from Google Analytics and Google Ads used in Google's advertising systems. Sawmill is Google's primary logging infrastructure. Because these logs are the pipelines through which Plaintiffs' and Class Members' health information is received, linked to user identifiers, and processed for use in Google's advertising systems, each are relevant. In an effort

---

[1] Google states that "Plaintiffs refused further discussion" and "insist[ed] that Google comply with Plaintiffs' demands or seek relief from the Court", but this is not true. It is in-fact Google who stated the Parties are at an impasse in its April 8 letter and proposed the Parties submit this joint status report. Plaintiffs remain willing to discuss ways to address Google's purported proportionality concern, but cannot agree to arbitrarily limit the data sources to just 200 sources for Step Three and 50 sources for Step Four as Google demands.

understand how Google modifies, processes, adds to, or removes data from log to log while balancing burden concerns, Plaintiffs ask Google to produce (a) the data fields for each log; and (b) field descriptions and comments for just 7 key logs where event data is captured, processed, joined with other data, and attributed to specific users:

| log_source | log_type |
|---|---|
| ██ | █████ |
| ████ | ██ |
| ██ | ████ |
| ██ | ██ |
| ██ | █████ |
| ███████ | ██████ |
| ███████ | ███████ |
| ██ | |

Google refuses to produce the data fields for these Sawmill logs, offering instead to produce field information only for the seven logs Plaintiffs are also seeking fields descriptions and comments for. Omitting these field names, however, would give Plaintiffs no insight into the contents of logs that, on their face, appear to contain relevant information. Google has not claimed producing the data fields would be unduly burdensome, nor could it, as the request only covers column names that can be extracted with a query and not the underlying data.

*Spanner/BigTable/Napa.* Spanner, BigTable, and Napa contain data collected through Google Analytics. Google identified 15,174 data stores associated with 27 components of Google's Gold system (i.e., the internal name for Google Analytics). Plaintiffs selected 4,352 data stores from these locations for Google to provide additional information in Step Three. Plaintiffs selected these specific data stores because they relate to components of the Google Analytics system: (a) where the data is initially collected, (b) where Google identifies users, (c) where users are sorted into audiences, and (d) where the data is ultimately used for advertising. The data stores identified represent approximately 28% of the more than

15,000 data stores Google identified for these systems, hold the key evidence to proving Plaintiffs claims that not only did Google collect Plaintiffs' health information from their healthcare provider web properties, but that it also identified them in that data and used it for advertising purposes.

Google rejected Plaintiffs proposal for these systems as well but did not offer any compromise until this Status Report. Google's position that Plaintiffs' selection "goes far beyond the Court's order to identify a 'sub-set of relevant data sources that [Plaintiffs] reasonably expect to be relevant and proportional to the litigation'" is simply incorrect. Plaintiffs have narrowed the universe of logs by more than 60%, substantially reducing the amount of information for Google to produce in Step Three. Moreover, for a substantial portion of these logs (2,890 of them) Plaintiff are only requesting field names and not descriptions. The specific sources identified are also purposefully tailored to represent the various stages of Google's collection, processing, and use of the data it intercepted from healthcare provider web properties, to minimize duplication while ensuing the information is relevant to Plaintiffs' claims.

Nonetheless, Google asserts that Plaintiffs' proposal is "overbroad" given that it has agreed to produce additional information for 24 sources already (i.e., 17 for Kansas/Oz and 7 for Sawmill). But Google ignores that given this is a multistep process: excluding information at Step Three makes it impossible for Plaintiffs to identify data sources for which Google will ultimately produce a sub-set of event level data for Named Plaintiffs consistent in Step Four. Given that Plaintiffs have already identified strong reasons to believe that the information in these sources is relevant, they should at least be considered in the next stage.

Google's objection to Plaintiffs' proposal as "patently disproportionate" is also entirely hypothetical. While Google claims the identified sources could "return millions of fields in total" as "certain data stores may have thousands or tens of thousands of fields" such non-quantified assertions must be rejected. *See Epic Games, Inc. v. Apple Inc*., 2021 WL 1326298, at *2 (N.D. Cal. Apr. 9, 2021) (for purposes of a proportionality analysis, "the party claiming the burden does have the obligation to substantiate that claim."). Tellingly, Google does not say how many of these data fields that it represents tally in the "millions" repeat across sources—and if it had, it is likely to reveal this figure is inflated. Further, Plaintiffs cannot even use this information to narrow their proposal any further because Google

does not provide any aggregate statistics for any of the sources Plaintiffs identified that would allow Plaintiffs to address Google's proportionality concern. *See Epic Games, Inc.*, 2021 WL 1326298, at *2 (overruling proportionality objection where there is not "any indication of the volume of responsive materials" that would allow the other party to "make a meaningful decision about the key documents it wants"). For example, if certain data fields repeat across multiple sources, which is very likely, Plaintiffs would not need Google to produce the description and comments for that field from every single source.[2]

Instead of negotiating in good faith, Google seeks to hinder Plaintiffs ability to prove their case at the outset by arbitrarily limiting the scope of discovery to (a) field information in Step Three for 200 data sources (roughly 1% of all sources it identified) and (b) a data sample from just 50 of those sources (or 0.25% of what it identified in Step One). Cutting the universe of data by 99.75% without providing Plaintiffs the information necessary to meaningfully select which sources are relevant to their case, or determine what is sufficient for a representative sample is unreasonable and should be rejected. Indeed, Google has not even attempted to substantiate the random limits it created below, other than that they provide discovery into "some number" of data sources "but not all." Google cannot withhold information about the data in its systems by claiming (without support) that it will serve no purpose to Plaintiffs either. As Plaintiffs have already explained the information Google produces at Step Three is clearly relevant because will reveal how Google uses data across its systems, including by linking, associating, or merging it with other data it has, and will ultimately inform how Plaintiffs narrow the sources from which Google produces a sample of data from in Step Four. The Court should not allow this to continue and should endorse Plaintiffs Step Two proposal.

## II.    DEFENDANT'S POSITION

Although Google followed through on its obligations to produce a list of data sources, Plaintiffs have come back with a sweepingly broad set of requests that are disproportionate to the case. Because Google does not believe this complies with what the Court ordered when it allowed Plaintiffs to "identify a sub-set of data sources they reasonably expect to be relevant and proportional to the litigation," Google

---

[2] Indeed, this is the reason Plaintiff is only asking Google to produce descriptions and comments for 7 of the Sawmill logs but requested all the data fields for each log.

respectfully requests that this Court set a limit on the number of data sources that Plaintiffs may request in Steps 2 and 4 of the Order. Dkt. 256.

***The Court's Order.*** In its Order regarding data sources production, the Court detailed a four-step process. Dkt. 256. In ***Step 1***, Google was required to "produce a <u>list</u> of data sources . . . along with any *existing* description of those data sources, in use with Google Ads, Google Display Ads and Google Analytics during the relevant time period." *Id.* (emphasis added). In ***Step 2***, Plaintiffs were ordered to "identify a sub-set of data sources that they reasonably expect to be relevant and proportional to the litigation." *Id.* In ***Step 3***, Google would then "produce a list of all fields within the sub-set of relevant data sources and, by querying or otherwise extracting, the engineers' comments for the fields, where such comments exist." *Id.* In ***Step 4***, Plaintiffs would "identify a relevant and proportional sub-set of event-level data for Named Plaintiffs, after which Google would provide that sub-set of relevant and proportional event-level data.

***Current Status***. ***Step 1*** is complete. Google produced information pursuant to Step 1 on February 27, 2026: one sheet containing the list of data sources that could include user-associated event-level data in use with Google Analytics in Spanner, BigTable, or Napa (15,174 data stores), and two sheets with lists of data sources that could potentially include user-associated event-level data in use with Google Analytics, Search Ads, and Display Ads in Sawmill (2,897 data stores), or Kansas/Oz (17 data stores). As ordered, Google's production also included any existing descriptions of the data sources.[3]

Plaintiffs then requested additional information above and beyond what the Court ordered, and Google, out of a spirit of cooperation, agreed. This included creating custom descriptions of certain tables and providing information regarding the categorization of certain data sources. Specifically, Google created custom descriptions of 17 Kansas/Oz data stores in collaboration with Google's engineers and provided information about the categorization of the 15,174 Spanner, BigTable, and Napa data stores. Plaintiffs nonetheless came back to Google on March 19, 2026, complaining that Google did "not provide sufficient information for Plaintiffs to assess the relevance of these data stores," and requested still further

---

[3] Plaintiffs complain that Google's initial production "only included descriptions for the Sawmill logs and no information about these other systems." However, the Court's order clearly required Google to provide only *existing* descriptions, Dkt. 256 at 2, and descriptions existed only for the Sawmill logs.

information. Google then provided further assistance on March 24, 2026, by explaining that the categories largely mapped to those identified in a diagram of system design that Google had previously shared. *See* GOOG-DOEVC-000005469.

It is on ***Step 2*** that the Parties are at an impasse. On March 27, 2026, Plaintiffs sent Google its requests for two of the lists of data (Sawmill and Kansas/Oz). Despite the fact that Step 2 required Plaintiffs to identify a "sub-set of data sources that they reasonably expect to be relevant and proportional to the litigation," Plaintiffs asked for: (1) field names, field descriptions, and comments for all 17 Kansas/Oz data stores; (2) field descriptions and comments for 7 Sawmill logs; (3) field names for **all 2,897 Sawmill data stores**; and (4) field names, field descriptions, and comments for **4,351** Spanner, BigTable, and Napa data stores. Plaintiffs, in other words, made practically no effort to narrow their requests to a "sub-set" of the disclosed Step 1 data sources. Google objected to Plaintiffs' disproportionate and overbroad requests, but Plaintiffs made no effort to compromise, arguing that they only asked for "approximately 40%" of the data sources Google identified, and stating that "[i]f Google continues to refuse to produce the information Plaintiffs requested for the entire subset of data sources Plaintiffs have identified, we will need to bring this to the Court."  Hence, the present dispute.

***Google's Proposal***. Google requests that the Court set a cap on the number of data sources for which Plaintiffs may seek additional discovery in Steps 2 and 4 of the Court's Order. Specifically, Google requests that the Court set a limit of 200 data sources for Step 2, and 50 for Step 4.

Plaintiffs argue that they are only asking for additional information from 40% of the data sources that Google identified. But merely selecting a percentage ignores the raw number of the logs Plaintiffs request—7,266. This is not reasonably "relevant [or] proportional to the litigation." Indeed, Plaintiffs have hardly attempted to identify a sub-set of relevant data, choosing instead to request field names for ***every single one*** of the nearly ***3,000*** Sawmill data sources, and ***over 4,000*** of the Spanner, BigTable, and Napa data stores. Because certain data stores may have hundreds of thousands of fields each, Plaintiffs' request for detail for over 7,000 data stores will amount to ***millions*** of fields in total, many of which are irrelevant to the claims at issue. Contrary to Plaintiffs' suggestion, this estimate is not conjecture: engineers at Google involved in this data sources production process have explained that certain logs have hundreds

of thousands of data fields, and there are many scenarios where Plaintiffs' uncapped requests would cause fields in the datasets Google produces under Step 3 to easily number well into the millions in total—though even just to know exactly how many would require undergoing a burdensome exercise in the first place. Indeed, in the production Google made on April 24 alone, there were already nearly 10 million fields. Unsurprisingly, the greater the number of data stores, the higher the potential number.[4]

Besides, what will Plaintiffs do with all this data, anyway? What purpose does it serve, other than to satisfy either a completionist impulse or a harassing one, to require such broad, duplicative, and ultimately grossly unnecessary disclosure? Tellingly, Plaintiffs fail to address the issues that have already arisen, and will be compounded, regarding the unnecessary magnitude of data their requests. Plaintiffs already know the canonical data sources at issue in this case. They have known it all along. At some point, they should pivot to prosecuting their case, rather than prosecuting discovery for discovery's sake.

Indeed, even when faced with the Step 1 list of 18,000 datastores, Plaintiffs repeatedly came back to Google demanding more information than the Court ordered, claiming it "could be useful for Plaintiffs to triage the list" provided. Maybe so, but the perfect is the enemy of the good here. Even if Google provides Plaintiffs with these millions of field names, Plaintiffs will likely complain again that they need more information to understand what they mean. Then the burden will no doubt fall on Google to help Plaintiffs make heads or tails of field names that have little to no bearing on this case in the first place. This has been a recurring theme of the case; the answer cannot be to permit Plaintiffs to continue making increasingly intrusive requests for ever more information.

Google therefore respectfully requests that the Court provide guardrails for Steps 2 and 4 of the Court's Order. Like **Step 2**, **Step 4** also relies on Plaintiffs to identify, in good faith, "a relevant and proportional sub-set of event-level data for Named Plaintiffs." Dkt. 256 at 3. For Step 2, Google asks that the Court allow Plaintiffs to identify up to 200 data sources, and for Step 4, up to 50 data sources (which itself is still far more numerous than the number of sources that contain the actually useful data in this

---

[4] Plaintiffs' suggestion (at 3-4) that it would be more manageable for Google to refrain from providing data fields that repeat across multiple sources demonstrates the extent to which it misapprehends the work such productions require. Eliminating duplicate data would actually necessitate *more* engineering work; Google would have to create tooling to read and analyze that data, and be able to accurately detect, locate, and extract duplicates.

case).[5] Setting a limit on Plaintiffs' requests is consistent with the Order's purpose in allowing Plaintiffs to receive "discovery related to *some number* of data sources," but not all of them or even most of them, "with the guideposts of Rule 26—relevance and proportionality—in mind." *Id.* at 2.

DATED: May 7, 2026

**LOWEY DANNENBERG, P.C.**

*/s/ Christian Levis*
Christian Levis (admitted *pro hac vice*)
*clevis@lowey.com*
Amanda Fiorilla (admitted *pro hac vice*)
*afiorilla@lowey.com*
44 South Broadway, Suite 1100
White Plains, NY 10601
Tel: (914) 997-0500

**SIMMONS HANLY CONROY, LLP**

Jason 'Jay' Barnes (admitted *pro hac vice*)
*jaybarnes@simmonsfirm.com*
An Truong (admitted *pro hac vice*)
*atruong@simmonsfirm.com*
112 Madison Avenue, 7th Floor
New York, NY 10016
Tel.: 212-784-6400

**KIESEL LAW LLP**

Jeffrey A. Koncius, State Bar No. 189803
*koncius@kiesel.law*
Nicole Ramirez Jones, State Bar No. 279017
*ramirezjones@kiesel.law*
8648 Wilshire Boulevard
Beverly Hills, CA 90211-2910
Tel: 310-854-4444

**LIEFF CABRASER HEIMANN
& BERNSTEIN, LLP**

---

[5] These figures are neither "arbitrary" nor "random"; earlier in this case, Google identified approximately 200 data sources that it believed could potentially contain data relevant to the case. And contrary to Plaintiffs' apparent argument, it is simply not the case that all data stores Google identified in Step 1 are relevant; by court order, the list was required to be comprehensive. Those figures are thus ill-suited as comparators, and Plaintiffs' percentages (at 4) are wildly overblown.

Michael W. Sobol (State Bar No. 194857)
*msobol@lchb.com*
Melissa Gardner (State Bar No. 289096)
*mgardner@lchb.com*
Jallé H. Dafa (State Bar No. 290637)
*jdafa@lchb.com*
275 Battery Street, 29th Floor
San Francisco, CA 94111-3339
Tel: 415 956-1000

Douglas Cuthbertson (admitted *pro hac vice*)
*dcuthbertson@lchb.com*
250 Hudson Street, 8th Floor
New York, NY 10013
Tel: 212 355-9500

**SCOTT+SCOTT ATTORNEYS AT LAW LLP**

Hal D. Cunningham (Bar No. 243048)
*hcunningham@scott-scott.com*
Sean Russell (Bar No. 308962)
*srussell@scott-scott.com*
600 W. Broadway, Suite 3300
San Diego, CA 92101
Tel: (619) 233-4565

Joseph P. Guglielmo (admitted *pro hac vice*)
*jguglielmo@scott-scott.com*
Ethan Binder (admitted *pro hac vice*)
*ebinder@scott-scott.com*
230 Park Ave., 17th Floor
New York, NY 10169
Telephone: (212) 223-6444

*Attorneys for Plaintiffs and the Proposed Class*

Dated: May 7, 2026                     **COOLEY LLP**

                                       */s/ Tiffany Lin*
                                       BENEDICT HUR (SBN 244018)
                                       (bhur@cooley.com)
                                       SIMONA AGNOLUCCI (SBN 246943)
                                       (sagnolucci@cooley.com)
                                       EDUARDO SANTACANA (SBN 281668)
                                       (esantacana@cooley.com)
                                       JOSHUA ANDERSON (312836)
                                       (joshua.anderson@cooley.com)
                                       TIFFANY LIN (SBN 321472)
                                       (tiffany.lin@cooley.com)
                                       HARRIS MATEEN (SBN 335593)
                                       hmateen@cooley.com
                                       3 Embarcadero Center, 20th Floor
                                       San Francisco, California 94111-4004
                                       Telephone: +1 415 693 2000
                                       Facsimile: +1 415 693 2222

                                       *Attorneys for Defendant Google LLC*

**FILER'S ATTESTATION**

Pursuant to Civil Local Rule 5-1(i)(3), I, Christian Levis, hereby attest under penalty of perjury that concurrence in the filing of this document has been obtained from all signatories.

Dated: May 7, 2026                    **LOWEY DANNENBERG, P.C.**


                                      By: */s/ Christian Levis*