**BARNES LAW, LLC**
Jason 'Jay' Barnes, State Bar No. 362766
231 Madison Street, Third Floor
Jefferson City, MO 65101
Telephone: (573) 308-7658
Facsimile: (573) 635-7414
*jaybarnes@barnes.law*

**KIESEL LAW LLP**
Jeffrey A. Koncius, State Bar No. 189803
Nicole Ramirez Jones, State Bar No. 279017
8648 Wilshire Boulevard
Beverly Hills, CA 90211-2910
Telephone: (310) 854-4444
Facsimile: (310) 854-0812
*koncius@kiesel.law*
*ramirezjones@kiesel.law*

**SCOTT+SCOTT ATTORNEYS AT LAW LLP**
Joseph P. Guglielmo (admitted *pro hac vice*)
230 Park Avenue, 24th Floor
New York, NY 10169
Telephone: (212) 223-6444
Facsimile: (212) 233-6334
*jguglielmo@scott-scott.com*

**LOWEY DANNENBERG, P.C.**
Christian Levis (admitted *pro hac vice*)
Amanda Fiorilla (admitted *pro hac vice*)
44 South Broadway, Suite 1100
White Plains, NY 10601
Telephone: (914) 997-0500
Facsimile: (914) 997-0035
*clevis@lowey.com*
*afiorilla@lowey.com*

**LIEFF CABRASER HEIMANN & BERNSTEIN, LLP**
Michael W. Sobol, State Bar No. 194857
Melissa Gardner, State Bar No. 289096
275 Battery Street, 29th Floor
San Francisco, CA 94111-3339
Telephone: (415) 956-1000
Facsimile: (415) 956-1008
*msobol@lchb.com*
*mgardner@lchb.com*

**LIEFF CABRASER HEIMANN & BERNSTEIN, LLP**
Douglas Cuthbertson (admitted *pro hac vice*)
250 Hudson Street, 8th Floor
New York, NY 10013
Telephone: (212) 355-9500
Facsimile: (212) 355-9592
*dcuthbertson@lchb.com*

*Attorneys for Plaintiffs and the Proposed Class*
*Additional Counsel Listed on Signature Page*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

| | |
|---|---|
| JOHN DOE, *et al.*, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>GOOGLE LLC,<br><br>Defendant. | Case No. 3:23-cv-02431-VC<br><br>**PLAINTIFFS' OPPOSITION TO GOOGLE'S MOTION FOR JUDGMENT ON THE PLEADINGS**<br><br>Date: September 10, 2026, 10:00 a.m.<br>Judge: Hon. Vince Chhabria<br>Ctrm: 4, 17th Floor |
| **This document applies to: All Actions** | |

# TABLE OF CONTENTS

Page

I. INTRODUCTION ..... 1
II. ARGUMENT ..... 2
  A. Google's CIPA Section 631 Violations are Well Pled. ..... 2
  B. Google Seeks to Narrow CIPA Without Support. ..... 4
    1. CIPA Section 631 Applies to Google's Technologies in this Case. ..... 4
    2. ERC Was the First Opinion to Require "In Transit" Comprehension. ..... 6
    3. "Read" or "Learn" Do Not Require Comprehension. ..... 8
    4. CIPA Section 631 is Logical and Comprehensible. ..... 10
    5. Any Overlap Between Sections 632 and 631 is Intentional. ..... 11
    6. The Rule of Lenity Does Not Apply. ..... 13
    7. Privacy Rights in Online Communications are Worthy of Protection. ..... 14
  C. Google's Geolocation Argument Has No Merit. ..... 14
III. CONCLUSION ..... 15

# TABLE OF AUTHORITIES

Page

**Cases**

*Adler v. Community.com, Inc.*,
2021 WL 4805435 (C.D. Cal. Aug. 2, 2021) ........ 15

*Berger v. State of N.Y.*,
388 U.S. 41 (1967) ........ 11

*Cody v. Ring LLC*,
2025 WL 240763 (N.D. Cal. Jan. 16, 2025) ........ 3

*Committee to Relocate Marilyn v. City of Palm Springs*,
88 Cal.App.5th 607 (2023) ........ 8

*Crano v. Sojern, Inc.*,
2025 WL 2689267 (N.D. Cal. Sept. 19, 2025) ........ 14

*Dellasala v. Samba TV*,
2026 WL 1138358 (N.D. Cal. Apr. 21, 2026) ........ 14

*Doe v. Eating Recovery Center LLC*,
806 F. Supp. 3d 1109 (N.D. Cal. 2025) ........ *passim*

*Doe v. FullStory, Inc.*,
712 F. Supp. 3d 1244 (N.D. Cal. 2024) ........ 15

*Doe v. Meta Platforms, Inc.*,
690 F. Supp. 3d 1064 (N.D. Cal. 2023) ........ 15

*Frasco v. Flo Health et al.*,
No. 3:21-cv-00757-JD ........ 5

*Graham v. DaimlerChrysler Corp.*,
34 Cal.4th 553 (2004) ........ 8

*Gutierrez v. Converse*,
2024 WL 3511648 (C.D. Cal. July 12, 2024) ........ 7

*Harrott v. County of Kings*,
25 Cal.4th 1138 (2001) ........ 13

*Heerde v. Learfield Commc'ns, LLC*,
741 F. Supp. 3d 849 (C.D. Cal. 2024) ........ 7

*Ion Equipment Corp. v. Nelson*,
110 Cal.App.3d 868 (1973) ........ 13

*Jones v. Tonal Sys., Inc.*,
751 F. Supp. 3d 1025 (S.D. Cal. 2024) ........ 3

*Kearney v. Salomon Smith Barney, Inc.*,
39 Cal.4th 95 (2006) ........ 11, 12

**TABLE OF AUTHORITIES**
**(continued)**

**Page**

*Kight v. CashCall, Inc.*,
200 Cal.App.4th 1377 (2011) ....................14

*L.B. v. LinkedIn Corp.*,
2025 WL 2899514 (N.D. Cal. Oct. 10, 2025)....................3

*Lewis v. Magnite, Inc.*,
2025 WL 3687546 (C.D. Cal. Dec. 4, 2025) ....................14

*In re Meta Android Priv. Litig.*,
No. 25-cv-04674-RFL....................5

*Norcia v. Samsung Tel. Am., LLC*,
845 F.3d 1279 (9th Cir. 2017) ....................12

*Outfitter Props., LLC v. Wildlife Cons. Bd.*,
207 Cal.App.4th 237 (2012) ....................8

*R.C. v. Sussex Publishers, LLC*,
2025 WL 1735994 (N.D. Cal. June 23, 2025) ....................14

*R.C. v. Sussex Publishers, LLC*,
2025 WL 948060 (N.D. Cal. Mar. 28, 2025)....................14

*Rambo v. Rambo*,
245 Ala. 98 (1943) ....................9

*In re Ramon A*,
40 Cal.App.4th 935 (1995) ....................13

*Ribas v. Clark*,
38 Cal.3d 355 (1985) ....................12

*Smith v. LoanMe, Inc.*,
11 Cal.5th 183 (2021) ....................13

*Tavernetti v. Superior Court*,
22 Cal.3d 187 (1978) ....................13

*Torres v. Prudential Financial, Inc.*,
2025 WL 1135088 (N.D. Cal. April 17, 2025)....................6, 7

*U.S. v. Leung*,
471 F.3d 1107 (9th Cir. 2006) ....................15

*Wendz v. State Dep't of Educ.*,
93 Cal.App.5th 607 (2023) ....................8

*Williams v. DDR Media, LLC*,
757 F.Supp.3d 989 (N.D. Cal. 2024) ....................7, 8

**TABLE OF AUTHORITIES**
**(continued)**

**Page**

*Valenzuela v. Super Bright LEDs Inc.*,
2023 WL 8424472 (C.D. Cal. Nov. 27, 2023) ....................15

**Statutes**

Cal. Pen. Code § 638.51 ....................4

Cal. Pen. Code § 4 ....................13

Cal. Pen. Code § 630 ....................11, 12

Cal. Pen. Code § 631 .................... *passim*

Cal. Pen. Code § 632 ....................5, 11, 12

**Court Rules**

Fed. Rule Civ. Proc. 12 ....................14

## I. INTRODUCTION

Plaintiffs' operative Second Amended Complaint ("SAC") describes surveillance of private communications on Healthcare Providers' websites. It alleges that Google, using website code it disseminated for the purpose, collected identifiable, intimate, and legally protected details about Plaintiffs' and Class Members' healthcare, including communications about doctors, conditions, treatments, and patient status. The SAC more than satisfies federal pleading standards to state claims against Google under California Penal Code ("CIPA") Section 631. It details, with concrete support appropriate to the pleadings stage, exactly how Google uses Google Source Code to capture sensitive health communications in real time.

Unable to challenge the factual sufficiency or plausibility of these allegations, Google asks this Court to extra-legislatively amend Section 631, narrowing it so that Google's alleged conduct is excused. Google presents its Motion for Judgment on the Pleadings ("Motion" or "MJP") as an attack on the SAC, but the real question is what Section 631 requires to state a violation.

Google's argument that Section 631 requires more than what the SAC alleges is meritless. Google's primary authority is this Court's summary judgment order in *Doe v. Eating Recovery Center LLC,* 806 F. Supp. 3d 1109 (N.D. Cal. 2025) ("*ERC*"). In *ERC*, this Court held, "albeit without a great deal of confidence," that plaintiffs must ultimately prove a defendant attempted to understand the substantive meaning of communications "while" they were "in transit" to satisfy Section 631. The Court applied that reasoning to grant summary judgment on claims that Meta engaged in conduct very similar to Google's alleged conduct here. *Id.* at *1115.

The Court should revisit the legal conclusions it reached in *ERC*, and deny Google's Motion, because recent legislative history, and statutory interpretation informed by CIPA's history and purposes, all confirm that Section 631 prohibits Google's conduct exactly as alleged. CIPA's text nowhere requires instantaneous understanding of data while still in transit, before the contents can be processed to extract their meaning. With respect to CIPA's temporal and physical requirements, it is enough that Google used a "bug" to obtain Plaintiffs' and Class Members' health-related communications in California.

## II. ARGUMENT

Google does not contend that the SAC fails to provide fair notice of the Section 631 claim against it, or that it alleges implausible facts. Instead, relying on this Court's summary judgment order in *ERC*, Google argues that CIPA § 631 requires alleging that Google not only redirected and used, but also tried to comprehend the meaning of, communications it captured from Plaintiffs' interactions with their Healthcare Providers, "during the virtually infinitesimal amount of time it takes for the communication to travel from the website visitor to the website operator." *See ERC*, 806 F. Supp. 3d at 1116. Nothing in Section 631 requires Google to comprehend substantive meaning before its Source Code's transmission ends, just as a classical application of CIPA would not require the operative who planted the Bug to learn the contents of a communication before the radio waves reached his receiver, and a speaker transformed them into sound that reached his ears.

Because the SAC adequately pleads a CIPA claim, the Court should deny Google's Motion.

### A. Google's CIPA Section 631 Violations are Well Pled.

The SAC is a plain statement of relevant, sometimes technical, facts. It faithfully alleges how Google Ads tracking code, and other "Google Source Code" transmits communications to Google, what they contain, and how these technologies came to operate where patients communicate information about their health. It does this through 70 pages of factual allegations, supported, line by line, with citations to reliable sources. The SAC next alleges, at pages 71-99, how the requirements for class certification and seven Counts are supported by the facts alleged. All but one count (good faith and fair dealing) survived Google's Motion to Dismiss the SAC, in whole or substantial part. With respect to Section 631, the Court concluded that Google's intentional, non-consensual acquisition of the contents of Plaintiffs' and Class Members' communications are plausibly alleged. Dkt. 198 at 1, 6-7.

The SAC also appropriately pleads the timing of Google's misconduct. It attaches evidence of "contemporaneous" transmissions of communications content by Google's Source Code to Google "extracted from data recordings showing specific Health Information communications," created using "Fiddler" tools that generate "images of the browsing experience." SAC ¶¶ 34, 99-

100; SAC Exs. 1-2; Appendix A Row 1.[1] Exhibits 1 and 2 to the SAC evidence real-time "transmissions" to Google "endpoints" as a matter of course *during* communications between patients and their providers. *See id.*; SAC ¶¶ 24-30 (describing endpoints); ¶ 34 (describing Exhibits 1-2), 89 (explaining Fiddler contents), 91 (discussing transmitted data in addition to contents "being tracked" in Exhibit 1).

The SAC further alleges Google's purposes for learning and using the contents of communications received through Google Source Code. This code is a component of Google's broad-scale data collection efforts nationwide, and Google derives a host of valuable benefits from counting patient "Health Information" among its data "assets." SAC ¶¶ 3-4, 23-29, 129, 186-88. The SAC details Google's use of this information. SAC § V-E; *id.* ¶ 123 (Google "did far more with the information than store it for the web property owner's analysis.").

Google Source Code is well within the scope of Section 631. It is a quintessential "Bug" installed to redirect communications to Google. SAC ¶ 217 ("Google intercepted and received Plaintiffs' and Class Members' Health Information through the surreptitious redirection from [their] computing devices to Google …"); ¶ 265 ("Google intruded upon Plaintiffs' and Class Members' computing devices by gaining unauthorized access to those devices via web-bugs.") In the same way that Bugs used in the 1960s transmitted a parallel communication over radio waves to an operative, the Google Source Code in this case allegedly sends information "in real-time back to specific Google-owned domains [endpoints]" where Google receives the transmissions as patient conversations with their own healthcare providers are taking place. SAC ¶ 24.

There is no question that the SAC provides fair notice about the nature of Google's misconduct, distinguishing *L.B. v. LinkedIn Corp.,* 2025 WL 2899514, at *16 (N.D. Cal. Oct. 10, 2025), and *Cody v. Ring LLC*, 2025 WL 240763, at *2 (N.D. Cal. Jan. 16, 2025) (failure to put defendant on notice), and *Jones v. Tonal Sys., Inc.*, 751 F. Supp. 3d 1025, 1037 (S.D. Cal. 2024) (failure to plausibly allege facts), on which Google relies.

[1] The citation provided in Appendix 1 for an explanation of Fiddler has been archived as of July 2025 at, https://web.archive.org/web/20250722191509/https://learn.microsoft.com/en-us/windows/win32/win7appqual/fiddler-web-debugger-tool. The original URL is non-functional.

**B. Google Seeks to Narrow CIPA Without Support.**

Google's primary authority is an uncertain one. Last year, this Court considered a summary judgment record on conduct by Meta, similar to Google's conduct alleged here. The Court initially and tentatively found that "even if Meta's process of excising certain information from the URLs does not amount to 'reading' the contents of the communication [under] Section 631(a), Meta's mere act of redirecting the communication to itself falls within that clause." *ERC* Dkt. 145. But the Court subsequently held that redirecting communications "did not satisfy the 'in transit' requirement as a matter of law." *ERC*, 806 F.Supp.3d at 1115. Each of the reasons for the Court's conclusion, which it acknowledged came "without a great deal of confidence," and resulted in a "strange" outcome, are addressed below and show why the Court should deny Google's Motion.

**1. CIPA Section 631 Applies to Google's Technologies in this Case.**

In addressing CIPA's temporal requirements, the Court observed that "[t]his question is hard because the statute was not drafted with the internet in mind," so "there is reason to question whether the Legislature intended for CIPA to apply to the type of conduct implicated by this case at all." *ERC*, 806 F. Supp. 3d at 1118-19.

The California Legislature took notice of this Court's questions. As set forth in legislative analysis from a Hearing of the Assembly Privacy and Consumer Protection Committee on July 1, 2026: "Last year, in granting summary judgment for a defendant website operator, Judge Chhabria of the Northern District wrote: 'The language of CIPA is a total mess . . . As difficult as it is to apply CIPA to the physical world, it's virtually impossible to apply it to the online world.'" *See* Declaration of Melissa Gardner iso Plaintiffs' Request for Judicial Notice Exhibit ("Ex.") 1, at 20.

The 2026 Committee analysis, and legislative action, directly address *ERC's* concern that Section 631 may not have been intended to reach online communications by unequivocally stating that Sections 631 and 632 have long been understood to apply. *Id.* at 1. The Hearing concerned SB 690, a two-year effort to reform CIPA, sparked by claims under the "pen register" provision added to CIPA in 2015, which covers collection of IP addresses without a court order. *See* Cal. Pen. Code § 638.51. Because the substantial compensatory and deterrent provisions set forth in Section 637.2

apply to the entire "chapter," enactment of the pen register provision eventually resulted in thousands of California businesses receiving demand letters or being sued based on their collection of IP Addresses, no matter what else, if anything was being communicated. Ex. 1 at 1. Quick settlements reportedly "encourage[ed] vexatious litigants," reminiscent of abuses of the ADA's protections for individuals with disabilities. *Id.* at 7, 25.

As introduced in February 2025, SB 690 aligned with Google's position in this case, proposing to eliminate CIPA's protections for analytics and advertising technologies entirely, subject only opt-out requirements in the CCPA. *Id.* at 9; *see also* Ex. 2 at 6 ("SB 690 would clarify that online businesses that comply with CCPA … cannot be punished under CIPA."). Privacy advocates promptly raised concerns that SB 690 would undermine important protections for online privacy, and "immunize[] big tech," including in **this specific case.** Ex. 2, at 12, 15. SB 690 was held and referred to the Committee on Privacy and Consumer Protection for a more robust analysis.

In 2026, the Committee published a robust 35-page Analysis considering CIPA litigation. It explained that Section 631 "ha[s] long been understood to apply … to online communications" and "is a key protection that warrants a more nuanced approach than a broad exemption." Ex. 1 at 2. It identified "many meritorious" online tracking cases that require CIPA's protections. *Id.* at 22 (citing *In re Meta Android Priv. Litig.*, No. 25-cv-04674-RFL; *see also e.g.*, *id.* at 22 (referring to *Frasco v. Flo Health et al.*, No. 3:21-cv-00757-JD: "illicit recordings of online communications, [] can entail egregious privacy violations – as was the case in the recent litigation in which Meta collected sensitive reproductive information from the Flo app.").

After a year of consideration, including of concerns "that the bill undermines key protections against privacy violations—in particular, surreptitious interception of information by undisclosed third parties, which can lead to sensitive information of targeted individuals falling into the wrong hands," the author of SB 690 "recognize[ed] that the pen register statute is on a fundamentally different footing from [§ 631 and § 632, and] agreed to amend the bill." *Id.* at 2. As now pending, SB 690 would allow only the Attorney General to pursue pen register claims for online website and mobile app tracking. *See* Ex. 3. Section 631 is unchanged.

The Legislature thus has responded to *ERC's* questions about whether Section 631 applies to the Internet. The answer is Yes, and there are "meritorious" cases pending. This is one of them.

**2. ERC Was the First Opinion to Require "In Transit" Comprehension.**

A second basis of the *ERC* decision was that "[c]ourts [] have been all over the map" on how to apply the "transit" requirement to online tracking, with some holding that understanding communications in transit was required to state a claim. For example, *ERC* cited Judge Breyer's summary adjudication in *Torres v. Prudential Financial, Inc.*, 2025 WL 1135088 (N.D. Cal. April 17, 2025) as holding that the "in-transit requirement" was unmet where a company "didn't actually read or attempt to read the communications while they were in transit." *ERC*, 806 F.Supp.3d at 1116. *ERC's* conclusion did not fully account for the facts of the cited decisions.

While *Torres* contains language that may seem like it applied the rule later set forth in *ERC*, the question before Judge Breyer was different because the technology was different. *Torres* involved "Session Replay" technology, which generates "a recreation of [] events" on "webforms." Those recreations were accessible only using a "Certificate" stored on the defendant's servers, which the defendant could not access except for "troubleshooting" purposes. *Torres*, 2025 WL 1135088, at *1. The court rejected the plaintiffs' argument that being able to access replays for troubleshooting converted the defendant's conduct into an attempt to read or learn contents while in transit, since plainly, any troubleshooting would have occurred after the fact. *Id.* at *6 n.6. The court also rejected the argument that compiling replays for website clients constituted reading, because "[t]he act of reassembling events like keystrokes, mouse movements, and clicks into a session replay (for the convenience of a party to the communication itself) is not analogous to creating personal profiles that can then be marketed to third-party advertisers." *Id.* at *6.

*Torres* did not adopt a general rule that "CIPA could never apply in the context of the internet, where communications are near instantaneous and cannot be meaningfully read or understood until later." *Id.* Just the opposite, Judge Breyer pointed to a case about use of "browser plug-ins to 'replicate and send [ ] user data to Facebook through a separate, but simultaneous, channel,'" to show that "CIPA remains perfectly viable in the context of internet communications."

*Id.* at *6 n.5. Despite the seemingly broader language in *Torres*, the decision actually stands for the proposition that, unlike Google here, a defendant who did **not ever** "analyze, summarize, or otherwise interpret Plaintiffs' data," or only does so for troubleshooting, does not violate Section 631, not that redirecting communications never does. *Id.* at *6 (emphasis added).

This is further confirmed by the case *Torres* relied on. Specifically, *Torres* cited Judge Illston's order in *Williams v. DDR Media, LLC*, 757 F.Supp.3d 989 (N.D. Cal. 2024), which concerned "TCPA Guardian" software that tracked who agreed to receive telephone solicitations by storing an illegible "hash" of users' contact information. As in *Torres*, the summary judgment record proved that the defendant made no attempt, at any time, to read, learn, or even see the contents of any communications it received, in transit or otherwise. *See Williams*, 757 F. Supp. 3d at 996 ("undisputed evidence shows that [defendant] … does not analyze, interpret, or save the original inputted information."). *Williams* required real-time interception *to* read contents, not real-time reading. Likewise, *Gutierrez v. Converse*, 2024 WL 3511648 (C.D. Cal. July 12, 2024), also cited in *ERC* and by Google, granted summary judgment on claims about communications the defendant only accessed to provide "technical assistance." *Gutierrez*, 2024 WL 3511648, at *7.

In short, prior to *ERC*, Courts with the benefit of complete discovery held that the "read or learn…in transit" element could be satisfied by real-time redirection to a defendant, **unless** receipt of the message was divorced, entirely, from any effort to actually read or learn the contents. Where communications were simply being stored by a defendant for someone else, were illegible, or otherwise never accessed for their substance, CIPA liability could not attach because obtaining them could not have been part of any "effort at understanding the substantive meaning" of the communication. *Williams*, 757 F. Supp. at 995. This is consistent with the holdings in other cases, such as *Heerde v. Learfield Commc'ns, LLC*, 741 F. Supp. 3d 849, 862 (C.D. Cal. 2024), which have allowed claims like those alleged here to proceed past the pleadings.

*ERC* was the first case to hold that *even if* the defendant is capturing communications contents so that it can analyze them for its own purposes, including user profiling, liability only attaches if it tries to comprehend them in transit. The Court was right to doubt that conclusion.

### 3. "Read" or "Learn" Do Not Require Comprehension.

Google, and to a lesser extent, *ERC*, focus on the term "read," ignoring that CIPA also prohibits attempts to "learn" what is said. Analyzing CIPA consistent with the authorities above, neither word necessarily requires "understand[ing] th[e] substantive meaning" in transit. MJP at 6. The cited authorities only require "some effort." *See ERC*, 806 F.Supp.3d at 1117, quoting *Williams*, 757 F. Supp. 3d at 995. That is consistent with the dictionary definitions of these terms.

Under California rules of statutory interpretation, when a word is not defined by the statute, courts "turn to general and legal dictionaries" in order to determine the word's "ordinary meaning." *Wendz v. State Dep't of Educ.*, 93 Cal.App.5th 607, 626 (2023), citing *Outfitter Props., LLC v. Wildlife Cons. Bd.*, 207 Cal.App.4th 237, 244 (2012) ("We use the ordinary dictionary meaning" and "construe the words in context, keeping in mind the statutory purpose[.]") "[T]he more helpful dictionary definitions are those in existence at or about the time the legislation in question was enacted." *Committee to Relocate Marilyn v. City of Palm Springs*, 88 Cal.App.5th 607, 625, n.5 (2023); *see also Graham v. DaimlerChrysler Corp.*, 34 Cal.4th 553, 570, n.4 (2004) ("the definition that should be consulted is not from the most recent edition of the dictionary, but the one current when the Legislature" acted.) Thus, Plaintiffs look to the meaning of those words at the time of CIPA's passage, around 1967, and do so with consideration of "the statutory purpose."

According to Webster's Seventh Collegiate Dictionary (1967), the first definition of "read" is "to receive or take in the sense of (as letters or symbols) by scanning."[2] The modern Webster's maintains the same definition, stating that "read" means "to receive or take in the sense of (letters, symbols, etc.) especially by sight or touch."[3] Thus, to "read" is not limited to understanding, but includes "to receive or to take in," a pre-cursor to understanding, but not the same thing.

Likewise, Webster's Seventh (1967) defined "learn" as "to gain knowledge or understanding of;" "to come to realize;" "to find out;" or "to acquire knowledge[.]"[4] And the

---

[2] *See* https://archive.org/details/webstersseventhn00unse/page/n739/mode/2up.
[3] *See* https://www.merriam-webster.com/dictionary/read, with similar secondary definitions.
[4] See https://archive.org/details/webstersseventhn00unse/page/480/mode/2up.

modern Webster's maintains the same definition, stating that to "learn" is "to gain knowledge or understanding of;" "to come to realize;" or "to come to know."[5] Webster's Unabridged Second (1968) adds "to gain or receive knowledge" and "to be informed" to the definition of "learn." Similarly, Black's Law Dictionary, Fourth Ed. (1968) defined "LEARN" as "to gain knowledge or information of," citing *Rambo v. Rambo*, 245 Ala. 98, 99 (1943) (to "learn" means "to acquire information or intelligence about; to find out about; to ascertain.").[6]

Google read and learned the contents of Plaintiffs' communications by taking them in; scanning them; and gaining knowledge. Here, Google argues for an even more restrictive version of CIPA than *ERC*, contending that *because* Plaintiffs alleged "Google's Use" of contents after Google obtained them, Plaintiffs have alleged "the opposite" of reading (or learning) them in real-time. MJP at 6, citing SAC ¶¶ 125, 127-29. Grammatically, using the contents of illicitly-obtained communications is not the "opposite" of trying to learn what they are. Legally, Google's alleged use supports that Google acquired the contents as part of its efforts to read them, violating CIPA.

Requiring instantaneous comprehension to establish that learning occurred would render many obvious CIPA violations scientifically impossible. For example, Section 631 protects "reports," not just messages. It cannot be that someone who chooses not to undertake the impossible task of understanding entire reports, in the infinitesimal time required to transmit reports, can never violate the statute. Similarly, in a land-line telephone call, the amount of time that a communication is "in transit" is determined by the length of the telephone wire that signals must traverse between the parties. Under Google's interpretation, to violate § 631(a), a defendant would have to place himself in a position where he could "understand the substantive meaning" of electrical impulses while they remained in transit between the parties. But the laws of physics and neuroscience make this impossible. The electrical signals on a traditional telephone call travel at the speed of light. For a telephone call between two people with one mile of wire between them, the sound on one end of the call will be received 0.00000537 seconds after it is spoken on the other

[5] See https://www.merriam-webster.com/dictionary/learn.

[6] Black's Law Dictionary maintained the same definition through the Sixth Edition, which published in 1990, but "LEARN" was removed in the Seventh Edition, published in 1999.

end. But it takes the human brain longer than that to process spoken and written words. *See Ultra-rapid Access to Words in the Brain, Nat. Commun.*, 2012 Feb. 28; 3:711. *MacGregor, Lucy J., et al*. It is not possible to understand the meaning of a communication in 0.00000537 seconds.

**4. CIPA Section 631 is Logical and Comprehensible.**

The fourth reason for *ERC's* holding was that "the statute is just badly drafted," so it is "virtually impossible to understand what Section 631(a) actually means." *ERC*, 806 F. Supp. 3d at 1115, 1118. While not a model of clarity, it is possible to make sense of each clause and word of Section 631. Doing so requires interpreting it in light of the relevant technology at the time.

In relevant part, Section 631 provides:

> [Clause 1] Any person who, by means of any machine, instrument, or contrivance, or in any other manner, intentionally taps, or makes any unauthorized connection, whether physically, electrically, acoustically, inductively, or otherwise, with any telegraph or telephone wire, line, cable, or instrument, including the wire, line, cable, or instrument of any internal telephonic communication system,
>
> [Clause 2] or who willfully and without the consent of all parties to the communication, or in any unauthorized manner, reads, or attempts to read, or to learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line, or cable, or is being sent from, or received at any place within this state . . . .

Cal. Pen. Code § 631(a).

To secretly learn communications contents in the 1960s, two methods were commonly used. The first was a "Tap," spliced into wires anywhere on the path between two telephones, which captured the electrical signals flowing over those wires. The second was a "Bug," consisting of a microphone and a transmitter that could be installed on one party's telephone receiver. Rather than extracting electrical signals as they traveled by wire, a Bug simultaneously broadcast electronic representations of speech over separate radio waves, typically to an operative waiting to receive the broadcast. Taps, therefore, extracted information from wires, lines, and cables, whereas Bugs captured it from the source, e.g., inside the receiver, and sent a copy to a third party. *See Berger v. State of N.Y.*, 388 U.S. 41, 47 (1967) (discussing Taps and Bugs).

One reason CIPA 631 appears convoluted is that it targets all manner of Tap-like, and Bug-like, surveillance, across multiple technologies, in a single sentence. The ECPA accomplishes such

prohibitions more accessibly, by prohibiting use of any "device" that "intercepts," regardless of what the *communication* was doing at the time (traveling or being uttered). Even with CIPA, however, clarity is possible with the distinction between Taps and Bugs in mind.

The first clause of Section 631(a), prohibits "any unauthorized connection," including Taps *and* Bugs. It discusses specifics of Taps first (connection ". . . with any telegraph or telephone wire, line, cable"), and then specifics about Bugs ("or instrument, including the . . . instrument of any internal telephonic system.").

The second clause, which applies to "any message, report, or communication," is structured like the first, except that it encompasses two kinds of Tap-like surveillance, as well as Bugs. It first prohibits non-consensual, unauthorized learning "while the [message] is in transit," prohibiting Tap-like behavior without regard to the use of wires. Second, with an "or" clause, it prohibits Taps or Tap-equivalents that do involve wires ("…or passing over any wire, line, or cable"). Third, with another "or" clause, it addresses the use of Bugs or Bug-equivalents on equipment used to send or receive messages ("or is being sent from, or received at any place within this state.").

Specifying the distinction between Taps and Bugs, while trying to encompass all forms of communications surveillance, in one sentence, is why Section 631 is hard to follow. It is also the best explanation for the final "or" clause on learning contents while communications are "being sent … or received." That last clause applies to Bugs, because Bugs (equipment) are discussed last in every clause. Reading the second clause to protect content "being" sent, even if captured before reaching wires, as Bugs do, aligns with the first clause of Section 631, and CIPA's purposes (§ 630), and surveillance known in the 1960s. The Legislature left any concerns about extra-territorial application of the prohibitions on Taps to standard conflicts principles applied by the Courts. *See e.g.*, *Kearney v. Salomon Smith Barney, Inc.*, 39 Cal.4th 95, 128 (2006). To the extent Google's arguments are based on Section 631 being hard to interpret, they are unsupported.

**5. Any Overlap Between Sections 632 and 631 is Intentional.**

The fifth reason that *ERC* rejected the "plausible interpretation" of Section 631, as **not** requiring real-time comprehension, was that Section 632 prohibits "recording," and "[i]f the same

conduct were covered by the second clause of Section 631(a), it would appear to render Section 632 superfluous." *ERC*, 806 F. Supp. 3d at 1118.

The California Supreme Court considered a similar argument for interpreting Section 631 narrowly, and rejected it in light of the statutory purposes. In *Ribas v. Clark*, 38 Cal.3d 355 (1985), the defendant argued that 631(a) could not apply to interceptions made via extension telephone:

> Defendant contends that the Privacy Act prohibits only the unauthorized monitoring of communications while they are "in transit," and that "once a phone message reaches its place of destination it is no longer in transit ...." This argument, however, ignores the plain language of section 631, subdivision (a), that provides for the punishment of one "who ... reads, or attempts to read, or to learn the contents ... of [a] ... communication while the same is in transit ..., or is being sent from, or received at any place within this state ...." (Italics added.) It cannot be seriously disputed that defendant is accused of eavesdropping on plaintiff's conversation with his wife while the communication was either "in transit" or was "being sent from" and "received at" a place within this state.

*Ribas*, 38 Cal. 3d at 359–60.

The Court addressed overlap between Sections 631 and 632 by looking to CIPA's intent "'to protect the right of privacy'" from "a serious threat to the free exercise of personal liberties..." *Id.*, citing Cal. Pen. Code § 630. A defendant who employs a Tap or Bug covered by 631, during a "confidential" conversation covered by 632, violates *both* Sections. The Court observed that Section 631 is probably a catch-all to prevent creative escapes from liability: "[I]t is probable that the Legislature viewed section 631 as a means of proscribing attempts to circumvent other aspects of the Privacy Act, e.g., by requesting a secretary to secretly transcribe a conversation over an extension, rather than tape recording it in violation of section 632." *Id.* at 360-361.

On issues of California law, federal courts are "bound by the decisions of the California Supreme Court, 'including reasoned dicta.'" *Norcia v. Samsung Tel. Am., LLC*, 845 F.3d 1279, 1284 (9th Cir. 2017). And when confronted with the choice to narrow CIPA's scope, California courts consistently choose a broad interpretation. In *Kearney*, 39 Cal.4th at 115, the Court described CIPA as "a broad, protective invasion-of-privacy statute" that applied to communications leaving the state. In *Tavernetti v. Superior Court*, 22 Cal.3d 187, 194-95 (1978), the Court explained that courts interpreting CIPA must heed the "fundamental principle" that California "public policy favor[s] protection of privacy rights." Accordingly, *Tavernetti* refused to

adopt a narrow interpretation of CIPA "in the face of the Legislature's forcefully expressed intent and the constitutional significance in California of the right to privacy." Likewise, in *Ion Equipment Corp. v. Nelson*, 110 Cal.App.3d 868, 880 (1973), the Court rejected a narrow reading, holding that CIPA applied to corporations (even though it makes no mention of them) because "[t]he purpose of [CIPA] is to deter wrongful conduct," which "could be easily circumvented if it were not an offense to eavesdrop upon or record confidential communications of corporations." None of CIPA's prohibitions should be narrowly construed.

**6. The Rule of Lenity Does Not Apply.**

The sixth reason that *ERC* interpreted Section 631 narrowly is that CIPA is a criminal statute. *ERC* cited *Harrott v. County of Kings*, 25 Cal.4th 1138, 1154 (2001) for the common law proposition that "it is appropriate to apply the rule of lenity." *ERC.* 806 F. Supp. 3d at 1118.

There is no ambiguity in the statute to warrant lenity. *Supra* § B-4; *Smith v. LoanMe, Inc.*, 11 Cal.5th 183 (2021). Even if there were, California courts "will not construe an ambiguity in favor of the accused if such a construction is contrary to the public interest, sound sense, and wise policy. Rather, the major consideration in interpreting a criminal statute is legislative purpose," which means a court must "read the statute in light of the evils which prompted its enactment[.]" *In re Ramon A*, 40 Cal.App.4th 935, 941 (1995), internal citations omitted. Google's alleged use of Source Code to capture sensitive health information for its own use easily meets this threshold.

The California Penal Code also disclaims the use of the rule of lenity, confirming its application is inappropriate here. *See* Cal. Pen. Code § 4 ("The rule of the common law, that penal statutes are to be strictly construed, has no application to this Code. All its provisions are to be construed according to the fair import of their terms, with a view to effect its objects and to promote justice."). And "although the Legislature imposed penal sanctions and civil liability" for CIPA violations, where the case is civil in nature, California courts "apply interpretation principles applicable to a civil statute and make no attempt to determine whether [the] interpretation extends to a criminal matter." *Kight v. CashCall, Inc.*, 200 Cal.App.4th 1377, 1388 (2011) (explaining standard for CIPA interpretation).

#### 7. Privacy Rights in Online Communications are Worthy of Protection.

*ERC* asked rhetorically, "Did the Legislature really intend to subject companies ... to criminal liability for using third-party software to track website activity?" The Legislature's answer today is Yes, particularly in a case like this, as discussed in Section II-B-1 above.

The answer would also have been "Yes" in 1967 when the statute was enacted. A marketing company bugging a hospital's phone lines to surveil patients' inquiries about specific doctors, conditions, and diseases would plainly violate CIPA. Technology has changed; the principles have not. Requiring Section 631 claims to allege more than the SAC alleges would defeat CIPA's purposes as the Legislature intended in the 1960s, anticipating "advances in . . . technology," and as the Legislature confirmed it still recognizes *today*.

Google cites a handful of District Court Orders dismissing Section 631 claims under Rule 12, but each was decided on the strength of its own pleadings, at the time of the order. For example, Google cites Judge Corley's March 2025 Order dismissing CIPA claims in *R.C. v. Sussex Publishers, LLC*, 2025 WL 948060, at *7 (N.D. Cal. Mar. 28, 2025) (MJP at 7), but omits that after amendment, plaintiffs' Section 631 claims were upheld. *R.C. v. Sussex Publishers, LLC*, 2025 WL 1735994, at *2 (N.D. Cal. June 23, 2025) ("Plaintiffs plausibly allege Google intercepted communications while they were in transit to Defendant."). To the extent other District Courts have followed or adopted the reasoning of *ERC* as applied to different technologies, they also lacked the information now before the Court, including the Legislature's July 2026 analysis. *See Dellasala v. Samba TV*, Inc., 2026 WL 1138358, at *6–7 (N.D. Cal. Apr. 21, 2026) (finding post-receipt processing insufficient); *Lewis v. Magnite, Inc.*, 2025 WL 3687546 (C.D. Cal. Dec. 4, 2025); *Crano v. Sojern, Inc.*, 2025 WL 2689267 (N.D. Cal. Sept. 19, 2025).

Taken together, the authorities discussed above show that the Court should interpret Section 631(a) broadly, rather than so narrowly as to exclude Google's conduct alleged.

### C. Google's Geolocation Argument Has No Merit.

For the reasons set forth in Section II-B-4 above, explaining how CIPA targets Taps and Bugs in sequence, the pertinent inquiry for Plaintiffs' allegations that Google used a Bug is whether

Google learned contents while the communications were "being sent from, or received at any place within this state." Cal. Pen. Code § 631(a).

The California nexus is satisfied because the alleged operative receiving redirected communications was Google. Google's receipt of contents happened while the contents were "being … received at" a place in California because Google was receiving them in California. *See* SAC ¶ 14; *Doe v. Meta Platforms, Inc.*, 690 F. Supp. 3d 1064, 1080 (N.D. Cal. 2023) (allegations defendant "effectuated its scheme to track …patient communications …from California" sufficient); *Doe v. FullStory, Inc.*, 712 F. Supp. 3d 1244, 1260 (N.D. Cal. 2024) (alleged "practice, … interception, and … use of the data in California by [California-based defendant] sufficient.)

The Federal Wiretap Act is in accord. In *U.S. v. Leung*, 471 F.3d 1107, 1109 (9th Cir. 2006), the Ninth Circuit explained that, for purposes of the analog federal statute, an interception "occurs where the tapped phone is located and where [the interceptor] first overhear[s] the call."

Google's authorities are not on point. *Adler v. Community.com, Inc.*, 2021 WL 4805435 (C.D. Cal. Aug. 2, 2021) concerned text messages that had already been delivered. There was no Tap or Bug, the complaint was that celebrities used a middleman to receive fans' text messages. *Valenzuela v. Super Bright LEDs Inc.* 2023 WL 8424472, at *10 (C.D. Cal. Nov. 27, 2023) confirms that "being" received requires contemporaneous acquisition (alleged here), and *distinguished* the failed allegations in that case from "third-party software that caused the plaintiff's web browser to send communications directly to the third party" (also alleged here). *See* § II-A.

Separately, because Plaintiffs John Doe II and John Doe IV are both residents of California (SAC ¶¶ 7-8) who communicated with Kaiser, based in California (SAC ¶ 43-44), the Court should, at the very least, sustain their Section 631 claims. First, their communications were always sent or received in California because Kaiser was a party. Second, it is not plausible that either Plaintiff, who each allege multiple communications with Kaiser (*see id.*), happened to have left the State each time they needed to seek medical care.

## III. <u>CONCLUSION</u>

The Court should deny Google's Motion for Judgment on the Pleadings.

Dated: August 7, 2026

**BARNES LAW, LLC**

*/s/ Jason 'Jay' Barnes*
Jason 'Jay' Barnes, State Bar No. 362766
*jaybarnes@barnes.law*
231 Madison Street, Third Floor
Jefferson City, MO 65101
Telephone: (573) 308-7658
Facsimile: (573) 635-7414

**LOWEY DANNENBERG, P.C.**
Christian Levis (admitted *pro hac vice*)
*clevis@lowey.com*
Amanda Fiorilla (admitted *pro hac vice*)
*afiorilla@lowey.com*
44 South Broadway, Suite 1100
White Plains, NY 10601
Tel.: (914) 997-0500
Fax: (914) 997-0035

**KIESEL LAW LLP**
Jeffrey A. Koncius, State Bar No. 189803
*koncius@kiesel.law*
Nicole Ramirez Jones, State Bar No. 279017
*ramirezjones@kiesel.law*
8648 Wilshire Boulevard
Beverly Hills, CA 90211-2910
Tel.: 310-854-4444
Fax: 310-854-0812

**LIEFF CABRASER HEIMANN & BERNSTEIN, LLP**
Michael W. Sobol, State Bar No. 194857
*msobol@lchb.com*
Melissa Gardner, State Bar No. 289096
*mgardner@lchb.com*
275 Battery Street, 29th Floor
San Francisco, CA 94111-3339
Tel.: 415 956-1000
Fax: 415-956-1008

Douglas Cuthbertson (admitted *pro hac vice*)
*dcuthbertson@lchb.com*
Jahi Liburd (admitted *pro hac vice*)
jliburd@lchb.com
250 Hudson Street, 8th Floor
New York, NY 10013

Tel.: 212 355-9500
Fax: 212-355-9592

**SCOTT+SCOTT ATTORNEYS AT LAW LLP**
Hal D. Cunningham, State Bar No. 243048
*hcunningham@scott-scott.com*
Sean Russell, State Bar No. 308962
*srussell@scott-scott.com*
600 W. Broadway, Suite 3300
San Diego, CA 92101
Tel.: (619) 233-4565
Fax: (619) 233-0508

Joseph P. Guglielmo (admitted *pro hac vice*)
*jguglielmo@scott-scott.com*
Ethan Binder (admitted *pro hac vice*)
*ebinder@scott-scott.com*
230 Park Ave., 17th Floor
New York, NY 10169
Tel.: (212) 223-6444
Fax: (212) 223-6334

*Attorneys for Plaintiffs and the Proposed Class*

**ATTESTATION**

Pursuant to Civil Local Rule 5-1(h)(3), I hereby attest that all signatories listed, and on whose behalf the filing is submitted, concur in the filing's content and have authorized the filing.

Dated: August 7, 2026

*/s/ Melissa Gardner*
Melissa Gardner